## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

THE LITTLE ROCK DOWNTOWN NEIGHBORHOOD
ASSOCIATION, INC., THE PETTAWAY NEIGHBORHOOD
ASSOCIATION, THE HANGER HILL NEIGHBORHOOD
ASSOCIATION, THE FOREST HILLS NEIGHBORHOOD
ASSOCIATION, INC., THE COALITION OF
LITTLE ROCK NEIGHBORHOODS, INC.,
ARKANSAS COMMUNITIES ORGANIZATION, INC.,
JOSHUA SILVERSTEIN, DALE PEKAR,
JOHN HEDRICK, DENISE ENNETT,
ROHN MUSE, BARBARA BARROWS
and KATHY WELLS                                           **PLAINTIFFS**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 20 2019

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**Vs.**                    **Case No.** _4:19cv362-JM_

FEDERAL HIGHWAY ADMINISTRATION,
UNITED STATES DEPARTMENT OF TRANSPORTATION;
ANGEL L. CORREA, DIVISION ADMINISTRATOR,
ARKANSAS DIVISION, FEDERAL HIGHWAY
ADMINISTRATION; and
ARKANSAS DEPARTMENT OF
TRANSPORTATION and SCOTT BENNETT
DIRECTOR, ARKANSAS DEPARTMENT OF
TRANSPORTATION                                            **DEFENDANTS**

This case assigned to District Judge _Moody_
and to Magistrate Judge _____

## COMPLAINT FOR DECLARATORY JUDGMENT,
## AND FOR
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Come the Plaintiffs, The Downtown Little Rock Neighborhood Association, Inc.,

Pettaway Neighborhood Association, The Hanger Hill Neighborhood Association, Inc., The

Forest Hills Neighborhood Association, Inc., the Coalition of Little Rock, Neighborhoods, The

Arkansas Communities Organization, Inc. ("the Organizational Plaintiffs"), and Joshua

Silverstein, Dale Pekar, John Hedrick, Denise Ennett, Rohn Muse, Barbara Barrows and Kathy

Wells ("the Individual Plaintiffs"), (collectively herein "the Plaintiffs"), and for their cause of

action against the Defendants, Federal Highway Administration, United States Department Of

Transportation ("FHWA); Angel L. Correa, Division Administrator, Arkansas Division, Federal

Highway Administration; the Arkansas Department of Transportation ("ArDOT"), and Scott

Bennett, Director, Arkansas Department of Transportation, state:

### *NATURE OF THE CASE*

1.      This Complaint seeks declaratory and injunctive relief against the Defendants for their

failure to comply with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C.

§§4321 – 70a; the implementing regulations for NEPA issued by the White House Council on

Environmental Quality ("CEQ" and "the CEQ Regulations"), 40 C.F.R. §§1500 – 08; the

Department of Transportation Act ("DOTA"), 49 U.S.C. §303; the Federal-Aid Highway Act

("FAHA"), 23 U.S.C. §138; the Safe, Accountable, Flexible, Efficient Transportation Act of

2005 (SAFETA), 109 Pub. L. 59, 119 Stat. 1144 (variously codified); the Federal Water

Pollution Control Act (Clean Water Act), 33 U.S.C. §§ 1311, 1344; Executive Orders 12898 and

11988; and regulations implementing those acts;

2.      The action arises from the Defendants' approval and issuance of an Environmental

Assessment ("EA") dated June 8, 2018, and a Finding of No Significant Impact ("FONSI") dated

February 26, 2018, and other documents prepared by the Defendants and their consultants,

selecting and approving Alternative 2B described in the said EA and the FONSI as the preferred

alternative for the widening and reconstruction of a 7.3 mile section of Interstates 30 and 40 in

the cities of Little Rock and North Little Rock generally described as the area between the

intersections of Interstate 530, Interstate 440, and Interstate 30 on the south, and the intersections

of Interstate 30, Interstate 40 and Highway 67/167 on the north, commonly referred to as "the 30

2

Crossing Project", or simply "the Project." A map of the Project area is shown in the following

Figure No. 1. Interchanges with other major highways that will also be rebuilt are circled.



4

3.     The 30 Crossing Project is the largest highway project ever undertaken in the State of

Arkansas. It is currently estimated to cost in excess of One Billion Dollars ($1,000,000,000.) and

require four years to construct. It is the major north-south highway corridor in the State. It is a

major regional corridor between the southwest and eastern United States, and its construction as

currently designed would directly, indirectly and permanently impact traffic patterns throughout

central Arkansas and the lives of the residents in that area.

4.     In approving the EA and issuance of the FONSI, the Defendants failed to comply with

the procedures for gathering information, public participation, and decision-making set forth in

NEPA, the Department of Transportation Act ("DOTA"), 49 U.S.C. §303; the Federal-Aid

Highway Act ("FAHA"), 23 U.S.C. §138; the Safe, Accountable, Flexible, Efficient

Transportation Act of 2005 (SAFETA), the regulations implementing those statutes, and

Executive Orders 12898 and 11988, as more fully described herein. Specifically, but without

limitation, the Defendants failed to comply with procedural requirements regarding the purpose

and intent of the proposed action; analysis of alternatives to the proposed action; direct, indirect

and cumulative impacts; and mitigating measures.

5.     The Defendants' failure to make the determinations described in the preceding paragraph,

and their procedures, findings, conclusions, and actions in approving the EA and FONSI were

arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law (5 U.S.C.

§706(2)(A)), as more fully described herein.

6.     The Organizational Plaintiffs are organizations that represent owners and residents of

homes, apartments and condominiums in geographic areas bordering the 30 Corridor Project area

or in adjacent areas who will be exceptionally and severely affected by impacts on the human

environment that will occur as a result of the 30 Corridor Project that have not been considered

by the Defendants in the EA and FONSI. Such adverse effects include increased traffic and noise, diminished air quality, permanent and irreparable change and damage to the historic quality of the affected neighborhoods, damage to the affected neighborhoods' social, aesthetic and economic qualities, traffic usage and patterns, and safety. The members of the Organizational Plaintiffs will be adversely affected or aggrieved by the action of the Defendant agencies in approving the EA and FONSI. The Organizational Plaintiffs have been authorized by their members or governing boards to represent the interests of their members in this litigation, and have standing to sue on behalf of their members pursuant to 5 U.S.C. §702.

7.      The Individual Plaintiffs are persons who live in or near the 30 Corridor area, and who will be exceptionally and severely damaged, prejudiced and aggrieved by the actions and omissions of the Defendants in their failure to company with the requirements of NEPA and the above cited statutes and regulations, in that the Project would cause impacts on the human environment from increased traffic and noise, diminished air quality, permanent and irreparable change and damage to the project area's historic quality, damage to the area's social and economic qualities, disruptive traffic usage and patterns, and decreased safety, thereby preventing the Individual Plaintiffs from enjoying their homes, neighborhoods and quality of life. The Project will also adversely affect the ability of the Individual Plaintiffs to use I-30, I-630, I-40 and Highway 67/167 in their daily activities. Such impacts have not been assessed by the Defendants in preparation of the EA or FONSI. The Individual Plaintiffs will be adversely affected or aggrieved by the action of the Defendants in approving the EA and FONSI, and thus have standing to sue pursuant to 5 U.S.C. §702.

8.      A Motion for Preliminary and Permanent Injunction will be filed following the filing of this Complaint. Upon hearing on such Motion, the status quo ante should be maintained and

6

Defendants should be temporarily restrained and enjoined from conducting or allowing any work on the 30 Corridor Project that would alter or modify I- 30 or that would otherwise limit the choice of reasonable alternatives to the Preferred Action described herein unless and until such time as a hearing on a permanent injunction may be conducted in this matter; that upon such hearing, a permanent injunction should be issued and the Defendants permanently enjoined until they have fully complied with the requirements of NEPA and its implementing regulations as described herein.

### *JURISDICTION AND VENUE*

9.      This Court has jurisdiction over this action under 28 USC §1331 (Federal Question); 28 USC §1361 (Mandamus); 28 U.S.C. §1651 (Writs); 28 U.S.C. §§2201-02 (Declaratory Judgment Act); and 5 U.S.C. §§701 *et seq*. (Administrative Procedure Act).

10.     This Court has a right of review of administrative actions by the Defendant, U.S. Department of Transportation, Federal Highway Administration pursuant to 5 U.S.C. §702 (Administrative Procedure Act).

11.     Venue of this action is proper in this Court under 28 U.S.C. §1391(e), in that a substantial part of the events or omissions giving rise to the claims occurred, and the property that is the subject of the action, is situated in this District and Division.

### *THE PARTIES*

#### *Plaintiffs*

12.     The organizational Plaintiff, Little Rock Downtown Neighborhood Association, Inc. ("DNA"), is a not-for-profit corporation organized and existing under the laws of the State of Arkansas. The geographic area covered by the DNA includes an area of Little Rock bounded on

7

the east by South Louisiana Street, on the north by the Arkansas River, on the west by Dr. Martin
Luther King, Jr., Dr., and on the south by West Roosevelt Road. Among the purposes of the
DNA are to preserve and protect the environment of the area and its historic character and
values. The members of the DNA are concerned about increases in traffic volumes and patterns,
noise and air pollution that would result in the neighborhood in which they reside; the negative
effect that widening of I-30 will have on the social and economic environment of downtown
Little Rock and particularly those portions of Little Rock on each side of the 30 Corridor, in the
River Market District and in the area of the Clinton Presidential Library and Heifer International
Headquarters. They are also concerned about, among other issues, the direct, indirect and
cumulative impacts that the widening of both I-30 and I-630 will have on their neighborhood and
the historic areas immediately north and south of I-630 and west of I-30, and the failure of the
Defendants to consider all reasonable and seasonable alternatives to the proposed action,
including, without limitation, improvements to public transportation and environmental justice.

13.     The organizational Plaintiff, The Pettaway Neighborhood Association, Inc., ("PNA"), is a
not-for-profit corporation organized and existing under the laws of the State of Arkansas. The
geographic area covered by the PNA includes an area bounded on the east by I-30, on the north
by I-630, on the west by Main Street and on the south by west Roosevelt Road. Among the
purposes of the PNA are to preserve and protect the environment of the area and its historic
character and values. The members of the PNA are concerned about increases in traffic volumes
and patterns, noise and air pollution that would result in the neighborhood in which they reside;
the negative effect that widening of I-30 will have on the social and economic environment of
downtown Little Rock and particularly those portions of Little Rock on each side of the 30
Corridor, in the River Market District and in the area of the Clinton Presidential Library and

8

Heifer International Headquarters. They are also concerned about, among other issues, the direct, indirect and cumulative impacts that the widening of both I-30 and I-630 will have on their neighborhood and the historic areas immediately north and south of I-630 and west of I-30, and the failure of the Defendants to consider all reasonable and seasonable alternatives to the proposed action, including, without limitation, improvements to public transportation and environmental justice.

14.     The organizational Plaintiff, The Hanger Hill Neighborhood Association, Inc. ("HHNA"), is a not-for-profit corporation organized and existing under the laws of the State of Arkansas. The geographic area covered by the HHNA includes the area bounded by I-30 on the west, East 6th Street on the north, rail lines on the east, and East 17th Street on the south. Among the purposes of the HHNA are to preserve and protect the environment of the area and its historic character and values. The members of the HHNA are concerned about increases in traffic volumes and patterns, noise and air pollution that would result in the neighborhood in which they reside; the negative effect that widening of I-30 will have on the social and economic environment of downtown Little Rock and particularly those portions of Little Rock on each side of the 30 Corridor, in the River Market District and in the area of the Clinton Presidential Library and Heifer International Headquarters. They are also concerned about, among other issues, the direct, indirect and cumulative impacts that the widening of both I-30 and I-630 will have on their neighborhood and the historic areas immediately north and south of I-630 and west of I-30, and the failure of the Defendants to consider all reasonable and seasonable alternatives to the proposed action, including, without limitation, improvements to public transportation and environmental justice.

9

15.     The organizational Plaintiff, Forest Hills Neighborhood Association ("FHNA"), is a not-for-profit corporation organized and existing under the laws of the State of Arkansas. The geographic area covered by the FHNA including I-630 on the north, South Pine Street on the east, West 12th Street on the south, and Jonesboro Drive on the west. Among the purposes of the FHNA are to preserve and protect the environment of the area and its historic character and values. The members of the FHNA are concerned about increases in traffic volumes and patterns, noise and air pollution that would result in the neighborhood in which they reside; the negative effect that widening of I-30 will have on the social and economic environment of downtown Little Rock and particularly those portions of Little Rock on each side of the 30 and I-630 Corridor, in the River Market District and in the area of the Clinton Presidential Library and Heifer International Headquarters. They are also concerned about, among other issues, the cumulative impacts that the widening of I-30 will have on I-630 and on their neighborhood, particularly the traffic congestion that is predicted to occur on I-630 as a result of the 30 Crossing Project, and the failure of the Defendants to consider all reasonable and seasonable alternatives to the proposed action, including, without limitation, improvements to public transportation and environmental justice.

16.     The organizational Plaintiff, The Coalition of Little Rock Neighborhoods, Inc. ("the Coalition"), is a not-for-profit corporation organized and existing under the laws of the State of Arkansas. Among the purposes of the FHNA are to assist in, coordinate and promote the development, maintenance and activities of the various neighborhood associations in the City of Little Rock; to assist in the distribution of information among such organizations for their mutual benefit; to promote quality residential life in Little Rock as a vital part of maintaining a healthy city economy; and to provide a voice for the neighborhood associations of the City with local

10

and state government. The Coalition is concerned about increases in traffic volumes and patterns, noise and air pollution that would result in the neighborhood in which they reside; the negative effect that widening of I-30 will have on the social and economic environment of downtown Little Rock and particularly those portions of Little Rock on each side of the 30 and I-630 Corridor, in the River Market District and in the area of the Clinton Presidential Library and Heifer International Headquarters. They are also concerned about, among other issues, the cumulative impacts that the widening of I-30 will have on I-630 and on their neighborhood, particularly the traffic congestion that is predicted to occur on I-630 as a result of the 30 Crossing Project, and the failure of the Defendants to consider all reasonable and seasonable alternatives to the proposed action, including, without limitation, improvements to public transportation and environmental justice.

17.     The organizational Plaintiff, the Arkansas Communities Organization, Inc. (ACO) is an Arkansas non-profit corporation dedicated to bringing low-income and working Arkansans together to win changes that improve the health, income and opportunities for people in our communities; guarantee a brighter future for our children; and give ordinary Arkansans a voice in major policy decisions in both government and private business. ACO is concerned about the 30 Crossing Project and its potentially disproportionate impacts on low-income and minority populations in the Little Rock area, the potentially adverse impacts on the health of children of the Project, and the potentially adverse impacts on the economy and property values in the low-income and minority populated areas surrounding the 30 Corridor and I-630, particularly in view of the experiences of those areas from the construction of I-630.

18.     The Plaintiff, Joshua Silverstein, is a resident and citizen of Little Rock, Arkansas. Mr. Silverstein resides in a high-rise condominium building immediately adjacent to the intersection

of I-30 and Highway 10 (aka Cantrell Road/LaHarpe Boulevard). He also is a professor of law at the University of Arkansas at Little Rock, William H. Bowen School of Law in Little Rock which is located in the northwest corner of the intersection of I-30 and I-630, although he brings this action in his individual capacity and not on behalf of the University of Arkansas or any subdivision thereof.. He is concerned about the effects on his neighborhood and work environment as a result the replacement of the Highway 10/I-30 interchange and the proposed new entrance and exit ramps onto and exiting from I-30; the proposed I-30 overpasses of Little Rock city streets; increases in traffic volume, traffic patterns, noise and air pollution that would result in the neighborhood in which he resides; the potentially negative effect that widening of I-30 will have on the social and economic environment of downtown Little Rock and particularly those portions of Little Rock in the River Market District, in the area of the Clinton Presidential Library and Heifer International Headquarters, and on each side of the 30 Corridor. He is also concerned about the direct, indirect and cumulative impacts that the widening of both I-30 and I-630 will have on his neighborhood and the historic areas immediately north and south of I-630 and west of I-30, and the failure of the Defendants to consider other alternatives to the proposed expansion, including improvements to public transportation.

19.     The Plaintiff, Dale Pekar, is a resident and citizen of Little Rock, Arkansas. He resides on Rock Street, a residential area in the City of Little Rock immediately west of I-30. Mr. Pekar was formerly an economist and a supervisory planning team leader with the US Army Corps of Engineers, the U.S. Forest Service and the Natural Resources Conservation Service of the USDA (US Department of Agriculture) in conducting environmental analyses pursuant to the provisions of the National Environmental Policy Act. Mr. Pekar is concerned about the increases in traffic volumes, changes in traffic patterns, noise and air pollution that would result in the neighborhood

12

in which he resides; the negative effect that widening of I-30 will have on the social, aesthetic and economic environment of downtown Little Rock and particularly those portions of Little Rock in the River Market District, the Clinton Presidential Library and Heifer International Headquarters, and on each side of the 30 Corridor. He is also concerned about the direct, indirect and cumulative impacts that the widening of both I-30 and I-630 will have on his neighborhood and the historic areas immediately north and south of I-630 and west of I-30, and the failure of the Defendants to consider other alternatives to the proposed expansion, including improvements to public transportation and environmental justice to low-income and minority areas in the Project area.

20.     The Plaintiff, John Hedrick, is a resident and citizen of Little Rock, Arkansas. Mr. Hedrick has had many years of experience in managing, operating and overseeing transportation authorities and systems, including highways, light rail, railroads and bus transportation. Mr. Hedrick resides on East 15th Street in Little Rock south of I-630 and immediately west of the I-30 Corridor Project area. He is also concerned about the increases in traffic volumes and patterns, noise and air pollution that would result in the neighborhood in which he resides; the negative effect that widening of I-30 will have on the social, aesthetic and economic environment of downtown Little Rock and particularly those portions of Little Rock in the River Market District, the area of the Clinton Presidential Library and Heifer International Headquarters, and on each side of the 30 Corridor. He is also concerned about the direct, indirect and cumulative impacts that the widening of both I-30 and I-630 will have on his neighborhood and the historic areas immediately north and south of I-630 and west of I-30, the failure of the Defendants to consider other alternatives to the proposed expansion, including improvements to public transportation and environmental justice to low-income and minority areas in the Project

13

area.

21.     The Plaintiff, Denise Ennett, is a resident of the City of Little Rock, residing at the

intersection of I-30 with I-630. She is the immediate past president of the Plaintiff, Little Rock

Downtown Neighborhood Association, Inc. ("DNA"), and is concerned about the increases in

traffic volumes and patterns, noise and air pollution that would result in the neighborhood in

which she resides; the negative effect that widening of I-30 will have on the social, aesthetic and

economic environment of downtown Little Rock and particularly those residential portions of

Little Rock on each side of the 30 Corridor, in the River Market District and in the area of the

Clinton Presidential Library and Heifer International Headquarters. She is also concerned about,

among other issues, the direct, indirect and cumulative impacts that the widening of both I-30

and I-630 will have on her neighborhood and the historic areas immediately north and south of I-

630 and west of I-30, and the failure of the Defendants to consider all reasonable and seasonable

alternatives to the proposed action, including, without limitation, improvements to public

transportation and environmental justice to low-income and minority areas in the Project area.

22.     The Plaintiff, Rohn Muse, is a resident of the City of Little Rock, residing at in an area

immediately south of I-630. He is the immediate past president of the Plaintiff, Forest Hills

Neighborhood Association, Inc. ("FHNA"), and is concerned about the increases in traffic

volumes, patterns, congestion, noise and air pollution as a result of the 30 Corridor Project that

would result in the areas of I-630 and arteries to I-630 in which he resides; the negative effect

that widening of I-30 will have on the social, aesthetic and economic environment of downtown

Little Rock and particularly those residential portions of Little Rock on each side of the 30

Corridor, in the River Market District and in the area of the Clinton Presidential Library and

14

Heifer International Headquarters. He is also concerned about, among other issues, the direct, indirect and cumulative impacts that the widening of both I-30 and I-630 will have on her neighborhood and the historic areas immediately north and south of I-630 and west of I-30, and the failure of the Defendants to consider all reasonable and seasonable alternatives to the proposed action, including, without limitation, improvements to public transportation and environmental justice to low-income and minority areas in the Project area.

23.     The Plaintiff, Barbara Barrows, is a resident of the City of Little Rock, residing at the intersection of I-30 with I-630. She is the immediate past president of the Plaintiff, Hanger Hill Neighborhood Association, Inc. ("HHNA"), and is concerned about the increases in traffic volumes and patterns, noise and air pollution that would result in the neighborhood in which she resides; the negative effect that widening of I-30 will have on the social, aesthetic and economic environment of downtown Little Rock and particularly those residential portions of Little Rock on each side of the 30 Corridor, in the River Market District and in the area of the Clinton Presidential Library and Heifer International Headquarters. She is also concerned about, among other issues, the direct, indirect and cumulative impacts that the widening of both I-30 and I-630 will have on her neighborhood and the historic areas in Hanger Hill and those immediately north and south of I-630 and west of I-30, and the failure of the Defendants to consider all reasonable and seasonable alternatives to the proposed action, including, without limitation, improvements to public transportation and environmental justice to low-income and minority areas in the Project area.

24.     The Plaintiff, Kathy Wells, is a resident of the City of Little Rock, residing in the historic neighborhood in downtown Little Rock. She is the president of the Plaintiff organization, Coalition of Little Rock Neighborhoods (CLRN), and has long been an activist for neighborhood

15

associations and civic causes in the City of Little Rock. She has resided for many years in the

area immediately west of I-30 and north of I-630, and is concerned about the increases in traffic

volumes and patterns, noise and air pollution that would result in the neighborhood in which she

resides; the negative effect that widening of I-30 will have on the social, aesthetic and economic

environment of downtown Little Rock and particularly those residential portions of Little Rock

on each side of the 30 Corridor, in the River Market District and in the area of the Clinton

Presidential Library and Heifer International Headquarters. She is also concerned about, among

other issues, the direct, indirect and cumulative impacts that the widening of both I-30 and I-630

will have on her neighborhood and the historic areas east of and immediately west of I-30 and

south of I-630. She is also concerned about the failure of the Defendants to consider all

reasonable and seasonable alternatives to the proposed action, including, without limitation,

improvements to public transportation and environmental justice to low-income and minority

areas in the Project area.


### *Defendants*

25.     Defendant, Federal Highway Administration ("FHWA"), United States Department of

Transportation, is an agency of the Executive Department of the United States of America. The

FHWA has been delegated responsibility for, among other things, construction, management,

administration, regulation and oversight of various highways and transportation facilities and

their development and funding, and for conducting environmental assessments and

environmental impact statements to determine the impact of proposed highway and transit

development on the human environment prior to construction according to the mandates of

NEPA, the Department of Transportation Act ("DOTA"), the Federal-Aid Highway Act

("FAHA"), the Federal Transit Act ("FTA"), and the Safe, Accountable, Flexible, Efficient

Transportation Act of 2005 (SAFETA).

26.     The Defendant, Angel L. Correa, is an individual resident of the State of Arkansas, and is

currently serving as the Division Administrator, Arkansas Division of the Defendant Federal

Highway Administration ("FHWA"). As such, he is responsible for implementing and

overseeing the performance of all of the functions and responsibilities of the Federal Highway

Administration in the State of Arkansas. Defendant Correa approved the Environmental

Assessment prepared by the Defendant, Arkansas Department of Transportation dated June 8,

2018, and signed the Finding of No Significant Impact issued by the FHWA on February 26,

2019. He is joined as a Defendant in his representative capacity as such Division Administrator.

27.     The Arkansas State Transportation Department (formerly named Arkansas State

Highway and Transportation Department) ("ArDOT") is an agency of the State of Arkansas with

its principal offices in Pulaski County, Arkansas. ArDOT has the responsibility, among others, to

plan, design, construct and maintain highways and roads in the State of Arkansas; to enter into

agreements with the FHWA regarding Federal funding for highway construction; and to

coordination with other agencies of the state and federal government, including FHWA, having

transportation responsibilities (Ark. Code Ann. § 27-1-102). ArDOT prepared the Environmental

Assessment dated June 6, 2018 that was approved by the FHWA in its FONSI dated February

26, 2019, and will implement the construction of the proposed 30 Corridor Project.

28.     The Defendant, Scott Bennett, is the current Director of the Arkansas Department of

Transportation. As such, he is responsible for implementing and overseeing the performance of

all of the functions and responsibilities of the Arkansas Department of Transportation in the State

of Arkansas. Defendant Bennett is joined as a Defendant in his representative capacity as such

17

Director.

### *FACTUAL BACKGROUND*

29.     In 2012, through Amendment 91 to the Constitution of Arkansas, the citizens of Arkansas

approved a 10-year, half-cent sales tax to improve the state's Four-Lane Highway system. It was

anticipated that an estimated $1.8 billion would be raised by the tax and 70% of that will be

spent on design and construction and widening of highway projects, with the other 30% to be

allocated to counties and cities for use on their roads and streets. (Source: Connecting Arkansas

Program website)

30.     The Arkansas Department of Transportation (ArDOT) conceived a program called "The

Connecting Arkansas Program" (CAP) by which the State's share (70%) of the monies derived

from the Amendment 91 tax revenues would be expended. Approximate $1.8 Billion is being

allocated to 36 projects in the State of Arkansas, and is the largest highway construction program

ever undertaken by the Department. (Ibid.)

31.     The 30 Corridor Project, which is a part of the "Connecting Arkansas Program," proposes

to expand approximately 7.3 miles of I-30 and I-40 that transects Little Rock and North Little

Rock, generally described in the EA as:

> A portion of Interstate 30 (I-30) from Interstate 530 (I-530) and Interstate 440 (I-440) to Interstate 40 (I-40), including the Arkansas River Bridge, and a portion of I-40 from Highway (Hwy) 365 (MacArthur Drive) to Highway 67; and a portion of I-40 from its intersection with I-30 to its intersection with 67/167.
> (see Project Map, Figure No. 1)

32.     At the time of the issuance of the draft EA on the 30 Corridor Project for public comment

in June 2018, ArDOT represented to the public that the cost of the Project would be

approximately $650 million. A large percentage of the funds raised by the Amendment 91 are

proposed by ArDOT to be used on the 30 Corridor Project. There is litigation currently pending

in the Circuit Court of Pulaski County to determine whether the funds generated by the

Amendment 91 tax may be expended on the Project.

33.     Another $90 million is being spent by ArDOT on the widening of I-630 between

University Avenue and Baptist Medical Center, and another $90 million is proposed to be spent

by ArDOT on widening of Highway 10 between Pleasant Valley Drive and Pleasant Ridge Road,

and the reworking of the interchange of Highway 10 with I-430. Approximately 60 - 65% of the

costs of those projects are to be derived from the Amendment 91 tax, making a total of

approximately $1 billion proposed to be spent on those three projects in Pulaski County alone.

34.     Beginning in about April, 2014, the ArDOT, in conjunction with the Federal Highway

Administration, began conducting a process referred to as "Planning and Environmental

Linkages ("PEL") that purportedly covered various aspects of the 30 Corridor Project. Meetings

were held with public officials and members of the public, and comments taken. The PEL reports

that were assembled from those meetings and comments were not part of the NEPA

environmental review conducted by the Defendants relative to the 30 Crossing Project, but are

extensively referred to in the Environmental Assessment that is the subject of this litigation.

During that PEL process various alternatives to the proposed Project, many of which were

proposed by the public, were considered and discarded by ArDOT prior to the preparation and

issuance of the Draft Environmental Assessment discussed in the following paragraphs.

Consequently, the public was not provided an opportunity to submit comments on a Draft EA

containing reasonable alternatives that were discarded by ArDOT during the PEL process.

35.     ArDOT prepared and issued a draft Environmental Assessment (EA) for public comment

on June 8, 2018, consisting of approximately 3,800 pages.[1] Most of the Plaintiffs herein and

---

[1]     The draft EA issued for public comment consisted of approximately 3,800 pages,

many other members of the public submitted timely comments upon the draft EA.

36.     No additional drafts of the Environmental Assessment were issued for public comment

by ArDOT, and the EA was approved by FHWA through the issuance of its Finding of No

Significant Impact (FONSI) with a two-page EA "Errata Sheet" on February 26, 2019.

37.     The FONSI adopted and approved a preferred "build" alternative that was Alternative

2B, originally known as "the 6-lane with Collector/Distributor Lanes with Split-Diamond

Interchange Alternative", and also as the "10-lane Downtown C/D." The FONSI determined that

there would be no significant adverse impact upon the human environment from development of

the preferred alternative. A copy of the FONSI dated February 26, 2019 (including the Errata

Sheet) is attached to this Complaint as **Exhibit No. 1**.

38.     No revised draft EA was issued for additional public comment after ArDOT's

consideration of the public comments that were received on the draft EA, and the draft FONSI

was not made available for public review before issuance of the FONSI in final form.

39.     After the closure of the public comment period on the draft EA, and contemporaneously

with the issuance of the FONSI, ArDOT retained a consortium of highway design/construction

consultants who estimated the current cost of the Project as described in the EA to be

approximate One Billion Dollars ($1,000,000,000.00). ArDOT then announced that it did not

have sufficient funds available or budgeted with which to construct the Project as described in

the EA, and that it had requested its design/construction consultants to develop a plan for

construction of as much of the Project as could be done with available funds.

---

including appendices. However, the FONSI issued by FHWA refers to the EA it approved as
consisting of 7,100 pages of which the EA is said to consist of 123 pages. The inconsistency is
not explained in the FONSI.

40.     The development of an alternative plan for reconstruction and widening of the I-30

Corridor with availability of only approximately one-half to two-thirds of the funds that are

necessary to develop the proposed Project as originally designed would result in a significant

change in the scope, design and construction of the Project, with consequential significant

adverse consequences, effects and impacts not foreseen or analyzed by the EA or the FONSI,

and on which the public has not been provided an opportunity to comment.

41.     In addition, Plaintiffs disagree with the manner in which preparation of the EA was

conducted, and the adequacy and conclusions of the Final EA and the FONSI. There are serious

flaws and deficiencies in the EA that fail to meet the requirements of the National Environmental

Policy Act (NEPA), the Federal Transportation Act (FTA) and the Federal-Aid Highway Act

("FAHA"), Executive Orders 12898 and 11988 and other applicable laws, and that require the

development of a full-blown Environmental Impact Statement. Those flaws and deficiencies will

be described herein.

### The Defendants' Final Agency Action
### And The Administrative Procedure Act

42.     The Federal Highway Administration's approval of the FONSI dated February 26, 2019,

constitutes "final agency action" within the meaning of sections 702 and 704 of the

Administrative Procedure Act, 5 U.S.C. §§702, 704.

43.     The Plaintiffs are "persons adversely affected or aggrieved" by the Defendants' final

agency action within the meaning of §702 of the Administrative Procedure Act, 5 USC §702.

All Plaintiffs are concerned about the effect of the Facility on their human environment as

described in the preceding paragraphs.

44.     Plaintiffs have exhausted all administrative remedies by submitting written comments to

the FHWA throughout the environmental review process and appearing at public hearings on the

Project. All issues raised in this complaint were raised before by Plaintiffs, other public

commenters, or government agencies prior to the Project's approval.

45.     For these reasons and those set forth herein, the FONSI and the EA upon which it is

based should be held to be arbitrary, capricious, and not in compliance with the requirements of

NEPA and its implementing regulations and other applicable laws and regulations, and thus void.


### APPLICABLE LAWS

### The National Environmental Policy Act


46.     In 1969, Congress, "recognizing the profound impact of man's activity on the

interrelations of all components of the natural environment, particularly the profound influences

of population growth, high-density urbanization, industrial expansion, resource exploitation, and

new and expanding technological advances, and recognizing further the critical importance of

restoring and maintaining environmental quality to the overall welfare and development of man,"

enacted NEPA, declaring it to be "the continuing policy of the Federal Government ... to use all

practical means and measures ... to create and maintain conditions under which man and nature

can exist in productive harmony, and fulfill the social, economic and other requirements of

present and future generations of Americans." (NEPA §101(a), 42 USC §4331(a)). NEPA was

signed into law by President Richard M. Nixon on January 1, 1970. (Pub. L. 91-190, 42 U.S.C.

4321-4347)

47.     NEPA is our basic national charter for protection of the environment. 40 CFR §1500.1(a)

It establishes policy, sets goals, and provides means for carrying out the policy.  Section 102(2)

of NEPA contains "action-forcing" provisions to ensure that Federal agencies act according to

the letter and spirit of the Act.  The President, the Federal agencies and the courts share

responsibility for enforcing the Act so as to achieve the substantive requirements and goals of the

Act.  (Ibid.)

48.     Among the goals set forth in §101(b) of NEPA (42 USC §4331(b)) are to:

a       fulfill the responsibilities of each generation as trustee of the environment
        for each successive generation;

b.      attain the widest range of beneficial uses of the environment without
        degradation, risk to health or safety, or other undesirable and unintended
        consequences;

c.      preserve important historic, cultural and natural aspects of our national
        heritage, and maintain wherever possible, an environment which supports
        diversity and variety of individual  choice; and

d.      enhance the quality of renewable resources and approach the maximum
        attainable recycling of depletable resources.

49.     To achieve those goals and policies, NEPA requires in relevant part that all agencies of

the Federal Government <u>shall</u> include in every recommendation for or report on major Federal

actions significantly affecting the quality of the human environment, a detailed statement by the

responsible official on:

(i)     the environmental impact of the proposed action,

(ii)    the adverse environmental effects which cannot be avoided should the
        proposal be implemented,

(iii)   alternatives to the proposed action (including the "no action" alternative),

(iv)    the relationship between local short-term uses of man's environment and
        the maintenance and enhancement of long-term productivity, and

(v)     any irreversible and irretrievable commitments of resources which would
        be involved in the proposed action should it be implemented.

(NEPA, §102(C), 42 USC §4332(C)) (Underlining supplied)

### *The CEQ Regulations*

50.     Pursuant to NEPA §202 (42 USC §4342) and Executive Orders Nos. 11514 and 11991,

the White House Council on Environmental Quality ("CEQ") was created to assist in

promulgating regulations implementing and expounding upon the provisions of NEPA by

requiring that all Federal agencies prepare an Environmental Assessment ("EA") and/or an

Environmental Impact Statement ("EIS") to determine the potential environmental effects of

proposed Federal actions.  Those regulations are promulgated at 40 C.F.R. Part 1500 *et seq*. ("the

CEQ Regulations"), and are binding on all Federal agencies. The CEQ Regulations are generally

entitled to substantial deference, *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341,

60 L.Ed.2d 943 (1979)

51.     Under the CEQ regulations, the process of assessing the environmental impact of a

proposed Federal action is normally divided into three major steps (40 C.F.R. §1501.4):

    A. Preparation of an environmental assessment ("EA"), which is defined as a
       "concise public document that serves to briefly provide sufficient evidence
       and analysis for determining whether the proposed Federal action may
       significantly affect the quality of the human environment; (40 CFR §1508.9).
       The preparation of an EA may be omitted if the agency decides that the
       proposed action merits preparation of an EIS.  (40 CFR §1501.3, 1501.4).

    B. If the EA determines that the proposed federal action will not significantly
       affect the environment, prepare a Finding of No Significant Impact
       ("FONSI"), which is defined as a document briefly presenting the reasons
       why an action will not have a significant effect on the human environment and
       for which an environmental impact statement therefore will not be prepared.
       (40 CFR §1508.13)

    C. If the agency determines that the proposed federal action may significantly
       affect the environment, commence the scoping process to prepare an EIS. (40
       CFR §1501.4)

52.     The CEQ Regulations also address the issue of the scope of a NEPA analysis.  Such

regulations require, among other things, that all reasonable and feasible alternatives to the

proposed action be considered; that the direct, indirect and cumulative effects of a proposed

action that may reasonably be anticipated be included in the EA or EIS; and that measures to

mitigate unavoidable adverse environmental impacts be developed and implemented. The CEQ

regulations further prohibit the "segmentation" of various components of a planned action into

smaller projects to avoid studying the cumulative impacts of the entire action or development.

(40 CFR §§ 1508.25, 1508.27(b)(7)) (Underlining supplied)

53.     The Defendants have violated the requirements of NEPA and the CEQ Regulations in the

ways and manner described herein, and the FONSI issued by the FHWA should be set aside and

voided.

### *The Department of Transportation Act*

54.     The Department of Transportation Act of 1966 includes Section 4(f) requiring the FHWA

to make "special effort . . . to preserve the natural beauty of the countryside and public park and

recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a); *see also*

23 U.S.C. § 138(a). Section 4(f) allows approval of transportation programs or projects

> requiring the use of publicly owned land of a public park, recreation area, or
> wildlife and waterfowl refuge of national, State, or local significance, or land of
> an historic site of national, State, or local significance . . . only if -- (1) there is no
> prudent and feasible alternative to using that land; and (2) the program or project
> includes all possible planning to minimize harm . . . resulting from the use.
> 49 U.S.C. § 303(c). (Underlining supplied)

55.     The word "use" in Section 4(f) is construed broadly and can be either actual use

(physical occupation of the land) or constructive use where a highway significantly and

25

adversely affects park land even though the road or right-of-way does not physically encroach upon the park. The close proximity of a highway project to park, recreational and wilderness areas constitutes a "use" of publicly owned recreation land for purposes of Department of Transportation Act section 4(f). *Conservation Soc. of Southern Vermont v. Secretary of Transp.*, 443 F. Supp. 1320 (D. Vt. 1978).

56.     Section 4(f) creates a presumption that the public parks, recreational and natural resource areas protected by that section may not be used for or impacted by highways unless truly compelling reasons indicate that no alternative to the highway location is possible. The Defendants failed to apply that presumption in its EA and in determining that there would be no significant impact resulting to the parks, recreational and natural resource areas by the 30 Corridor Project.

### *The Clean Water Act*

57.     Congress enacted the Clean Water Act to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, the CWA prohibits the discharge of any pollutant (including fill material) into navigable waters unless authorized by a permit. 33 U.S.C. §§ 1311, 1344. The CWA and its implementing regulations define "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7). Waters of the United States include wetlands adjacent to waters of the United States. 33 C.F.R. § 328.3(b). "Pollutants" include dredged spoil, rock, and sand, among other materials. Id. § 1362(6).

58.     Under the Corps' 404 Guidelines, wetlands are identified as "special aquatic sites" that "are generally recognized as significantly influencing or positively contributing to the general

26

overall environmental health or vitality of the entire ecosystem of a region." 40 C.F.R. § 230.3(q-1); see id. § 230.41.

59.     The CWA authorizes the Secretary of the Army to issue section 404 permits, under certain circumstances, "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." Id. § 1344(a). The Secretary of the Army acts through the Chief of Engineers of the Corps. Id. § 1344(d); 33 C.F.R. § 323.6(a).

60.     CWA section 401, 33 U.S.C. § 1341, requires any applicant for a federal license or permit, including a CWA § 404 permit, that will authorize activities which may result in

a discharge to waters of the United States to provide the federal licensing or permitting agency (including the Corps) with a certification from the State in which the discharge originates or will originate that any such discharge will comply with certain applicable provisions of the CWA. These CWA provisions include requirements to ensure that discharges to waters (including discharges of dredged or fill material) do not impede the water quality standards that, inter alia, are designed to protect aquatic species. Defendants have failed to comply with these provisions of the CWA and its implementing regulations as more particularly set forth herein.

### *The Corps of Engineers Regulations*

61.     NEPA requires that each federal agency develop regulations designed to implement the requirements of NEPA in their activities (NEPA §103, 42 USC §4333), although *the individual agency regulations supplement rather than replace the CEQ regulations*, which remain applicable to all federal agency actions.  (33 CFR §230.1)

62.     Pursuant to that requirement, the COE developed regulations contained at 33 CFR §§230 and 325. The COE regulations make clear that they are intended only to supplement the CEQ

27

regulations contained at 40 C.F.R. Part 1500 through 1508, and that the COE regulations are intended to be used only in conjunction with the CEQ regulations. Whenever the COE regulations are unclear or not specific, the CEQ regulations apply. (33 C.F.R. §230.1)

63.     The EA proposes that up to approximately 20 acres of wetlands will be affected (*i.e.*, filled or otherwise destroyed) by the proposed Project. Such action is controlled by 40 CFR §230.10(a), which states:

> [N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

64.     Furthermore, EPA Guidelines developed in conjunction with the U.S. Army Corps of Engineers further provide that, where the project is not "water dependent" (*i.e.*, must have access or proximity to water or the special aquatic site to fulfill its basic purpose, such as a wharf or harbor), *a presumption exists* that practicable alternatives are available that do not involve special aquatic sites (*i.e.*, wetlands), *unless clearly demonstrated otherwise*. 40 C.F.R. §230.10(a)(3)

65.     The EPA Guidelines also provide that a presumption exists that where a discharge is proposed for a special aquatic site (*i.e.*, wetlands), all practicable alternatives to the proposed discharge that do not involve a discharge into a special aquatic site *have less adverse impact* on the aquatic ecosystem, unless clearly demonstrated otherwise. *Id.*

66.     The Defendants have failed to clearly demonstrate that practical alternatives to the filling of the special aquatic sites noted in the EA do not exist.

### Executive Order 12898
### Environmental Justice

67.     On February 11, 1994, President Bill Clinton issued Executive Order 12898 requiring

that each Federal agency, to the greatest extent practicable, shall make achieving environmental

justice part of its mission by identifying and addressing disproportionately high and adverse

human health or environmental effects of its programs, policies, and activities on minority

populations and low-income populations in the United States and its territories and possessions,

EO 12898, Sec. 1-101

68.     According to the FONSI issued by FHWA, 33% of the households in the study area are

considered to be low-income, and 59% of the population in the Project Study Area are minority

non-white and Hispanic. Twenty-two of the 62 census block groups in the Project Study Area

have median incomes below the poverty guideline.

69.     The EA fails to adequately assess the socio-economic impact of the proposed 30 Corridor

Project upon the minority non-white and Hispanic populations and communities who reside in or

have businesses in the vicinity of the 30 Corridor, and have thus failed to comply with the

requirements of E.O. 12898 as more fully described herein.


### Executive Order 11988
### Floodplain Management (1977)

70.     Executive Order 11988 directs federal agencies to "provide leadership and take action to

reduce the risk of flood loss, to minimize the impacts of floods on human safety, health and

welfare, and to restore and preserve the natural and beneficial values served by floodplains."

71.     This EO was authorized to assist in furthering the National Environmental Policy Act

(NEPA), the National Flood Insurance Act of 1968 (amended), and the Flood Disaster Protection

Act of 1973. Defendants have failed to comply with EO 11988 by failure to conduct a proper

hydraulic and hydrologic analysis of the effect of the proposed Project on flooding in North

Little Rock, Arkansas and in other parts of the I-30 corridor.

### BASIS AND CLAIMS FOR RELIEF

### COUNT 1.

### The 30 Crossing Project Proposed for Construction
### Will Not Be The One Analyzed by the Environmental Assessment

72.     Plaintiffs adopt and ratify all of the preceding allegations of fact set forth above.

73.     ArDOT prepared and issued a draft EA for public comment on June 8, 2018, consisting

of approximately 3,800 pages. The draft EA proposed and examined only two (2) alternatives,

each with two (2) sub-alternatives relative to the configuration of the I-30/Highway 10

Interchange. At the time of the issuance of the Draft EA by ArDOT in June, 2018, construction

of each of the two alternatives with each sub-alternative was estimated to cost approximately

$650 million.

74.     Plaintiffs herein and many other members of the public submitted timely comments based

upon the Draft EA. No Supplemental Draft EA nor a draft FONSI were issued by the Defendants

for public review and comment.

75.     During the period of time after issuance of the Draft EA and the issuance of the FONSI,

ArDOT awarded a contract to a consortium of contractors ("the design/construction team") to

review the proposed Project and provide a proposal for construction of the Project.

76.     After the closure of the public comment period on the draft EA, and prior to or

contemporaneously with the issuance of the FONSI, the design/construction team estimated the

cost of the Project as described in the EA to be approximately One Billion Dollars

($1,000,000,000.00). After issuance of the FONSI, ArDOT announced that it did not have sufficient funds available and budgeted with which to construct the Project as described in the EA, and that it had requested its design/construction consultants to develop a plan for construction of so much of the Project as could be done with the available funds.

77.     The EA, which was based on a project estimated to cost of approximately $535 million, anticipated the lack of funding for the Project as described in the EA, and provides in relation to such contingency:

> The Preferred Alternative is 7.3 miles in length with an estimated cost of between $615 and $700 million. The identified method of delivery of the project is design-build to a budget. The design-builder will work to maximize the amount of project scope that can be delivered for fixed budget of $535 million. In the event that the Design-Build firm cannot provide the full project scope for the fixed budget, *additional construction projects will be programmed and contracts will be let at a future date to complete the project scope.*
> FONSI, p. 6. (Italics added)

78.     Further, Federal Highway Administration statutes and regulations require that, before construction of alterations or changes in interstate highways shall commence, the funding for such work shall be committed and budgeted; *i.e.*, "financially constrained." See 23 U.S.C. §134(j)((3)(d), which provides:

> **(D) Requirement of anticipated full funding.**--The program shall include a project, or an identified phase of a project, only if full funding can reasonably be anticipated to be available for the project or the identified phase within the time period contemplated for completion of the project or the identified phase.

79.     In addition, 23 U.S.C. §135(g)(5)(E), relative to Statewide transportation improvement planning, states:

> **(E) Requirement of anticipated full funding.**--The transportation improvement program shall include a project, or an identified phase of a project, only if full funding can reasonably be anticipated to be available for the project within the time period contemplated for completion of the project.

31

80.   As of the filing of this Complaint, ArDOT has not developed and issued, nor has FHWA approved, a final plan for the construction of an I-30 Corridor Project that is within the financial constraints of ArDOT.

81.   The development of an alternative plan for reconstruction and widening of the I-30 Corridor with only approximately one-half to two-thirds of the funds that are necessary to develop the proposed Project as originally designed will result in a significant change in the scope, extent, design and construction of the Project, and in significant adverse consequences, effects and impacts not foreseen or analyzed by the EA or the FONSI, and on which the public has not been provided an opportunity to comment. Limiting construction on a portion or segment of a project of the magnitude as the 30 Crossing Project could result in partially-altered, partially-constructed segments of roadway, bridges, exit and entry ramps, shoulders, and travel lanes that would create or magnify rather than improve traffic problems.

82.   The lack of ready and available funding renders the entire Environmental Assessment unreliable because all the proclaimed benefits may be illusory; the deferred components may not be completed before the project design year, if ever; and agency decision-makers cannot make an informed decision if they do not know which components of the Project may be deferred due to lack of funds.

83.   Further, 40 CFR §1502.9(c) (Draft, final, and supplemental statements) provides:

   (c) Agencies:

   (1)   Shall prepare supplements to either draft
         or final environmental impact statements if:

         (i) The agency makes substantial changes in
         the proposed action that are relevant to environmental
         concerns; or

         (ii) There are significant new circumstances

32

> or information relevant to environmental concerns
> and bearing on the proposed action or its
> impacts.

84.     The provisions set forth above are equally applicable to draft, final and supplemental environmental assessments.

85.     Any decision of ArDOT to construct the 30 Crossing Project in portions depending on the availability of funding would constitute a "substantial change" in the proposed action from that proposed in the EA, and would also constitute "significant new circumstances or information relevant to environmental concerns." This "No-Commitment-To-Complete" feature of the EA requires the performance of a separate EA or EIS to determine the environmental impact of that portion of the Project that is <u>certain</u> to be performed with available funding, and on which other agencies and the public should be given an opportunity to comment regarding the appropriate prioritization of the separate components.

86.     Further, 23 CFR § §771.129 (Re-evaluations), requires that, before any amendments to an action that has been previously approved by the FHWA may be implemented, the amendments must first be approved by the FHWA to determine whether the environmental documentation remains valid. That Section provides:

> The Administration must determine, prior to granting any new approval related to
> an action or amending any previously approved aspect of an action, including
> mitigation commitments, whether an approved environmental document remains
> valid as described in this section.

87.     Thus, if ArDOT proposes the design and construction of a 30 Corridor Project that is modified or different from that proposed in the EA and FONSI approved by FHWA, then NEPA, its implementing regulations, and FHWA regulations require that the EA be supplemented to consider the alternatives and likely environmental impacts of the modified proposal.

88.     The Court should issue an order prohibiting and enjoining the Defendants from letting

contracts for the construction of any of the 30 Corridor Project until such time as (i) the

Defendants have developed a definite design and plan for the Project that can be constructed

with funds that are available to ArDOT without reservation or restraint; (ii) the designed plan for

such construction has been analyzed by Defendants in an Environmental Impact Statement; (iii)

a draft EIS has been issued for public review and comment; (iv) such public comments have

been received and reviewed by the Defendants and a response summary prepared; and (v) a new

decision document issued by the Defendant, FHWA.

## COUNT 2.

### *Defendants Failed To Make a Final Draft of The EA*
### *Available to the Public for Comment*

89.     Plaintiffs ratify and affirm all of the preceding allegations of fact set forth above.

90.     40 CFR §1501.4(e)(2) (Whether to prepare an environmental impact statement) states:

In determining whether to prepare an environmental impact statement the federal
agency shall:
…

(e)     Prepare a finding of no significant impact (§1508.13), if the agency
determines on the basis of the environmental assessment not to prepare a
statement.

(1) The agency shall make the finding of no significant impact available to the
affected public as specified in §1506.6.

(2) In certain limited circumstances, which the agency may cover in its
procedures under §1507.3, the agency shall make the finding of no significant
impact available for public review (including state and areawide clearinghouses)
for 30 days before the agency makes its final determination whether to prepare an
environmental impact statement and before the action may begin. The
circumstances are:

> (i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to §1507.3, or
>
> (ii) The nature of the proposed action is one without precedent.
>
> (underlining supplied)

91.     The FHWA regulation on issuance of Findings of No Significant Impact is contained in 23 CFR §771.21 (Finding of no significant impact). That section does not contain a provision for the issuance of a FONSI for public review for 30 days before the agency makes it final determination as recommended in 40 CFR §1501.4(e)(2), quoted above.

92.     In the absence of such provision in the regulations of the FHWA applicable to issuance of FONSIs, the provisions of 40 CFR §1501.4(e)(2) are applicable, requiring that the agency shall make the FONSI available for public review … for 30 days before the agency makes its final determination where (i) the proposed action is, *or is closely similar to*, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to §1507.3, or (ii) the nature of the proposed action is one without precedent.

93.     FHWA regulation 23 CFR §771.115 (Classes of actions), which was adopted by the FHWA pursuant to the directive contained in 40 CFR §1507.3, provides three typical "classes" of actions that generally prescribe the level of documentation required in the NEPA process. The first of those three classes are Class I, relating to actions that "normally" require preparation of an EIS. With regard to that Class, the relevant portions of 23 CFR §771.115(a) read as follows:

> **(a)** *EIS (Class I).* Actions that significantly affect the environment require an EIS (40 CFR 1508.27).

The following are examples of actions that normally require an EIS:

(1) A new controlled access freeway.

(2) A highway project of four or more lanes on a new location.

…

94.     The 30 Corridor Project meets the descriptions of subsections (1) and (2) of §771.115(a). Although planned to be constructed largely (but not wholly) within existing right-of-way, the 30 Corridor Project is a complete reconstruction and expansion of I-30, with new controlled accesses and exists, and increased capacity by more than one-third. Over 11 acres of new right-of-way, almost 20 acres of wetland fill, and extensive lateral expansion of the existing roadway of I-30 and I-40 is required for the Project. The Project will almost double the size of the I-30 roadway in many places. It is, without question, *closely similar to* the projects described in 23 CFR §771.115(a) that normally require the preparation of an environmental impact statement under the procedures adopted by the FHWA. Therefore, under 40 CFR §1501.4(e)(2), the Defendant FHWA should have made the draft FONSI available for public comment.

## COUNT 3.

### *The Defendant's Responses to Public Comments*
### *Contain New Information Not Included in the Draft EA*
### *And On Which The Public Was Not Given Opportunity to Comment*

95.     The Defendants' Responses to the public comments contain information that was not included in the draft EA upon which the public submitted comments, and on which the public has not been given the opportunity to comment.

96.     For example, the Defendants' Responses to comments discloses for the first time that an IMPLAN analysis was conducted (page 2386/7100) which showed the potential effects of the

respective alternatives on jobs and income. The effects identified in that IMPLAN analysis
contradict the effect statements in the EA.

97.     Regarding the potential impacts of the Project on proposed development plans in Little
Rock and North Little Rock downtown area, the original EA states:

> Most of the proposed development plans are underway and are not dependent
> upon the construction of the proposed project, nor would they be limited
> should the proposed project not be built; however, there is potential for the
> proposed project to accelerate the rate of the development/redevelopment
> projects."

98.     However, the IMPLAN analysis results for the No-Action Alternative referred to in the
Defendants' Response to Comments indicate that not doing the project could cost the study area
1,800 jobs and will result in reduction of labor income by $84.5 million." EA, page 2386/7100.
This is a significant inconsistency in the content of the draft EA and the Response to Comments.

99.     There is also an inconsistency between the possibility of lost jobs ("could cost the study
area 1,800 jobs") and the statement in the Response that there will be a definite loss in labor
income ("will result in reduction of labor income by $84.5 million"). However, because the
IMPLAN analysis report was not included in the 3992-page-Draft EA it was impossible for the
reader to comment as to the validity of the imputed loss of "labor income" of some $47,000 per
lost job. This is but one example of supplemental information included in the Defendants'
Response to the public comments that was not included in the Draft EA, and on which the public
has been denied the opportunity to comment.

100.    The Court should find that the Defendants violated NEPA's requirements for public
participation in denying opportunity for public comment on the draft FONSI and the Defendants'
response to public comments, set aside and void the FONSI, and remand the FONSI to the
Defendants for further proceedings in accordance with NEPA and applicable regulations.

## COUNT 4.

### Defendants' Notice of Availability of the EA
### For Public Comment Was Misleading And Defective

101.    In its notice of issuance of the EA for public comment, the ArDOT stated that *it invited*

*public comments only on the preferred alternative – not other alternatives*. ArDOT's notice to

the public of the availability of the draft EA for comment read as follows:

> The proposed preferred alternative is the 6-lane with Collector/Distributor (C/D)
> Lanes with Split Diamond Interchange (SDI) at the Highway 10 Interchange.
> ***Please provide comments on the preferred alternative.***
> (Emphasis added)

102.    As a result of this wrongful instruction to the public to limit their comments to the

preferred alternative, members of the public were misled about the acceptable scope of their

comments, and did not submit comments that included other alternatives or impacts or other

subjects that might have otherwise been submitted.

103.    The Court should set aside and void the FONSI and remand this matter to the Defendants

for further proceedings in accordance with NEPA and applicable regulations.

## COUNT 5.

### *NEPA Requires Preparation of an EIS For The Proposed Project*

104.    Plaintiffs ratify and affirm all of the preceding allegations of fact set forth above.

105.    A federal agency must prepare an EIS for all "proposals for legislation and other <u>major</u>

Federal actions <u>significantly affecting</u> the quality of the human environment." 42 U.S.C. §

4332(2)(C). Based upon the CEQ Regulations, the 30 Crossing Project is a "major" Federal

action "significantly affecting the quality of the human environment."

106.    40 CFR §1508.18 defines a "Major Federal Action" as follows:

> "Major federal action" includes actions with effects that may be major and which are potentially subject to federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§1508.27).

107.    40 C.F.R. § 1508.27 further states that the term *"[s]ignificantly* [in "significantly affecting the quality of the human environment"] requires considerations of both context and intensity:"

> (a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), *the affected region,* the affected interests, *and the locality.* Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short and long-term effects are relevant. (Italics added)

> (b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

> > (1) *Impacts that may be both beneficial and adverse.* A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial.

> > (2) *The degree to which the proposed action affects public health or safety.*

> > (3) *Unique characteristics of the geographic area* such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

> > (4) *The degree to which the effects on the quality of the human environment are likely to be highly controversial.*

> > (5) *The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.*

> > (6) *The degree to which the action may establish a precedent for future actions with significant effects* or represents a decision in principle about a future consideration.

(7) *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts*. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. *Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.*

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.
(Italics added)

108.     If any <u>one</u> of the above-listed factors bearing on the "intensity" of the action are present,

an Environmental Impact Statement should be prepared. *National Parks & Conservation Ass'n v.*

*Babbitt*, 241 F.3d 72251 (9th Cir. 2001); *Sierra Club v. United States Forest Serv.,* 843 F.2d

1190, 1193 (9th Cir.1988); *Oregon Wild v. U.S.*, 107 F. Supp. 3d 1102, 1111, (D.Or. 2015).

109.     The proposed 30 Crossing Project clearly contains "intensity", based on the following

analysis of factors listed in 40 C.F.R. § 1508.27:

(a)     ***Impacts that may be both beneficial and adverse. A significant effect may exist even if the federal agency believes that <u>on balance</u> the effect will be beneficial****.*

The weight and significance of the impacts that this Project will have in

the Little Rock-North Little Rock metropolitan region depends on who is

making the assessment and their particular interests that are being served

or trampled. There can be no dispute that this Project <u>will have both</u>

beneficial and adverse impacts. However, in reading the EA, one is left

with the definite impression that it contains a significant amount of

chamber-of-commerce "boosterism" of the benefits, rather than a rigorous exploration and objective analysis of reasonable and feasible alternatives and impacts, such as the environmental and socio-economic impacts on minority and low-income populations. Without that objective analysis, it is impossible for an agency to determine that, "on balance", the effects of the Project will be beneficial or harmful, and if so, to what degree. An EIS would provide a "hard look" into those and other issues that are present in this Project and that is absent from the EA.

(b)   ***The degree to which the proposed action affects public health or safety.*** One of the major justifications by the Defendants for the Project is their oft-repeated contention that public safety will be improved by implementing the preferred alternative. The EA is replete with alleged facts regarding car crashes, personal injuries and property damage that were allegedly attributable to the current configuration of the 30 Corridor, and allegations that the proposed preferred alternative would alleviate those conditions. Public safety is a universal goal, but there are serious issues and disputes between the proponents and opponents of the Project about whether the proposed action is the best way to protect public health or safety, and if so, to what degree. An EIS would be greater clarity to this issue.

**(c)** *Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, or ecologically critical areas.*

> The geographic area included in the 30 Corridor Project includes a complex diversity of characteristics, including urban residential, commercial and industrial properties and park lands and ecologically critical areas, including wetlands. Significantly, the residential neighborhoods in the 30 Corridor contain largely minority and/or low-income populations. Thirty-three percent of the households are considered low-income by Federal standards, and *59% of the total project study area are minority population*. (FONSI, p. 12). There will be displacements of commercial businesses and residential buildings (most of which are in minority areas), and fill of approximately 20 acres of wetlands and ecologically sensitive areas in North Little Rock that could result in increased flooding. In addition, the Project is in close proximity to or directly affects seven historic districts (some of which are represented by Plaintiffs) and 136 properties that are listed on or eligible for the National Registry of Historic Places. (FONSI, pp. 12-13).

**(d)** *The degree to which the effects on the quality of the human environment are likely to be highly controversial.*

> "Controversial" in the context of this regulation means that substantial public controversy exists about whether "substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor, or the size, nature, or effect of the major Federal action rather than the mere existence of opposition to a use. *Native*

42

*Ecosystems Council v. United States Forest Serv.,* 428 F.3d 1233, 1240

(9th Cir. 2005); *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d

72251 (9th Cir. 2001). There is a fine line between controversy about the

purpose, size, nature, alternatives and effects of the proposed action, and

mere "opposition to a use." In this case, there is a bona fide dispute

between a substantial body of the public in central Arkansas and the

Defendants about the purpose, necessity, size, design, nature, alternatives

and effect of the 30 Corridor project as proposed; the lack of alternatives

studied; and the immediate and long-term impacts of the Project on

downtown Little Rock and North Little Rock, population growth, racial

relations, community cohesion and socio-economic disparity (particularly

on low-income and minority groups), among other issues. The Plaintiffs'

opposition is not merely a knee-jerk reaction to change, but scientifically-

supported opposition to ArDOT's knee-jerk solution to congestion by

simply building wider highways. Plaintiffs and their supporters sincerely

propose viable alternatives and solutions that Defendants have given slight

consideration. The substantive public comments received by the

Defendants on the proposed EA, the large majority of which opposed the

Project[2], illustrate that controversy. It is also noteworthy that the former

Metroplan Advisory Board, comprised of approximately 40 citizens of the

5-county Central Arkansas Metro area appointed by members of

---

[2]       351 comments were received by ArDOT on the draft EA. A 261 page Response to those
comments was prepared by ArDOT. See Appendix E to the EA. "Numerous commenters were
opposed to the project." (FONSI, p. 11)

Metroplan to advise Metroplan on this project, overwhelmingly opposed

the Project and formally recommended that the 30 Corridor Project not be

supported by Metroplan.

**(e)** ***The degree to which the possible effects on the human environment are
highly uncertain or involve unique or unknown risks.***

ArDOT acknowledges in the EA that it does not have sufficient funds with

which to construct the 30 Corridor Project as proposed by the EA. It did

not have those funds available and committed as of the issuance of the EA.

That, alone, renders the possible effects of the Project on the human

environment to be highly uncertain and risky. In addition, ArDOT

acknowledges that this is the largest and most ambitious project that it has

ever undertaken; the first highway project in the state to utilize the

"design-build to a budget" method; and the first project to use the

Planning and Environmental Linkage (PEL) study process to determine

possible alternatives that can be carried forward into the NEPA study for

the Project. Also, the EA acknowledges that there are many indirect and

cumulative impacts of the Project that are not addressed (*e.g.*, traffic

"bottlenecks" caused by the Project in areas outside the 30 Corridor that

will require further construction). With so many "firsts," and the other

contingencies and uncertainties that ArDOT has raised in how and when

the Project is to be constructed and the adverse impacts it will cause, it

seems foolhardy to risk the waste of over $1 Billion on unresolved

problems that are very foreseeable and that could be partially or

completely addressed through development of an Environmental Impact

Statement.

**(f)** ***The degree to which the action may establish a precedent for future actions with significant effects.***

The Defendant ArDOT has, in recent years and in recent projects,

demonstrated a willingness and desire to avoid the time and expense to

conduct meaningful environmental assessments prior to construction of its

major projects. For example, ArDOT used a "categorical exclusion" to

avoid conducting an environmental assessment or EIS before construction

of the Big Rock Interchange at the intersection of I-430 and I-630. It also

used a categorical exclusion in lieu of a more extensive study to

commence the major widening of I-630. The 30 Corridor Project is the

largest project ever undertaken by ArDOT and the largest public works

project ever undertaken in Arkansas. Failure to conduct an EIS on a

project of the scope, size and cost of the 30 Corridor Project would set a

precedent for not performing an EIS on any future project.

**(g)** ***Whether the action is related to other actions with individually insignificant but cumulatively significant impacts***

The 30 Corridor Project is inextricably connected with the current

expansion of a portion of I-630 between the Baptist Hospital Exit/Entrance

and University Avenue, proposed future expansions of I-630 to I-30, and

access to Highway 10/Cantrell Road from I-30. It is also related to future

expansions of I-30 south of the proposed "southern terminus" of the 30

Corridor Project, and other future projects on I-40 and Highway 67/167.

Any work of major significance (*i.e.,* widening of roadways, modification

of interchanges, access ramps, *etc.*) on any of those roads has direct,

indirect and cumulative impacts on the others. These impacts will be

discussed in greater detail herein.

110.    Evaluating the Project against the criteria provided by 40 C.F.R. § 1508.27, it is

clear that the characteristics of the Project meet most – not merely one or two – of the

criteria for preparation of an EIS, and the Court should order an EIS to be prepared.

111.    In addition, the sheer size, scope and cost of the 30 Crossing Project clearly call for the

Defendants to conduct an environmental impact statement on the Project. This Project qualifies

as a "project of regional or national significance" pursuant to 23 CFR §505, due to its costing in

excess of $500,000,000. The Project will cover approximately seven (7) miles of an

approximately 200 foot wide swarth of interstate highway through downtown Little Rock and

North Little Rock; will displace at least six (6) families and five (5) businesses; will heavily

impact countless other families and businesses who live or work in the 30 Corridor or who

commute daily on I-30, I-630 and Highway 10 and will be highly affected by construction noise

and dust, increased traffic, and changes in location of access/egress ramps; will further isolate

low-income and minority neighborhoods from the vibrant development in the area west of the 30

Corridor (*e.g.*, River Market, South of Main, etc.) and north of I-630; and, not least, cost over

One Billion Dollars – the largest highway project in the State of Arkansas by far. If this Project

does not require an EIS, then no project will.

112.    The CEQ Regulations do not specify the length of an EA. However, 42 CFR §1508.9

defines an "Environmental Assessment" as (a) "a <u>concise</u> public document for which a federal

agency is responsible that serves to: (1) <u>briefly</u> provide sufficient evidence and analysis for

determining whether to prepare an environmental impact statement or a findings of no significant

impact. ... (b) shall include <u>brief</u> discussions of the need for the proposal of alternatives as

required by section 102(2)(E) of the environmental impacts of the proposed action and

alternatives ... ." (Underlining supplied).

113.     Furthermore, in its guidance document entitled "40 Questions and Answers About The

NEPA Regulations," 46 Fed. Reg. 18026 (March 23, 1981), as amended, CEQ opined:

> While the regulations do not contain pages limits for EA's [sic], the Council has
> generally advised agencies to keep the length of EAs to not more than
> approximately 10-15 pages. Some agencies expressly provide page guidelines
> (e.g., 10-15 pages in the case of the Army Corps). To avoid undue length, the EA
> may incorporate by reference background data to support its concise discussions
> of the proposal and relevant issues.

> Agencies should avoid preparing lengthy EAs except in unusual cases, where a
> proposal is so complex that a concise document cannot meet the goals of Section
> 1508.9, and where it is extremely difficult to determine whether the proposal
> could have significant environmental effects. ***In most cases, however, a lengthy
> EA indicates that an EIS is needed.***

> ("40 Questions": Question and Answer 36 (a) and (b))

114.     Notwithstanding the emphasis on brevity of an EA in the CEQ documents cited above,

the EA that was submitted to the public for comment in this case was almost 4,000 pages in

length. The EA that was approved by the FHWA (which included the public comments and

agency responses) contained 7,100 pages, including 18 appendices. (FONSI, p. 4) As noted in

the above quotation from 40 Questions, *the sheer volume of the EA strongly indicates that an EIS*

*is needed.*

115.     The Court should determine that, under the NEPA Regulations cited above and the

circumstances of this case, an Environmental Impact Statement is required, and remand the case

to the Defendants for preparation of an EIS in accordance with the requirements of NEPA.

## COUNT 6.

### *The Purposes and Needs Section of the Draft EA Does Not Adequately Address the Conditions To Be Addressed By The Project And By Which The Alternatives And Impacts Analysis Are To Be Measured*

116. Plaintiffs ratify and affirm all of the preceding allegations of fact set forth above.

117. 40 CFR §1502.13, relative to the statement of the purpose and need of the proposed project, provides that "The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives, including the proposed action."

118. The "Purpose and Need" section of the EA covers the first 25 pages in the EA. It consists largely of general background information about the Little Rock-North Little Rock area, and is very broad, vague and imprecise. It is only at page 22 of the EA that a discussion of the purposes of the Project begins. There, it is stated that the purposes are primarily (i) to improve the condition of I-30 by "modernizing" infrastructure; (ii) improve "navigational safety" on the Arkansas River, and to (iii) increase speeds and reduce traffic congestion to and from downtown Little Rock-North Little Rock. These "purposes and needs" are overly broad and uninformative, and do not "specify the underlying purpose and need to which the agency is responding" as required by 40 CFR §1502.13.

119. The "purposes and needs" of the Project is important in that they influence the remainder of the scope of the EA. For example, the consideration of alternatives is determined based, in part, upon their ability to meet those purposes and needs. The terminology used in the Purposes and Needs Section of the EA is overly vague and does not state with sufficient clarity the precise conditions that are to be addressed by the proposed Project and by which the alternatives and impacts analysis are to be measured. To the extent that it is clear, it is designed to be biased in

48

favor of the Proposed Alternative, rather than to encourage a broad examination of alternatives and options for resolving traffic congestion and safety.

120.    The "Purposes and Needs" of the Project are based upon a number of assumptions that are not justified or appropriate. Among those assumptions are:

(i)      that the purpose and need of the Project should be to increase speeds and reduce traffic congestion *to and from downtown Little Rock-North Little Rock*, rather than to decrease traffic *through* downtown Little Rock-North Little Rock on I-30 by development of <u>alternative routes of access</u> to those downtown areas and development of <u>alternative routes around</u> the metropolitan area.

(ii)     for the next twenty (20) years, people will commute on a daily basis from areas in the metropolitan area (Pulaski, Saline, Faulkner, and Lonoke Counties) to downtown Little Rock-North Little Rock, thereby causing increases in traffic congestion on I-30;

(iii)    those people will, and should, make that commute largely in private automobiles with only one occupant.

121.    To support those assumptions, the EA states that the four-county Central Arkansas region has grown by 5.5% since the 2010 census. However, of those counties, each has grown faster during that period than Pulaski County. The EA assumes that rate of growth will continue, mostly in the counties *other than Pulaski*, and that drivers will continue to commute to downtown Little Rock-North Little Rock from those surrounding counties.

122.    Those assumptions dictate the findings of the EA, resulting in a self-fulling

prophesy of continued congestion regardless of the number of lanes that are added to I-30. The

assumptions are predictions without basis or consideration of other factors that could change the

assumptions dramatically.

123.    No consideration was given in the Environmental Assessment to the premise that the

purpose of the 30 Crossing Project should be to <u>decrease</u> traffic *through* downtown Little Rock-

North Little Rock on I-30 by development of <u>alternative routes of access</u> to those downtown

areas and development of <u>alternative routes around</u> the metropolitan area. The development of

alternative routes by which drivers or truckers could gain access to and from downtown Little

Rock-North Little Rock, or, if only passing through the area, could entirely by-pass the

downtown area would help to relieve congestion on I-30 and possibly eliminate the necessity of

a complete and total reconstruction of the 30 Corridor.

124.    Further, the "purposes and needs" section of the EA fails to consider the experiences of

other metropolitan areas showing that growth of suburbs frequently leads to the development of

professional, commercial and industrial complexes in the suburban areas, resulting in people

working in the communities where they live, thereby reducing the necessity for travel from the

suburbs to the downtown metropolitan area. Instead, Defendants have presumed in the EA that

the main location for employment growth in the foreseeable future will be in downtown Little

Rock-North Little Rock even though the studies and statistics relied upon by Defendants in the

EA show that the major growth areas are in Saline, Faulkner, and Lonoke Counties.

125.    The EA is defective in failing to provide a purpose and need for the EA that

(i) allows for consideration of the purpose of the 30 Crossing Project being to <u>decrease</u> traffic

*through* downtown Little Rock-North Little Rock on I-30 by development of <u>alternative routes</u>

of access to those downtown areas and development of alternative routes around the
metropolitan area, and (ii) provides an assumption that traffic in the 30 Corridor will not increase
over the next 20 years but may decrease due to changes in locations in employment and
residential patterns that are currently occurring in the Pulaski, Saline, Faulkner, and Lonoke
County area.

## COUNT 7.

### THE ENVIRONMENTAL ASSESSMENT "PIGGY-BACKS" ONTO DOCUMENTS THAT HAVE NOT BEEN SUBJECTED TO NEPA REVIEW AND ARE NOT PART OF THE ENVIRONMENTAL ASSESSMENT

126.    Plaintiffs ratify and affirm all of the preceding allegations of fact set forth above.

127.    The EA frequently refers to documents that were created as a result of a process
known as the "PEL Process" ["PEL" is an acronym for "Planning and Environmental Linkages"]
that involved a series of approximately 15 reports prepared by Defendant ArDOT and its
contractor prior to the development of the EA that purported to identify "the purpose and need
for improvements to I-30 and I-40, and evaluated possible viable alternatives to carry forward
into this NEPA study (the EA)." See EA, Chapter 1, page 1, Purpose & Need Section.

128.    "Environmental documents" are defined in 40 CFR §1508.10 as environmental
assessments, environmental impact statements, finding of no significant impacts and notice of
intent. The documents included in the PEL Study were not NEPA-documents. In an Application
for a Tiger VII 2015 Grant to the FHWA, ArDOT refers to the PEL Study process, and
acknowledges that the PEL process is separate from the NEPA environmental assessment
process by stating:

>    It will be the first project in the state to utilize the design-build to a budget
>    method, and is the first to incorporate the Planning and Environmental Linkage
>    (PEL) study process into the overall development, in order to determine possible

viable alternatives for a long-range solution, and recommended alternatives that *can be carried forward seamlessly into the National Environmental Policy Act (NEPA) study for this Project.*
(I-30 Corridor Project: Tiger VII 2015 Grant Application, Section A, p. 3) (Italics added)

129.   Notwithstanding that the PEL documents were not documents that were subject to NEPA

scrutiny, the Defendants attempted to include or incorporate them into the EA by means of

reference to various Appendices. For example, in the EA, Chapter 2 (Alternative Development),

page 25, the following text appears:

2.2   What Alternatives Were Evaluated in this EA?

Detailed information on the development of project alternatives can be found in the Alternatives Technical Report **(Appendix C)**. *The alternatives development process began in 2014 with the PEL Study conducted by ArDOT.* The PEL Study involved evaluation of a wide range of potential solutions to the congestion and safety issues along I-30 and I-40. Among those were bypass routes to the west of I-30 along Pike Avenue and Chester Street. *It was determined that these alternatives would not divert enough traffic from I-30 to resolve the congestion and safety issues and would have extensive impacts to residences and buildings along those routes. … .* (Italics added. Bold appears in original)

130.   This is but one example, among others, of alternatives and other issues that were

considered and rejected or otherwise prejudged and determined by Defendants in the PEL

Process but not included in the draft EA that was issued for public review and comment.

Consequently, the public reviewing the EA was deprived of an opportunity to consider and

comment upon those alternatives and other issues decided by ArDOT during the PEL Studies.

Yet, by tiering upon the PEL Study, the EA represents to the public that such alternatives have

been considered, rejected, and further consideration of them foreclosed.

131.   An agency cannot piggy-back an environmental assessment or other form of

impact statement on documents that have not previously been subjected to NEPA review.

*Northern Plains Resource Council, Inc. v. Surface Transp. Bd.* 668 F.3d 1067 (9th Cir. 2011);

*Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062 (9th Cir., 2002) (tiering to a document

that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose

of NEPA); *Oregon Natural Res. Council v. U.S. Bureau of Land Mgmt.*, 470 F.3d 818, 823 (9th

Cir.2006) (citing *Klamath–Siskiyou Wildlands Ctr. v. Bureau of Land Mgt.*, 387 F.3d 989, 998

(9th Cir.2004); *Idaho Conservation League v. U.S. Forest Service*, D. Idaho. August 29, 2012

Not Reported in F.Supp.2d., 2012 WL 3758161.

132.    In addition, the Council on Environmental Quality addresses this issue in its *40*

*Questions,* where CEQ explains:

> 21.    **Combining Environmental and Planning Documents.** Where an EIS or
> an EA is combined with another project planning document (sometimes called
> "piggybacking"), to what degree may the EIS or EA refer to and rely upon
> information in the project document to satisfy NEPA's requirements?
>
> > A.    Section 1502.25 of the regulations requires that draft EISs be prepared
> > concurrently and integrated with environmental analyses and related surveys and
> > studies required by other federal statutes. In addition, Section 1506.4 allows any
> > environmental document prepared in compliance with NEPA to be combined with
> > any other agency document to reduce duplication and paperwork. However, *these
> > provisions were not intended to authorize the preparation of a short summary or
> > outline EIS, attached to a detailed project report or land use plan containing the
> > required environmental impact data. **In such circumstances, the reader would
> > have to refer constantly to the detailed report to understand the environmental
> > impacts and alternatives which should have been found in the EIS itself.***
> >
> > *The EIS must **stand on its own** as an analytical document which **fully
> > informs** decisionmakers and the public of the environmental effects of the
> > proposal and those of the reasonable alternatives. Section 1502.1.* But, as long as
> > the EIS is clearly identified and is self-supporting, it can be physically included in
> > or attached to the project report or land use plan, and may use attached report
> > material as technical backup. (Emphasis added)
> > *(40 Questions*, Question/Answer 21)

133.    The tiering of the EA on the documents resulting from the PEL Studies is improper in

that such documents were not subject to NEPA public review and comment, but yet are treated in

the EA as documents upon which official decisions have been made. As such, they foreclose the

opportunity of the public to comment during the NEPA process upon the subject matter of those documents and decisions contained therein.

134.    Further, the Defendants violated the guidance provided in Question/Answer 21 of the *40 Questions* guidance quoted above by issuing a draft EA that contained only a short summary or outline of the alternatives analysis, impact analysis and other provisions of the EA, and, in all parts of the EA, referred the reader to the Appendices (of which there were 18) for the more detailed analysis of the subjects. The result of this is that the reader of the EA must refer constantly to the detailed Appendices to understand the environmental impacts and alternatives which should have been found in the EIS itself – a problem that the CEQ 40 Questions guidance was devised to avoid.

135.    The FONSI and the EA upon which the FONSI is based should be declared void, and this matter remanded to the Defendants for further proceedings in accordance with the requirements of NEPA and its implementing regulations.

## COUNT 8.

### *THE ALTERNATIVES ANALYSIS IS INADEQUATE.*

136.    Plaintiffs ratify and affirm all of the preceding allegations of fact set forth above.

137.    NEPA §102 [42 USC §4332) requires that all agencies of the Federal Government shall include in every recommendation for or report on major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on, among other issues, alternatives to the proposed action, including the no-action option.

138.    That provision in NEPA is implemented by 40 CFR §1502.14, relative to the

assessment of alternatives. The Alternatives Analysis requirement is referred to therein as "the

heart" of an EA or EIS. 40 CFR §1502.14 provides that the environmental impacts of the

proposal and the alternatives to the preferred alternative should be presented in comparative

form, sharply defining the issues and providing a clear basis for choice among options by the

decisionmaker and the public.

139.    Among other things, the agency is to:

    (a) *Rigorously explore and objectively evaluate all reasonable alternatives*, and
       for alternatives which were eliminated from detailed study, briefly discuss the
       reasons for their having been eliminated; (emphasis added)

    (b) Devote *substantial treatment to each alternative considered* in detail
       including the proposed action so that reviewers may evaluate their
       comparative merits; (emphasis added)

    (c) *Include reasonable alternatives not within the jurisdiction of the lead agency*;
       and

    (d) Include the *alternative of no action.*

### *Only One Alternative to the Preferred Plan Was Considered*

140.    The EA essentially considers only ArDOT's preferred plan and one alternative, each with

the same two sub-alternatives relative to the configuration of an interchange (I-30/Highway 10-

Cantrell Road) and collection/distribution lanes.[3] In an effort to increase the number of

alternatives, the two alternatives with their sub-alternatives were divided into four alternatives by

ArDOT, and are referred to as:

---

[3]     At the conclusion of the PEL Process, ArDOT presented only <u>one</u> alternative to the
Defendant FHWA, which was ArDOT's then- and currently-preferred Alternative 1(B).
Recognizing that an EA with only one alternative would not pass judicial muster, FHWA
insisted that ArDOT consider other alternatives. ArDOT then proposed Alternative 2.

Alternative 1A: 8-Lane General Purpose with Single Point Urban Interchange (SPUI) at Hy. 10;

Alternative 1B: 8-Lane General Purpose with SPUI at Hy. 10;

Alternative 2A: 6-lane with C/D with Split Diamond Interchange (SDI) at Hy. 10; and

Alternative 2A: 6-lane with C/D with SDI at Hy. 10.

141.    Comments were submitted by members of the public proposing a number of other reasonable and feasible alternatives that would lessen the volume of traffic on I-30 by creation of new routes to downtown Little Rock-North Little Rock, diversion of traffic onto existing streets and roads other than I-30, and the greater use of public transit. Those comments were given only passing reference in the EA, and the Defendants' response to such comments were usually that they had been considered during the PEL process and rejected. In addition, the No-Action alternative, which NEPA requires to be "rigorously explored and objectively evaluated," was summarily dismissed as unthinkable.

## *The Alternative of "Reduced Scale" Modifications To the 30 Corridor Was Not Adequately Considered*

142.    The EA is based upon the assumption that, because the I-30 Bridge over the Arkansas River must be replaced, the entire 30 Corridor (over 7 miles of roadway) must be widened to 8- to 10-lanes, with entrance and exit ramps relocated and four major interchanges reconstructed. It did not propose and consider an alternative for public comment that would include replacement of the bridge, but limit the lanes to the present six-lane configuration (with resurfacing and widening). Numerous public comments proposed that alternative, or a version thereof.

56

### *Alternative Routes Were Not Considered*

143.    The EA is based upon a number of assumptions not expressly stated in the EA.

One assumption is the premise that the only acceptable route for traffic to and from or through

central Little Rock is upon I-30, a premise that excludes other alternatives for achieving the goals

of reducing drive time, increasing safety, etc. Alternatives that would involve the expansion and

improvement of existing state highways or streets in Little Rock and North Little Rock as major

arteries into the downtown areas were rejected without serious consideration.

144.    A number of comments were submitted by members of the public – some of whom are

experienced in the design, construction and operation of highway and other public transportation

systems – that proposed the development of alternative routes into and through Little Rock and

North Little Rock for automobile and truck traffic from I-30, I-40, I-630, and other major traffic

arteries. Among such proposals were bypass routes to the west of I-30 along Pike Avenue and

Chester Street, and other routes to the east of I-30 that would provide alternate routes into North

Little Rock from I-40, known as "the Boulevard plan," the "Pike Avenue Extension Alternative,"

and the "Chester Street Extension Alternative."

145.    40 CFR §1502.14 (a) requires that the agency "rigorously explore and objectively

evaluate *all reasonable alternatives*, and for alternatives which were eliminated from detailed

study, briefly discuss the reasons for their having been eliminated. In violation of that regulation,

ARDOT summarily dismissed with little to no consideration alternatives proposed by third

parties. ARDOT cryptically explained in the EA that it dismissed these alternatives because of

the costs and environmental impacts of the potential bypass routes, and the fact that they

would not provide an "efficient connection" between 1-630 and 1- 40. (page 9 of the

Alternative Analysis Technical Report, indicated epage 708/3992) With ArDOT's preferred

alternative costing approximately $1 Billion dollars and having numerous environmental impacts, that objection rings hollow.

146.     The Defendants failed to "rigorously explore and objectively evaluate" the reasonable and feasible alternatives that were proposed by the public or their advisors and consultants. The Defendants failed to discuss in any meaningful manner the reasons for no alternatives being seriously considered and analyzed other than the Preferred Alternative proposed by ArDOT and the 8-Lane Alternative that FHWA required ArDOT to consider.

### *Use of HOV/Public Transit Lanes Were Not Considered*

147.     Alternatives such as the creation and use of high-occupancy lanes or lanes for use of automobiles, buses and other public transit vehicles during specific times of the day on the existing I-30, I-40, I-630 and other major highways were not given serious consideration. Instead, the EA states that ArDOT considered those options in the PEL Study, but rejected them for reasons that are perfunctorily stated in the EA. No opportunity was provided by the alternatives contained in the Environmental Assessment for public comment on any proposal for HOV or public transit lanes on I-30 or other highways feeding into I-30.

### *The EA Completely Ignores Public Transit*

148.     The Project does nothing for the considerable number of people in Little Rock and the surrounding area who have no means of dependable and safe privately-owned transportation. According to facts developed by Imagine Central Arkansas, *over 25% of the households who live south of the River Market District in Little Rock, including those south of I-630, do not own automobiles.* This is a startling figure. Many of those households contain elderly or low-income persons who must depend on public transit to commute to and from work, for

medical appointments, and for their shopping needs. Persons with those transportation needs are
not limited to the geographic area mentioned above, but exist throughout Pulaski County and in
surrounding areas.

149.    23 U.S.C. §134, relative to Metropolitan Transportation Planning, which applied to the
development of the EA prepared by the Defendants, provides:

> (c) General requirements.—
>
>> (1) Development of long-range plans and TIPs.--To accomplish the
>> objectives in subsection (a), metropolitan planning organizations
>> designated under subsection (d), in cooperation with the State and
>> public transportation operators, shall develop long-range
>> transportation plans and transportation improvement programs
>> through a performance-driven, outcome-based approach to
>> planning for metropolitan areas of the State.
>>
>> (2) Contents.--The plans and TIPs for each metropolitan area *shall
>> provide for the development and integrated management and
>> operation of transportation systems and facilities (including
>> accessible pedestrian walkways, bicycle transportation facilities,
>> and intermodal facilities that support intercity transportation,
>> including intercity buses and intercity bus facilities and commuter
>> vanpool providers) that will function as an intermodal
>> transportation system for the metropolitan planning area and as
>> an integral part of an intermodal transportation system for the
>> State* and the United States.
>>
>> (3) Process of development.--The process for developing the plans
>> and TIPs shall *provide for consideration of all modes of
>> transportation* and shall be continuing, cooperative, and
>> comprehensive to the degree appropriate, based on the complexity
>> of the transportation problems to be addressed.
>> (Emphasis added)

150.    Notwithstanding the directives in NEPA and in 23 U.S.C. §134(c), the EA does not
contain any alternatives for the use or expansion of public transit or discuss in any meaningful
way any plan or program for meeting the needs of this considerable portion of the population, or
for meeting the stated needs and purposes of the EA. Instead, ArDOT states in the EA that public

59

transit is not within the statutory responsibilities of the Department of Transportation, but is instead the responsibility of Rock Region Metro, and for that reason ArDOT did not analyze alternatives that included public transit.

151.    However, NEPA requires that reasonable alternatives *not within the jurisdiction of the lead agency* be considered in the alternatives presented in the EA. 40 CFR §1502.14(c). By failing to consider alternatives that include public transit, Defendants violate the requirement of §1502.14(c).

152.    In addition, ignoring public transit is clearly against the trend in most cities brought about by increasing populations, urban sprawl and a growing segment of people who do not own automobiles. Most major cities rely heavily upon clean, safe and efficient public transit to accommodate the transportation needs of all components of the public – not just the elderly and low-income – and at the same time reduce the demands on the capacity of the existing highways. One bus that holds 60 passengers consumes far less space than 60 cars. As noted above, the 30 Corridor Project is designed primarily to accommodate the needs of the single-passenger private automobile user, and the EA violates 40 CFR §1502.14(c) by failing to include an alternative that fully considers and analyzes incorporating public transit as a means of meeting the needs and purposes of the EA.

### *The EA Does Not Analyze An Alternative of Light Rail*

153.    The EA also did not seriously consider or discuss the development of a light rail system connecting downtown Little Rock with the major suburban areas, such as Benton, Conway, Cabot and other areas. It dismissed this option in the EA as "too expensive." Other cities have long operated light rail systems as a means of safely and efficiently moving people

from suburbs to inner-city business districts and back. Parking lots located at light rail stations along the routes provide convenience for the commuters, save energy, and remove many vehicles from the highways. Again, ArDOT has a responsibility to present for public consideration reasonable alternatives not within the jurisdiction of the lead agency. This, it failed to do.

### *New and Developing Transportation Technology Was Considered, But No Alternatives Were Analyzed*

154.    The EA recognized that this is an age of rapidly developing technology in every area of our lives, including automobile design and operation, and in the design and construction of highways to assist drivers in making intelligent choices. An entire chapter of the EA was dedicated to a discussion of existing and emerging technology. Yet, there is no consideration given in the EA to the incorporation of developing technology into either of the alternatives proposed for the 30 Corridor Project, or of an alternative of conducting necessary maintenance work on I-30 and the Arkansas River Bridge to address traffic flow and safety concerns, and deferring more extensive, radical and expensive expansion until the existing and emerging technology is readily available.  Such technology is currently being used in other states with more complex traffic problems than those presented by the Project, and in other countries.

155.    In addition, the EA does not consider and discuss current development of alternative means of transporting people, and the potential effect that those alternative means of transport may have on the highways. The use of "for hire" vehicles, such as Uber or Lyft, is rapidly increasing and has the potential to reduce the number of privately-owned vehicles on the highways.

61

156.    The EA clearly recognizes that "Technology is advancing at a tremendous rate and is

expected to have a significant impact on our society's lives in the future. ... Emerging

technologies such as connected and autonomous vehicles will dramatically change how we view

transportation." It quotes Bill Ford, Jr. stating that "Transportation will change more *over the*

*next 10 years* than it has over the last 100 years." (EA Interchange Justification Report,

Appendix B6-Emerging Technologies, p. 1) The EA states:

> ... thoughtful planners work now with elected officials, specific stakeholders and
> the public to consider and plan for the eventual widespread use of CAVs
> (Connected and Autonomous Vehicles) within their local transportation systems.
> They confront the reality that CAVs already are fundamentally altering traditional
> infrastructure planning horizons, issues and approaches across a broad range of
> topic; ... "

157.    Yet, rather than develop present an alternative incorporating technological advances for

public review and comment in the EA as "thoughtful planners" would do, the EA changes course

and states instead that "history is littered with bold predictions of a world revolutionized by new

and emerging technologies – some of which come true, often with unimagined consequences,

and others that never materialize in the face of social, economic and technological challenges

that could not be easily overcome."

158.    This cryptic position taken by ArDOT in the EA ignores the current production by

the automobile industry of electric vehicles (of which fifty models are currently being

commercially produced by automakers), vehicles with electronic safety and assisted-driving

features, and autonomous (self-driving) vehicles (AVs) that are currently being developed and

used in some areas of the United States. Predictions are that AVs will be perfected and

commercially sold in the U.S. in ten years.

159.    The EA does not propose for public consideration any alternative that incorporates

technological advances in transportation. Neither does the EA propose for public consideration

any alternative that would limit the work to be conducted on I-30 to that necessary for continued traffic flow and safety (with replacement of the Arkansas River Bridge), without expansion, to allow for the continued development of the technology that the EA itself predicts will occur. While ArDOT cautions against constructing a highway based on emerging technologies, it is equally unwise (if not more so) to spend a billion dollars on a highway that may be obsolete by the time it is finished, and will have to be retrofitted for AVs and other vehicles of the not-too-distant future.

160.    For this reason, the alternative of limiting the work on the 30 Corridor Project to the basic amount required for meeting average demand rather than peak demand, at a far lower cost than the Preferred Alternative, and perhaps in conjunction with other alternative routes into and from the metropolitan business area, would appear to be the most prudent course. However, that alternative was not given consideration.

### The "No Action" Alternative and Variations Thereon Were Not Adequately Considered or Were Distorted

161.    40 CFR §1502.14 requires that agencies shall rigorously explore and objectively evaluate all reasonable alternatives, including the "No Action" alternative. The EA fails to give substantially equal treatment to all the alternatives. The EA treats the No-Action Alternative in a summary fashion – not in a rigorous and objective manner. Equally important, the EA distorts the comparisons between the "action" and "no-action" alternatives.

162.    NEPA requires a fair analysis of all the alternatives. This EA fails to do that by, in part, making compensatory manual adjustments to the Action Alternatives but not the No-Action Alternative, (Appendix B, IJR, page 23, indicated epage 207/3992) and by omitting the No-Action Alternative in displays such as Figures 7 and 8 in Appendix B, IJR. This last

63

failing is particularly germane in that Table 5 shows that the No Action-Alternative outperforms the Action Alternatives in a number of Travel-Time pairings.

### *The Analysis Of Effects Is Distorted In That 1-30 Lane Additions Are Assumed To Occur In The Action Alternatives But Not In The No-Action Alternative.*

163.    The EA assumes that a lane will be added "on 1-30 in each direction from the South Terminal to 65th Street" in the Action Alternatives only.[5] If adding a lane is the most-likely future condition in the Action Alternatives, then it should be the most-likely future condition in the No-Action Alternative as well. On the other hand, if the addition of lanes "on 1-30 in each direction from the South Terminal to 65th Street" is unneeded in the No-Action Alternative, then the estimated cost of adding these lanes needs to be disclosed and identified as either a dollar-quantified benefit to the Action Alternative or a dollar-quantified cost to the Action Alternatives.

164.    In either event, the presentation of the No-Action Alternative in the EA is skewed to make the Action Alternatives more desirable. In fact, the No-Action Alternative enjoys faster peak hour average speeds on roads connecting to 1-30 than the Action Alternatives as shown in Figures 14 and 15 of Appendix B of Appendix A, page 31, indicated epage 307/3992. One example of the misrepresentations is the statement, "The No-Action Alternative does not relieve congestion or improve mobility," when the Action Alternatives do not relieve congestion either. Also, there is no corresponding statement in the Action Alternatives explaining that they will cause congestion and reduce mobility on roads connecting to 1-30.

64

### *The EA Repeatedly Misrepresents Travel Speeds For The Alternatives.*

165.    The EA continually maintains that "The No-Action Alternative has the lowest travel speeds for sections outside of the study area," and "Action Alternative 2A and 2B: 6-Lane with C/D with SPUI and SDI Action Alternatives has the highest travel speeds for sections outside of the study area."

166.    In point of fact, Tables 5 and 6 in the Appendix A (Indirect Effects Technical Report) show that the No-Action Alternative actually has the fastest travel speeds for "1-440 east of South Terminal" and has the fastest overall PM travel speeds of all the alternatives.

167.    Further, the points to which the travel times are computed are misleading to the commuting public. The EA (Appendix A Indirect Effects Technical Report, p. 2) identifies the major employers in the area (State of Arkansas, City of Little Rock, federal government, the University of Arkansas for Medical Sciences, and the Union Pacific Railroad) but instead selects the Clinton Presidential Center and the River Market as destinations for their accessibility studies. This effectively reduces the length of commuting time as the Clinton Presidential Center and the River Market are both so close to 1-30 as to make the drive to a parking lot trivial. This exaggerates the potential relative benefit from the Action Alternatives as shown in the following table. There are other areas of the EA and its appendices that skew information in favor of the Preferred Alternative and against the No-Action Alternative, or entirely fails to include the No-Action Alternative in the comparison of all alternatives.

***The EA Buries Information That Is Unfavorable to The Action Alternatives.***

168.    Not until page 335 of the 3,992 pages in the EApackage, in an Appendix B of an

Appendix A, is it disclosed that 1-30 congestion is expected to occur <u>immediately</u> after 30

Crossing opening day <u>if</u> no improvements are made from the South Terminal to 65th Street.

This failure, in conjunction with the EA's failure to disclose likely delays during

construction demonstrates a partiality – a boosterism – that is inappropriate in a NEPA

document.

169.    The EA shows that modeling results for both the 8-Lane GP Action Alternatives and

6-Lane with C/D Action Alternatives indicate that 1-30 congestion occurs immediately after

30 Crossing opening day from 2021 - 2026 if no improvements are made from the South

Terminal to 65th Street. This deficiency in the EA is further compounded by not disclosing

the estimated completion date for the South Terminal to 65th Street 1-30 segment. The

public thus has no way of knowing how long this backup is expected to continue.


## COUNT 9.

### ***THE EA FAILS TO ADEQUATELY ANALYZE***
### ***DIRECT AND INDIRECT IMPACTS OF THE PROPOSED ACTION***

170.    40 CFR §1502.16, relative to potential environmental consequences of a proposed

project, states that the EA must include discussions of:

(a) Direct effects and their significance (§1508.8).

(b) Indirect effects and their significance (§1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal,

regional, State, and local land use plans, policies and controls for the area

concerned. (See §1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under §1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under §1502.14(f)).

The EA failed to discuss many of these issues.

### A.                                   *Direct Impacts*

171.    "Direct impacts" are those that are caused by the action and occur at the same time and place. 40 CFR §1508.8. Among those could be the effects of the project on noise, air toxics, dust, nighttime lighting and other effects on people and things in the immediate area of the project.

172.    Many people, particularly minorities and low-income persons, live in the immediate vicinity of the 30 Corridor Project, and – as much of the work on the 30 Coridor Project will be done on a 24-hour basis – will be directly and constantly affected by the noise, air and light emissions from the Project. The EA failed to adequately assess the impacts of those emissions on people (or, as termed in the EA, "receptors") who live within close proximity to the I-30 corridor – particularly the areas of interchanges with other highways such as I-630, Highway 10 and I-40.

67

**B.**                          ***Indirect Impacts***

173.    One of the stated purposes and needs of the Project is to reduce traffic

congestion and improve speeds of driving into and through Little Rock-North Little Rock.

However, the EA acknowledges that one effect of each of the alternatives proposed by ArDOT

and FHWA will be to shift the congestion and traffic impediments to other portions of the

interstate and other highways in the central Arkansas area. It is difficult to find that

acknowledgment in the EA because ArDOT and FHWA are attempting to "segment" the

interstate system in Pulaski County to avoid addressing all of the congestion issues

comprehensively. The subject of impermissible "segmentation" of the I-30 and I-630 highways

for purposes of the EA is addressed further below.


### *The EA Recognizes That Traffic Congestion Will Be Shifted to Portions of the Interstate System Outside the 30 Corridor Area But Does Not Analyze the Impacts of That Congestion*

174.    The defining geographical limits of the 30 Crossing Project and the EA are shown in

Figure 1 at page 4 of this Complaint. Generally, they are where I-30 intersects on the south with

I-530 and I-440; on the northwest end at I-40 and State Highway 365 (MacArthur Drive); and at

the intersection of I-40 and Highway 67-167 on the northeast end. In addition, I-630 intersects

with I-30 in the middle of the corridor. Four interchanges are included in the Project and are

critical areas for congestion.

175.    Thousands of vehicles enter the 30 Corridor area each day from each of the terminus

points mentioned above. Studies and computer modeling conducted by ArDOT and others have

clearly shown (and the EA admits) that, if the 30 Crossing Project is constructed, it will shift

68

congestion from the 30 Corridor area to other areas outside of the arbitrary boundaries of the 30

Corridor Project.

176.    Those areas include portions of I-30 between the south terminus of the Project, 65th

Street, University Street and I-30, and I-430. ArDOT's modeling also shows that the 30 Corridor

Project would shift congestion onto I-630, causing slowing and backup, and onto Highway

67/167 and portions of I-40. The EA does not discuss or attempt to analyze the impacts of those

shifts of congestion to those areas outside the 30 Corridor study area.

### *The EA "Segments" The Highway System To Avoid An Analysis of All Affected Areas.*

177.    40 CFR §1508.25, relative to the scope of an EA or EIS provides:

> "Scope" consists of the range of actions, alternatives, and impacts to be
> considered in an environmental impact statement. The scope of an
> individual statement may depend on its relationships to other statements
> (§§1502.20 and 1508.28). To determine the scope of environmental
> impact statements, agencies shall consider 3 types of actions, 3 types of
> alternatives, and 3 types of impacts. They include:
>
> (a) *Actions* (other than unconnected single actions) which may be:
>
>> (1) *Connected actions*, which means that they are closely
>> related and *therefore should be discussed in the same
>> impact statement*. Actions
>> are connected if they:
>>
>>> (i) Automatically trigger other actions which may
>>> require environmental impact statements.
>>>
>>> (ii) Cannot or will not proceed unless other actions
>>> are taken previously or simultaneously.
>>>
>>> (iii) Are interdependent parts of a larger action and
>>> depend on the larger action for their justification.
>>
>> (2) *Cumulative actions*, which when viewed with other
>> proposed actions have cumulatively significant impacts *and
>> should therefore be discussed in the same impact statement.*

(3) *Similar actions*, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. *An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.*
(Emphasis added)

178.    The project does not have logical termini. The EA acknowledges that interstate highway congestion on different segments <u>outside</u> the study area cause backups onto 1-30 in the project area for the Action Alternatives. Those segments outside the study area are:

- 1-30 from the southern terminus of the study area to 65th Street.

- 1-30 south of 65th Street.

- I-630 at and west of its intersection with I-30.

179.    For the Action Alternatives <u>only</u>, the EA assumes that the immediate segment just south of the southern terminus of 30-Crossing to 65th Street (#1 above) will be constructed before 2041 and factors that assumption into a reduction in 30-Crossing study area congestion relief. However, it assumes that congestion associated with an even farther-south segment on 1-30, from 65th Street southward, will back up into both the 65th Street-30-Crossing segment and the 30 Crossing Study Area itself. Page 24 of EA Appendix B of Appendix A, indicated e-page 300/3992.

180.    The page 24 citation discloses that this congestion outside the study area is the "only basic problem," and yet the segment was excluded from the study area. The absurdity of the situation is further demonstrated by the fact that the 30-Crossing Action Alternatives

apparently cause the problem as no comparable congestion is identified for the No-Action Alternative.

181.    The shifting of congestion to areas of I-30 south of the 30 Corridor and to I-630 means that in order to achieve removal of that congestion, it will be necessary to continue to widen I-30 south to I-430 and I-630 westward from its intersection with I-30, as well as other highways that feed into the 30 Corridor area. Those are projects that ArDOT currently has under review and in planning. In fact, ArDOT's analysis shows that to prevent bottlenecks caused by the flow of cars through the expanded I-30 on other portions of interstates in Central Arkansas, those freeways will have to be widened to eight lanes, at a cost of $4 billion.[4] In view of ArDOT's difficulty in funding construction of the 30 Crossing Project, it seems doubtful that any additional construction expanding areas of I-30 south of its terminus at I-530/440 will be forthcoming soon.

182.    The widening and reconstruction of the 30 Crossing area, I-30 south of the 30 Crossing Project Area, and the widening of I-630 west from its intersection with I-30 are all connected, cumulative and similar actions as contemplated by 40 CFR §1508.25(a)(1), (2) and (3). As such, those projects and their individual and collective impacts should be considered in the same Environmental Impact Statement.

183.    Notwithstanding this, ArDOT and FHWA have attempted to isolate the 30 Corridor Project into a separate segment in an attempt to avoid determining the environmental impacts of resolving the traffic problems that will continue to exist in other segments.  NEPA does not

---

[4]     Comments of ArDOT's Connecting Arkansas Program manager Jerry Holder (director of Garver Engineers) that to prevent bottlenecks caused by the flow of cars through the expanded I-30 onto other portions of interstates in Central Arkansas would require those other freeways to be widened to eight lanes, at a cost of $4 billion (Arkansas Times Blog, October 15, 2015)

allow Defendants to subdivide projects that do not have independent utility or logical termini simply to expedite the NEPA process or avoid addressing environmental impacts.

184.   Regulations adopted to implement the FHWA's compliance with NEPA address improper segmentation and provide that "the action evaluated in each EIS or finding of no significant impact (FONSI) shall:

> (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;
>
> (2) Have independent utility or independent significance, *i.e.* be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and
>
> (3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements."
> 23 F.R. § 771.111(f).

185.   The 30 Corridor Project sector of I-30 has no logical terminus at any of the points used in the EA, nor does it have "independent utility." The proposed terminus points are simply arbitrary points selected by the ArDOT to avoid assessing the environmental consequences of the Project on other areas of I-30, I-630, I-40 and Highway 67/167.

186.   The failure to include the segment of I-30 south of the Project boundary to I-430, and the segment of I-630 west from its intersection with I-30 does not meet the requirements of 23 CFR §771.111(f), or the criteria contained in 40 CFR §1508.25. The segmentation of the 30 Corridor Project from other portions of I-30 not within the Project geographic area, and from I-630 was improper.

### ArDOT Made Assumptions Regarding Traffic Volumes and Congestion In the Environmental Assessment That Were Not Used in Modeling or Assessments of Traffic Volumes and Congestion in Adjoining Segments

187.   Assumptions were made in the EA to arrive at the conclusions supporting the Project. However, those same assumptions were not carried over into the appendices and applied to the

other segments discussed above with regard to traffic volumes and congestion. The same

assumptions used in evaluating the Preferred Alternative should apply to any modeling or

assessments of traffic volumes and congestion on the other Alternatives (including the No-

Action Alternative) or the segments outside of the study area that will be affected by the Project.

### *The EA Does Not Address the Indirect Impact Of Induced Development Resulting From This and Other Projects*

188.    The creation or expansion of highways frequently drives the development of new housing

areas and new commercial centers. Most major cities, such as Dallas and Houston, demonstrate

this principal, and it is also demonstrated by the development of the Bentonville – Fayetteville

Arkansas area.  Such development then changes the driving patterns of persons who may have

formerly used such highways onto new roads.

189.    The CEQ Regulations specifically recognize induced growth as an Indirect Effect that

must be analyzed. 42 CFR §1058.8 specifically states that ""Indirect effects" may include

growth inducing effects and other effects related to induced changes in the pattern of land use,

population density or growth rate, and related effects on air and water and other natural systems,

including ecosystems."

190.    A conclusory statement that growth will increase with or without the project, or that

development is inevitable, is insufficient; the agency must provide an adequate discussion of

growth-inducing impacts. *Laguna Greenbelt, Inc. v. United States Dep't of Transp.,* 42 F.3d 517,

526 (9th Cir.1994)

191.    Notwithstanding this, the EA fails to adequately consider and analyze the indirect impact

of the 30 Corridor Project on induced growth and development in the Central Arkansas area.

73

### *The EA Does Not Address the Indirect Impact Of The Project*
### *On Minority and Low-Income Residential Areas*

192.    The declaration of policy contained in NEPA, Section 101, recognizes "the profound impact of man's activity on the interrelations of all components of the natural environment," particularly the profound influences of population growth, high-density urbanization, and industrial expansion.

193.    40 CFR §1508.14 further defines the "human environment" as including "the natural and physical environment and the relationship of people with that environment. ... When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment." Thus, NEPA applies to urban environmental effects and effects on the quality of life for citizens of neighborhoods affected by a proposed project, including economic and social impacts as well as those affecting the natural environment.

194.    Thirty-Three percent (33%) of the households in the study area are considered to be low-income, and 59% of the population in the Project Study Area are majority non-white and Hispanic. Twenty-two of the 62 census block groups in the Project Study Area have median incomes below the poverty guideline.

195.    The Community Impacts Technical Report (CITR) appendix to the EA continues the EA's bias in favor of the Action Alternatives. The only thing said about the No-Action Alternative is negative, and the several items mentioned about the Action Alternatives are all positive. NEPA documents are required to present a balanced picture. This passage fails to mention positive effects associated with the No-Action, such as a reduced incidence of construction-related congestion, and then goes on to

74

speculate about the possible population growth effects of the Action Alternatives-even though such effects are not otherwise displayed in the document.

196.    Defendants were required by NEPA to analyze the effects of the Project on "Community Cohesion." The CITR defines "Community Cohesion" as "a term that refers to an aggregate quality of a residential area. Cohesion is a social attribute that indicates a sense of community, common responsibility, and social interaction within a limited geographic area. It is the degree to which residents have a sense of belonging to their neighborhood or community or a strong attachment to neighbors, groups, and institutions because of continual association over time." (Indicated e-page 1944/3992).

197.    The EA concludes that "...the project would have a beneficial effect on communities due to...increased community cohesion..." without providing any substantiation. page115, Indicated e-page 132/3992.  It continues: "The proposed improvements would not further separate, divide, or isolate these neighborhoods or other adjacent neighborhoods, ethnic or other specific groups, because the 1-30 facility is an existing interstate and no new alignment or location is proposed for the alternatives." There is no support cited for that statement, and history has shown it to be false.

198.    There is a long history of the construction of I-30 and I-630 causing disproportionately high and adverse environmental effects on the citizens who reside on the east side of the 30 Corridor Project and west of the Project and south of I-630. The EA acknowledges that the people who reside in those areas consist of a high proportion of minorities, and the evidence is strong from the past development of I-30 and I-630 that they have suffered economically and socially by being separated from the remainder of the City. For example, after construction of I-

630, the market values of property south of that highway fell dramatically, and today remain far below those of property north of I-630.

199.    The EA discusses a few benefits that the largely minority, low-income citizens in those areas that have been cut-off from the remainder of the City will purportedly derive from the 30 Corridor Project (such as sidewalks, bike paths, etc. over or under I-30), but it fails to discuss the disadvantages that those same citizens will sustain by being further separated from the City by an even wider and more complicated I-30 Corridor and its intersection with I-630, to say nothing of increased noise and toxic fumes as a result of the projected increased traffic.

200.    The EA fails to adequately assess the socio-economic impact of the proposed 30 Corridor Project upon the minority non-white and Hispanic populations and communities who reside in or have businesses in the vicinity of the 30 Corridor.  Not only NEPA, but Executive Order 12898 requires agencies to "identify[] and address[], as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."

### The EA Fails to Sufficiently Identify and Analyze the Health Effects of Mobile Source Air Toxics That Would Be Produced by This and Other Projects

201.    The EA does not fully address the potential indirect and cumulative impacts of the 30 Crossing Project on persons who reside in the vicinity. It is widely accepted and recognized through medical and scientific studies that vehicular traffic on interstates and other high-traffic roads emit a number of mobile source air toxic compounds (MSATs) that are harmful to human health, particularly the elderly and children. (See *30 Crossing Strategies: White Paper*, Nelson/Nygaard Consulting Associates, Inc. report prepared for City of Little Rock June 6, 2016,

76

in which it is stated that "Freeways are essentially toxic areas.") The U.S. Environmental Protection Agency and Defendant FHWA also recognize the risk of MSATs in their official publications.

202.    The EA states that one of the needs and purposes of the proposed Project is to accommodate an even greater volume of traffic on the I-30 Corridor, and at higher speeds. FHWA claims that the volume of vehicles on the 30 Corridor will increase to approximately 165,000 vehicles per day by 2040, but at the same time maintains that the volume of MSATs that will be emitted by those vehicles will be lower than current levels because new regulations will be enacted requiring more efficient automobile engines. That is disingenuous and sheer speculation. Proposed regulations to lower the emission levels of automobile engines has been withdrawn by the Department of Transportation and will undoubtedly not be re-proposed in the current political environment. In any event there is no calculation in the EA to support Defendant's claim that the volume of MSATs emitted by the predicted increased number of vehicles in the future will be less than those currently emitted. A detailed analysis by an EIS is required.

203.    This is even more pressing because of the cumulative impact on air emissions that the proposed widening of the easternmost portions of I-630 will have, in conjunction with those issued from the I-30 Corridor.

### The EA Fails to Adequately Assess the Indirect Impacts of the Project On Wetlands, Water Quality and Flooding

204.    40 CFR §230.10(a), relative to the placement of fill in wetlands as part of a project development, states:

[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

205.    Furthermore, EPA Guidelines developed in conjunction with the U.S. Army Corps of Engineers further provide that, where a project is not "water dependent "(*i.e.*, must have access or proximity to water or the special aquatic site to fulfill its basic purpose, such as a wharf or harbor), *a presumption exists* that practicable alternatives are available that do not involve special aquatic sites (*i.e.*, wetlands), *unless clearly demonstrated otherwise*. 40 C.F.R. §230.10(a)(3)

206.    The EPA Guidelines also provide that a presumption exists that where a discharge is proposed for a special aquatic site (*i.e.*, wetlands), all practicable alternatives to the proposed discharge that do not involve a discharge into a special aquatic site *have less adverse impact* on the aquatic ecosystem, unless clearly demonstrated otherwise. *Id.*

207.    Executive Order (EO) 11988 (1977) relative to Floodplain Management, directs federal agencies to "provide leadership and take action to reduce the risk of flood loss, to minimize the impacts of floods on human safety, health and welfare, and to restore and preserve the natural and beneficial values served by floodplains." This EO was authorized to assist in furthering the National Environmental Policy Act (NEPA), the National Flood Insurance Act of 1968 (amended), and the Flood Disaster Protection Act of 1973.

208.    Changes in the floodplain, such as adding fill material from highway construction and widening, constructing buildings or bridges, or constricting a channel, can cause a rise in the water surface elevation. This increase in the water surface elevation can subsequently impact properties not previously affected and are consequently regulated by FEMA. Floodplain impacts

78

are measured by the change in the water surface elevation or Base Flood Elevation (BFE). (EA,

Appendix O, page 4, Sec. 3.0, lines 11-15)

209.    Appendix O to the EA states that, in the Dark Hollow area of North Little Rock,

approximately 18.01 acre-feet (Ac-ft) of permanent fill would be placed below elevation 252 (the

base flood elevation) with the 8-Lane GP Alternative, and 17.43 Ac-ft of permanent fill would

result from the 6-lane with C/D Alternative (Figures 4 and 5).

210.    Appendix O to the EA further states:

> Mitigation in the form of compensatory storage would be created to replace the
> storage lost in the Dark Hollow floodplain due to permanent roadway fill. In the I-
> 30/I-40 interchange, three areas were identified as contiguous and hydraulically
> connected to the Fairman Ditch, which passes through the interchange from west
> to east. These flood storage areas are shown on Figure 6. As flood surface
> elevations rise in Fairman Ditch, flood waters would spill out of the channel and
> fill the contiguous flood storage areas. The areas would be graded to allow flood
> waters to drain to the Fairman Ditch (Attachment B). The exact method of making
> this connection would be the responsibility of the Design Builder. The volume
> able to be created in these three areas is 11.57 Ac-ft, 3.67 Ac-ft, and 10.85 Ac-ft,
> for a total of 26.09 Ac-ft. This is an excess of 8.08 Ac-ft over the worst case
> amount of fill that would result from any of the Action Alternatives in the Dark
> Hollow floodplain.

211.    The Dark Hollow area (a/k/a the Dark Hollow Basin) of North Little Rock covers

approximately 6,000 acres in North Little Rock, generally bound on the west by I-30, on the

north by I-40, on the east by high ground in the Rose City area, and on the south by the Arkansas

River. The northern and western portions of the area consists of relatively steep, hilly terrain

north of Interstate 40 and west of Interstate 30. During storm events, those hilly areas drain into

Dark Hollow, which contains a large area of wetlands. The wetlands serve as holding areas for

the storm water, filter out pollutants and debris from upstream and from the Interstate highways;

and provide sanctuary and breeding grounds for birds, small mammals, certain fish and

amphibians. The wetlands in the Dark Hollow Basin contribute directly to water quality of the Arkansas River and flood control in areas adjacent to Dark Hollow.

212.    The extensive flood plain in the Dark Hollow area of North Little Rock is shown in the following Figure 2. The flood plain is in the blue color, which covers the vast majority of the North Little Rock area south of I-40 and east of I-30.



213.    The Fairman Ditch (also denominated the "Pipe Diversion Ditch") referred to in the above-quoted excerpt from Appendix O, is a large ditch that transverses the Dark Hollow area. The Ditch runs in an East-West direction from the intersection of I-30 and I-40 for

approximately 4700 feet before turning south through the Union Pacific Railroad yards, through

North Little Rock east of I-30, and ultimately through the Redwood Tunnel ("the Tunnel") and

into the Arkansas River. Several other drainage ditches flow into the Ditch from other areas in

the northeast section of Dark Hollow, increasing the flow of storm waters by orders of

magnitude.

214.    Flooding frequently occurs in North Little Rock as a result of rain events in which water

is channeled through the Fairman Ditch and into areas of North Little Rock south of Dark

Hollow, including the Tunnel. The Tunnel was constructed in 1911; is concrete-lined; is

approximately 6.5 feet wide by 7.5 feet high; is approximately 2,640 feet long; and is in a bad

state of repair. The Corps of Engineers has determined on numerous occasions that the entire

Dark Hollow drainage system, including the Fairman Ditch and the Tunnel, is inadequate to

handle rainfall in excess of a *five-year* flood. See Appendix O, Section 4.0, p. 5), which provides

in part:

> The Redwood Tunnel was identified in the *North Little Rock, Dark Hollow
> Limited Re-Evaluation Report (USACE, 2012)* as undersized with respect to the
> flow it carries.
>
> In an effort to evaluate alternatives to alleviate flooding in the Dark Hollow
> Basin, the *North Little Rock, Dark Hollow Limited Re-Evaluation Report
> (USACE, 2012)* analyzed conveyance and storage improvements using HEC-
> HMS and HEC-RAS. The *North Little Rock Dark Hollow Limited Re-Evaluation
> Report (USACE, 2011)* recommended conveyance improvements focused on the
> existing channels and the Redwood Tunnel, as well as storage improvement
> located in the Dark Hollow floodplain.

215.    A number of additional assessments of the Tunnel have been conducted by the Corps of

Engineers in connection with the City of North Little Rock since 1975 with a view to reworking

the channels and replacing or repairing the Tunnel. However, no work has been performed

pursuant to those studies. As a consequence, the Dark Hollow area and portions of North Little

Rock south of Dark Hollow continue to be subject to frequent flooding following heavy rains.

216.    In addition, a major residential apartment development known as The Pointe at North

Hills is under construction on the northeast corner of the intersection of I-40, Highway 67/167,

and Park Hill Road in North Little Rock. The development has required the leveling of

approximately 70 acres of a hilltop upgradient of the Dark Hollow basin, and the permanent

filling of over 500 feet of ephemeral and intermittent streams and 6.7 acres of wetlands in the

drainage area of Dark Hollow. The fill of those wetlands and diversion of water into the Dark

Hollow area will increase the flow of floodwaters into the Fairman Ditch and the Redwood

Tunnel, exacerbating the flood problems in North Little Rock east of I-30.

217.    Furthermore, the Dark Hollow area and areas south of it in North Little Rock are

predominantly occupied by minority and low-income populations. No analysis appears in the EA

of the impact of the elimination of the 26 acres of wetlands from the Dark Hollow, the addition

of flood waters from the Pointe at North Hills Project immediately upgradient of the Dark

Hollow basin, or the grading of the proposed wetlands fill area to direct drainage of storm waters

into the Fairman Ditch, and from there to the Redwood Tunnel. This omission is a serious

violation of NEPA's requirements for assessment of indirect and cumulative impacts and also

EO 12898.

218.    The Defendant FHWA has promulgated regulations found at 23 CFR §650.111, relative

to location hydraulic studies to be conducted prior to construction of highways to determine the

potential impact of the construction on the human environment. That regulation provides in

relevant part:

> (a) National Flood Insurance Program (NFIP) maps or information developed by the
>     highway agency, if NFIP maps are not available, shall be used to determine
>     whether a highway location alternative will include an encroachment.

(b) Location studies shall include evaluation and discussion of the practicability of alternatives to any longitudinal encroachments.

(c) Location studies shall include discussion of the following items, commensurate with the significance of the risk or environmental impact, for all alternatives containing encroachments and for those actions which would support base flood-plain development:

(1) The risks associated with implementation of the action,

(2) The impacts on natural and beneficial flood-plain values,

(3) The support of probable incompatible flood-plain development,

(4) The measures to minimize flood-plain impacts associated with the action, and

(5) The measures to restore and preserve the natural and beneficial flood-plain values impacted by the action.

(d) Location studies shall include evaluation and discussion of the practicability of alternatives to any significant encroachments or any support of incompatible flood-plain development.

(e) The studies required by §650.111 (c) and (d) shall be summarized in environmental review documents prepared pursuant to 23 CFR part 771.

(f) Local, State, and Federal water resources and flood-plain management agencies should be consulted to determine if the proposed highway action is consistent with existing watershed and flood-plain management programs and to obtain current information on development and proposed actions in the affected watersheds.

219.    There appear to be no location studies conducted of the impact of the 30 Corridor Project on the Dark Hollow area to meet the requirements of 23 CFR §650.111. The Defendants failed to comply with the requirements of NEPA's requirement to fully discuss the direct and indirect effects of the proposed 30 Corridor Project as required by 40 CFR §1502.16, 23 CFR §650.111 and Executive Order (EO) 11988 in the preparation of the EA and the resulting FONSI. The EA and FONSI should be set aside and voided, and this matter remanded to the Defendants with

directions to prepare an EIS in compliance with the requirements of NEPA and all other applicable laws.

### *The EA Fails To Address Indirect Impacts On The River Market, Clinton Presidential Park, Heifer International And North Little Rock Riverfront Park/Argenta Areas*

220.    Some of the most rapidly developing and thriving areas of the Little Rock – North Little Rock metropolitan area are along or near the banks of the Arkansas River in both cities. The existing easy access to those areas from Interstate 30 and a relative abundance of on-street parking or conveniently-located parking lots has been instrumental in that development.

221.    The proposed 30 Corridor Project will significantly change the points of entry and exit to and from I-30 in both Little Rock and North Little Rock, and make it more difficult and time-consuming for persons to gain access to those areas. In addition, persons who visit the River Market District, the Argenta District, or reside in those areas and in the historic neighborhoods immediately to the south of the River Market District in Little Rock will experience loss of scarce on-street parking, creation of one-way streets and increased traffic. The analysis of the indirect impacts of these changes in access, parking and traffic patterns has not been sufficiently analyzed in the EA.

### *The EA Fails To Disclose Externalized Costs.*

222.    The EA fails to dollar-quantify the various externalized costs which will not be borne by the project--thus overstating any estimate of net benefits associated with the project. As the cities, employers, and private citizens will bear these costs, they must be displayed by alternative. For instance, the EA makes no mention of the fact that the River Rail Streetcar system will have to cover approximately $455,000 in cost associated with implementing the

preferred alternative. Instead, the document indicates impacts were avoided, as on page 31, indicated epage 215 of Appendix B, IJR.

223.    Adversely-affected property values associated with the increased noise of the Action Alternatives are not disclosed. Also, elimination of three free public parking lots and numerous on-street parking spaces will cause economic hardship to those regularly using those spots

224.    Numerous modifications to city streets are identified but not costed out, such as the four additional traffic lights noted on page 31 of Appendix A of Appendix B, IJR, indicated e-page 255/3992. Traffic lights are expensive and there is no indication that the City of Little Rock has agreed to bear such costs. The city cannot make an informed decision relative to the EA unless its related costs are identified. If the city cannot or does not plan to make improvements to city streets necessary for the proper functioning of the Action Alternatives, then the effects associated with late implementation of these measures needs to be reflected in the EA analysis in terms of congestion and travel time.

### *The EA Has Made Insufficient Effort To Quantify Effects by Claiming That They Cannot Be Quantified*

225.    Throughout the EA, it observes that the Project "may have" or "could have' certain effects, but then avoids further analysis through the excuse that the specific impacts of these changes cannot be quantified.

226.    CEQ's *Forty Questions* specifically addresses this issue in its answer to Question No. 19 as follows:

> 18. ***Uncertainties About Indirect Effects of A Proposal***. How should uncertainties about indirect effects of a proposal be addressed, for example, in cases of disposal of federal lands, when the identity or plans of future landowners

85

is unknown?

A. The EIS must identify all the indirect effects that are known, and make a good faith effort to explain the effects that are not known but are "reasonably foreseeable." Section 1508.8(b). In the example, if there is total uncertainty about the identity of future land owners or the nature of future land uses, then of course, the agency is not required to engage in speculation or contemplation about their future plans. But, in the ordinary course of business, people do make judgments based upon reasonably foreseeable occurrences. It will often be possible to consider the likely purchasers and the development trends in that area or similar areas in recent years; or the likelihood that the land will be used for an energy project, shopping center, subdivision, farm or factory. The agency has the responsibility to make an informed judgment, and to estimate future impacts on that basis, especially if trends are ascertainable or potential purchasers have made themselves known. The agency cannot ignore these uncertain, but probable, effects of its decisions.

227.    The FONSI and the EA upon which it is based should be voided and set aside, and this case remanded to the Defendants for such further proceedings as they may deem appropriate, but in compliance with the requirements of NEPA and all other applicable laws and regulations.

## COUNT 10.

### THE ENVIRONMENTAL ASSESSMENT FAILED TO ADEQUATELY ASSESS CUMULATIVE IMPACTS

228.    40 CFR §1508.12 defines "cumulative impacts" as "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."

229.    Courts have emphasized the importance of discussing cumulative impacts in environmental impact statements. *Kern v. United States*, 284 F.3d 1062 (9th Cir., 2002) An EA fails to satisfy the requirements of NEPA if it does not contain an adequate evaluation of the

cumulative impacts of a project. *See Natural Resources Defense Council, Inc. v. United States Army Corps of Engineers,* 457 F.Supp.2d 198, 230-31 (S.D.N.Y.2006); *Sierra Club v. Bosworth,* 352 F.Supp.2d at 925-27; and *Wyoming Outdoor Council Powder River Basin Resources Council v. United States,* 351 F.Supp.2d 1232, 1243 (D. Wyo. 2005). "Evidence is increasing that the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individually minor effects of multiple actions over time." CEQ, "Considering Cumulative Effects Under the National Environmental Policy Act", p. 1.

### The EIS' Geographic Scope of Cumulative Impacts is Too Restrictive

230.    In analyzing cumulative impacts, it is first necessary for an agency to identify the geographic area within which a project's cumulative impact on environmental resources may occur. The choice of an analysis scale must represent a reasonable decision and cannot be arbitrary. An agency must provide support for its choice of analysis area and must show that it considered the relevant factors. The geographical scope is not necessarily limited to the project's geographical boundaries. Nor is it limited to other administrative or political boundaries. Instead, demarcation of the boundaries requires a complicated analysis of several factors, such as the scope, magnitude and type of the project considered in relation to other past, current and future project, the area of potential cumulative effects, and other related issues.

231.    The EA in this case did not make clear the geographic area within which it chose to conduct the cumulative impacts analysis. The EA attempts to limit the cumulative impact analysis to only the immediate area of the 30 Corridor or the "study area" around the Corridor. The 30 Corridor Project, in conjunction with past, current and reasonably-certain future highway projects will have potentially significant impacts on air quality throughout central Arkansas and

on travel and transportation in south-southwestern United States.  Such a narrow designation of geographic area defeats the purpose of a cumulative impact analysis and renders the EA and the resulting FONSI to be invalid.

### *The EA Failed To Provide A Detailed Catalogue of Past, Current and Future Projects That Have Or Could Combine With The Intermodal Project To Cause Cumulative Impacts*

232.    A starting point for assessment of cumulative impacts in an EA is for the preparer to prepare a catalogue of past, current and future projects or sources reasonably certain to occur as a source of information regarding the environmental impacts from those sources that currently exist, under development, or that may be developed.

233.    An EA's analysis of cumulative impacts must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment. General statements about "possible effects" and "some risk" do not constitute a "hard look" absent a justification regarding why more definitive information could not be provided. Some quantified or detailed information is required.

234.    The EA provides no catalogue of past, current and future projects (sources) reasonably certain to occur as a source of information regarding the environmental impacts, and failed to take a "hard look" at the cumulative effects of those projects and sources that were identified with the effects of the proposed 30 Corridor Project.  The cumulative effects analysis is deficient and should be remanded to the Defendants with instructions to conduct an EIS.

88

### *The EA Fails To Address Cumulative Impacts*
### *Of Simultaneous Current Projects on Three Interrelated Interstates*

235.    As noted above, at least three (3) major projects involving the interstate highway system in Little Rock-North Little Rock are planned and in the development stage, and if they all are implemented as planned by ArDOT, their construction will overlap. Those areas are the 30 Corridor Project (including the removal and replacement of the I-30 bridge), the widening of I-630 between University Avenue and Baptist Medical Center, and the widening of Highway 10 between Pleasant Valley Drive and Pleasant Ridge Road, with modifications to the I-430 Interchange with Highway 10. Further expansion of I-630 and I-30 south of the 30 Corridor Project area are in the planning and development stages.

236.    All of these Interstates and State Highway 10 are major traffic arteries, carrying tens, if not hundreds of thousands of vehicles per day in and through Little Rock and North Little Rock. There is no question that they are part of "past, current or reasonably foreseeable actions," and clearly fall within the definition of "cumulative impacts" set forth above.

237.    The indirect and cumulative impacts on the human environment of conducting all three of those major projects with substantial overlap of construction was not mentioned in the EA. In addition, the cumulative impacts of all three projects (assuming they are completed) in the future was not discussed and analyzed.

### *The EA Fails to Analyze the Cumulative Impact of Completion of Interstate 57*
### *And the Additional Traffic That Would Be Added to the 30 Corridor*

238.    The Defendants propose to expand and include the present U.S. Highway 67/167 that intersects Interstate 40 in North Little Rock in the interstate system as Interstate 57. As proposed, and as relevant to this Complaint, I-57 would run from St. Louis, Missouri through northeast

Arkansas and along the current Highway 67/167 corridor to Little Rock-North Little Rock, where it would merge with the current I-40 and I-30. Signs have been posted by ArDOT and/or FHWA on Highway 67/167 stating that it is "Future I-57".

239.    The expansion of Highway 67/167 into I-57 would likely result in a dramatic increase in automobile and truck traffic on I-30 and I-40, and would have significant cumulative impacts on those two existing interstate highways and the 30 Corridor area. However, the EA does not mention this proposed development.

240.    The failure of the Defendants to consider and analyze the potential cumulative effects of future I-57 is a violation of NEPA, and should require the FONSI and the underlying EA to be voided and this matter remanded to the Defendants.

## COUNT 11.

### *Effect of Replacement of the I-30 Bridge*

241.    Each alternative in the EA assumes that the existing I-30 Bridge will be demolished and replaced. Aside from its age and deteriorating condition, the major objection to the existing bridge is that it contains a pier or support that is located in the middle of the shipping channel in the Arkansas River, and presents a hazard for barges and other vessels navigating the Arkansas River.

242.    However, there is nothing in the EA or any of its Appendices that discusses reasonable alternatives to the bridge design as proposed in Alternatives 1 and 2, or indirect and cumulative impacts of the demolition and reconstruction of the bridge. It is apparently assumed in the EA that such action is necessary, desired and beneficial.

243.    There are reasonable alternatives to the demolition and replacement of the I-30 bridge as proposed by the design contained in Alternatives 1 and 2 that should be analyzed. In addition, the

90

demolition and replacement of the bridge will have its own indirect and cumulative impacts on the use of the Arkansas River by barge traffic, on the possible development of additional barge terminals on the River, and on noise, air quality, employment and safety of persons in central Arkansas. Those potential impacts have been ignored in the EA.

## COUNT 12.

### *Violation of the Federal Transportation Act Section 4 (f)*
### *49 U.S.C. § 303; 23 U.S.C. §138*

244.    Plaintiffs reassert and reallege each of the preceding paragraphs as if set forth herein.

245.    Section 4(f) of the Federal Transportation Act prohibits the FHWA from approving any project that requires the use of publicly owned parkland, recreation areas, or wildlife and waterfowl refuges of national, state, or local significance unless (1) there is no prudent and feasible alternative to using such land and (2) the project includes all possible planning to minimize harm to the parkland. 49 U.S.C. § 303(c); 23 U.S.C. § 138; 23 C.F.R. Part 774. The "no feasible and prudent alternative" 4(f) standard allows less discretion for an agency to reject alternatives than under NEPA. An adequate Section 4(f) evaluation must be performed before approval of any use of Section 4(f) property.

246.    ArDOT and FHWA have failed to adequately conduct the above 4(f) analysis related to use of publicly-owned land which lies immediately adjacent to the west of the Project at McArthur Park, the use of publicly-owned land at the Clinton Center, the use of publicly-owned park land at the River Market area of Little Rock, and the use of publicly-owned land at the Riverside Park area of North Little Rock.

247.    The Project will use the above-named parklands, both through constructive use from the

Project causing indirect significant and adverse impacts to those lands, and through actual use

including physical impacts on and to those lands. Such "use" includes increased noise from both

I-30 and I-630, both during construction of the 30 Corridor Project (including the changes to the

interchange), and the impacts on air quality in MacArthur Park, Clinton Park, the River Market

and Riverside Park.

248.    In violation of Section 4(f) of the Federal Transportation Act, ArDOT and FHWA have

not considered if there is no prudent and feasible alternative to using the lands of those public

parks, and have not done all possible planning to minimize harm to said park lands.


## COUNT 13.

### Defendants Failed To Respond to Significant Public Comments

249.    40 CFR 1502.9(b) provides that "Final environmental impact statements shall respond to

comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points

in the final statement any responsible opposing view which was not adequately discussed in the

draft statement and shall indicate the agency's response to the issues raised." This requirement

also applies to preparation of responses to environmental assessments.

250.    There has been no appropriate response to numerous comments made by the public and

public officials, nor has the EA otherwise addressed or even acknowledged these

concerns.  There were many substantive, well-reasoned comments that ArDOT ignored or chose

to respond to with gross generalizations. Examples of this violation include:

> The CARTS Study Director pointed out the EA's failure to address the I-30
> eastbound/I-40 eastbound bottleneck in the 8-Lane Alternative (1874/7100) but a
> review of the response codes (F-4, G-4, G-5, G-6, F-1, F-7, J, and I-12) shows no
> response to this particular point.

92

None of the following comments from the CARTS Study Director on page 1875/7100 were addressed:

> "To present a complete picture of alternatives and their impacts, the Department should do the following:
>
> (1) for the bottleneck in the PM peak under the eight lane alternative, add one additional lane north and east bound from Broadway onto 67/167 (as included in the ten lane alternative); then rerun the simulations, and
>
> (2) Rerun the simulations of all alternatives without assuming the widening of I-30 to 8 lanes from the South Terminal to 65th Street, and (3) Compare the performance of the alternatives as altered above and make the results of those runs available to the public, and
> ...
> (4)Make available to the public the AM Simulation and 3D models of the Alternatives presented at the Public Hearing and both the AM and PM peak model runs for the variations identified above. Then the public and decision-makers will have a full range of possibilities to consider."

Nor was any response made to the CARTS Study Director's comment on page 1875/7100 regarding the Highway 10/I-30 Interchange, which stated in part: "

> This intersection has a high pedestrian accident rate and has been mentioned as critical to the City and the health of the River Market. None of the alternatives has yet proposed an acceptable solution to this problem. To insure pedestrian safety, options should be considered that decrease through vehicle traffic at this intersection, eliminate pedestrian and vehicle conflicts, and incorporate a pedestrian all-walk phase into the signal timing. ... ."

251.    The Environmental Assessment, and the resulting Finding of No Significant Impact issued by the FHWA, fail to comply with the requirements of NEPA as described above and as will be more specifically described in the Plaintiffs' Brief in Support of their Motion for Preliminary Injunction to be filed herein. The acts of the Defendants in preparing and issuing the FONSI and the underlying EA should be declared to be arbitrary, capricious and otherwise not in compliance with law, those documents declared to be null and void, and they should be remanded to the Defendants with instructions that if they continue to develop plans for

development and construction of the 30 Corridor Project, that such plans and development be performed in accordance with all requirements of NEPA, the Federal Highway Act, as amended, all regulations implementing such statutes, Executive Orders 12898 and 11988, and all other applicable laws, regulations and orders.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for an Order:

1. declaring the Finding of No Significant Impact issued by Defendant, Angel L. Correa, State Director of the Defendant Federal Highway Administration dated February 26, 2019, based upon an Environmental Assessment prepared by the Defendant, Arkansas Department of Transportation dated June 8, 2018, to be null and void, and of no effect;

2. granting preliminary and permanent injunctions against the Defendant, Arkansas Department of Transportation, the individual defendant, Scott Bennett, Director, Arkansas Department of Transportation, his successor or subordinates, the Federal Highway Administration, and Angel L. Correa, Division Director of the Arkansas Division of the Federal Highway Administration, his successor or subordinates, from implementing or allowing the implementation of the 30 Corridor Project as authorized by the FHWA's FONSI;

3. requiring the revocation of any permits issued to ArDOT for dredge and fill activities on any portion of the 30 Corridor Project under Section 404 of the Clean Water Act;

94

4.     remanding this matter to the Defendants with instructions that they not take

       any action on the 30 Corridor Project until they have developed a complete

       and funded proposal for all portions of the entire proposed project so it may be

       assessed pursuant to NEPA;

5.     directing the Defendants or their successors to prepare any future

       environmental documentation regarding the proposed 30 Corridor Project in

       accordance with the requirements of NEPA and its implementing regulations,

       and all other applicable laws, regulations and policies;

6.     Awarding plaintiffs their costs of litigation, including but not limited to,

       attorneys' fees, consultants' and expert witness fees, and costs as permitted by

       28 U.S.C. §2412 and Rule 54(d), Federal Rules of Civil Procedure; and

7.     Awarding such other legal, equitable and proper relief as may be just and

       proper.

                          Respectfully submitted,

                          **WILLIAMS & ANDERSON PLC**

                   By:    Richard H. Mays (AR Bar # 61043)
                          Heather Zachary (AR Bar # 2004276)
                          Stephens Building – 22nd Floor
                          111 Center Street
                          Little Rock, AR  72201
                          rmays@williamsanderson.com
                          hzachary@williamsanderson.com



U.S. Department
of Transportation

**Federal Highway
Administration**

**Arkansas Division**

February 26, 2019

700 W. Capitol Ave
Room 3130
Little Rock, AR 72201-3298
501-324-5625(Office)
501-324-6423(Fax)

Mr. Scott Bennett, Director
Arkansas Department of Transportation
P.O. Box 2261
Little Rock, Arkansas 72203-2261

Subject: I-530 – Hwy. 67 (Widening & Reconstr.)(I-30 & I-40)(F)
Pulaski County, ARDOT Job Number CA0602
FAP Number NHPP-030-22(68)

Dear Mr. Bennett:

As requested in Mr. John Fleming's letter of February 19, 2019, we have determined that this project will have no significant impact on the environment.

The Finding of No Significant Impact (FONSI) is based on the results of the environmental assessment (EA). The EA has been independently evaluated and determined to adequately and accurately discuss environmental issues and impacts of the proposed project. It provides sufficient evidence and analysis for determining that an environmental impact statement is not required. You may proceed to final design of the selected alternative. If you have any questions or would like to discuss, please contact me at 501-324-5625.

Sincerely,

Angel L. Correa
Division Administrator

Enclosure



**EXHIBIT**

**1**



ARKANSAS DEPARTMENT OF TRANSPORTATION

ArDOT.gov | IDriveArkansas.com | Scott E. Bennett, P.E., Director

10324 Interstate 30 | P.O. Box 2261 | Little Rock, AR 72203-2261
Phone: 501.569.2000 | Voice/TTY 711 | Fax: 501.569.2400

February 19, 2019

Mr. Angel Correa
Division Administrator
Federal Highway Administration
700 West Capitol, Room 3130
Little Rock, Arkansas 72201-3298

Re: Job Number CA0602
    FAP Number NHPP-030-22(68)
    I-530 – Hwy. 67 (Widening &
        Reconst.) (I-30 & I-40) (F)
    Pulaski County
    Revised FONSI Request

Dear Mr. Correa:

An Environmental Assessment (EA) for the referenced project was approved for
public dissemination on June 8, 2018, and a Location and Design Public Hearing
was held on July 12, 2018.

To address your comments and provide additional information, we have included
a revised Disposition of Comments, EA with errata sheet, and updated Finding of
No Significant Impact (FONSI) document for your review and approval, if
acceptable. A review of the project and its impacts indicate that its construction
will have no significant impact on the environment.

If you have any questions, please contact the Environmental Division at
569-2281.

Sincerely,

*John Fleming*

John Fleming
Division Head
Environmental Division

Enclosures
JF:DN:fc

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 1 of 29

## FEDERAL HIGHWAY ADMINISTRATION
## FINDING OF NO SIGNIFICANT IMPACT
### I-530 – Hwy. 67 (Widening & Reconstr.)(I-30 & I-40)(F)
### F.A.P. NUMBER NHPP-030-22(68)
### ARDOT JOB NUMBER CA0602
### PULASKI COUNTY, ARKANSAS

Upon consideration of the Federal Highway Administration (FHWA) approved Environmental Assessment (EA), public comments, and other considerations as contained in the following discussion, the FHWA has determined that the Preferred Alternative for the Widening and Reconstruction of I-30 and I-40 from I-530 to Hwy. 67 (the 30 Crossing project), will have no significant impact on the human or natural environment and hereby issues a Finding of No Significant Impact (FONSI) pursuant to 23 CFR 771(a).

The project is located in the Central Arkansas Regional Transportation Study (CARTS) area, which includes all of Faulkner, Pulaski, and Saline Counties, as well as portions of Lonoke County (Figure 1). Pulaski County is part of the Little Rock-North Little Rock Metropolitan Statistical Area (MSA) that is the political, economic, and transportation center of the state of Arkansas. Little Rock is the state capital and largest city (population of 193,524 according to the 2010 Census) in Arkansas, also serving as the county seat of Pulaski County. Little Rock is a regional employment center, with some of the major employers being the State of Arkansas, City of Little Rock, the federal government, and the University of Arkansas for Medical Sciences. North Little Rock had a population of 65,538 according to the 2010 Census, and also is home to several large businesses including the Union Pacific Railroad (UPRR). The project area is urbanized and primarily comprised of commercial and residential properties. There are undeveloped wetland areas in the southern and northern portions of the project area. Some of the prominent community features in the project area are the Verizon Arena, William J. Clinton Presidential Center and Park, Heifer International, and Little Rock River Market.

The I-30 corridor generally consists of three main lanes in each direction with parallel one-way discontinuous frontage roads on each side of the interstate within the right-of-way along the outer edge. In the northern portion of the project area, the I-40 corridor consists of three to four main lanes in each direction with parallel one-way frontage roads on each side of the interstate between the I-30/I-40 interchange and North Hills Boulevard (Blvd.). Within the project area, both I-30 and I-40 are classified as interstates, which are the highest classification of principal arterials. Within the 7.3-mile corridor, there are four system (connections between interchanges) interchanges:

- I-30 with I-530 and I-440
- I-30 with I-630
- I-30 with I-40
- I-40 with Hwy. 67/167

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 2 of 29

**Figure 1: Project Location Map**



Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 3 of 29

I-30 serves state and regional traffic passing through Little Rock and North Little Rock, but also provides significant local access to the downtown areas. I-30 and I-40 are the most highly traveled roads in Arkansas. Within the project area, the busiest roadway segments are I-40 west of North Hills Blvd and I-30 at the Arkansas River Bridge. Approximately 18% of the traffic is "through" traffic, which consists of vehicles moving through the project area that have both an origin and destination outside of the project area. Of the travelers within the project area coming from the north, more than half are destined for the downtown area of North Little Rock and Little Rock. More than one third of the daily traffic consists of "local" traffic, residents of Little Rock or North Little Rock using the I-30/I-40 corridor to travel to destinations within the project area. Daily truck traffic in the project area varies from 6% on I-30 at the Arkansas River Bridge to 9% on I-40. I-40 is an important freight corridor.

During the morning peak hour of 7:15-8:15 AM, I-40 westbound between Hwy 67 and I-30; and I-30 southbound from I-40 to downtown Little Rock; have high levels of congestion, with speeds significantly reduced and delays almost twice as long as free flow travel. I-30 northbound from the I-530/I-440 interchange to the I-630 interchange, is also highly congested in the morning peak hour. In the afternoon peak hour of 4:30-5:30 PM, I-30 northbound between I-630 and I-40 is highly congested, with delays and reductions in speed. I-30 southbound approaching the I-530/I-440 interchange is also highly congested in the afternoon peak. Both I-30 and I-40 have pavement that is in need of rehabilitation and geometrical deficiencies, including ramp lengths that are too short, interchanges that are too close together, curves that are too sharp, left exits, and shoulders that are missing or not wide enough. Traffic congestion and these roadway geometric deficiencies have contributed to crash rates that are substantially higher than the statewide average for similar freeways, with a high number of serious injury and fatal crashes. In addition, the I-30 Arkansas River Bridge is structurally deficient and has a substandard horizontal navigational clearance due to a pier that obstructs the navigational channel.

The purpose of this project is to increase the safety of vehicular traffic on I-30 and I-40 by correcting geometric deficiencies, improve the condition of the roadway by modernizing infrastructure and maintaining a state of good repair, improve navigational safety on the Arkansas River, correct the I-30 Arkansas River Bridge deficiencies, and reduce traffic congestion by improving mobility on I-30 and I-40. The intent of the project improvements is to provide for increased travel speed and reduced travel time to downtown North Little Rock and Little Rock as traffic demand increases in the future. The I-30 Arkansas River Bridge would be replaced with a new structure, correcting the functional and structural deficiencies and navigation safety issues. The data contained in the EA supports the need for the project, given both existing conditions and those projected for 2041.

This FONSI is based on FHWA's independent evaluation. The information contained in the EA has been determined to adequately and accurately discuss the need, environmental issues, and impacts of the proposed project and appropriate mitigation measures. The EA

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 4 of 29

and its supporting documentation reflect the extensive amount of alternative evaluation and public involvement performed by the study team, represented by the 18 appendices, totaling 7100 pages. The actual body of the EA is 123 pages, of which 51 pages are graphics intended to make the alternatives evaluation process easier for the public to understand. Of the appendices, the lengthiest are the Hazardous Materials Report (Appendix L), the NEPA Public Involvement Summary (Appendix E), and the IJR Traffic Results and Safety Analysis (Appendix B), which together account for over half of the total pages. The information presented in the appendices, and summarized in the EA, provides sufficient evidence and analysis for determining that no impacts identified would cause any significant adverse effects to the human or natural environment. Determination of no significant impact is sufficient cause for determining that an Environmental Impact Statement is not required.

**Project History**

Since 2002, Metroplan has reported that heavy congestion levels exist on I-30 and I-40 and recommended interchange improvements at I-30/I-630, I-40/I-30 and I-40/Hwy. 67. Up until January 2012, it also reported the need to widen I-30 and I-40 to ten lanes from I-630 to Hwy. 67/167 as indicated in Metroplan's Congestion Management Process Reports. Furthermore, the same recommendation was indicated in the 2003 Central Arkansas Regional Transportation Study – Areawide Freeway Study.

The National Environmental Policy Act (NEPA) Study incorporated the results of the Planning and Environmental Linkages (PEL) Study begun in April 2014 by ARDOT. The PEL Study was conducted in accordance with 23 CFR 450 and followed the FHWA *Guidance on Using Corridor and Subarea Planning to Inform NEPA*. This coordination of planning and NEPA efforts is consistent with congressional legislation intended to reduce duplication and improve decision-making. State, local, tribal and Federal agencies were involved in the PEL study and the public was given extensive opportunity to comment. At the beginning of the PEL study, a Technical Working Group (TWG) consisting of representatives of 37 agencies, including FHWA, the Cities of Little Rock and North Little Rock, Pulaski County, Metroplan, the Central Arkansas Transit Authority, regulatory and resource agencies, as well as the cooperating agencies, the U.S. Army Corps of Engineers (USACE) and U.S. Coast Guard (USCG).

The PEL Study identified the purpose and need for improvements to I-30 and I-40 and evaluated possible viable alternatives to carry forward into the NEPA Study. The PEL Study involved evaluation of a wide range of potential solutions including highway build alternatives, other modes (transit, rail), congestion management and bridge rehabilitation and replacement alternatives. Because of the close proximity of the I-30/Broadway, I-30/Hwy. 10, and I-30/I-630 interchanges to the Arkansas River Bridge, replacement of the bridge and correction of its structural and geometric deficiencies cannot be done in isolation

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 5 of 29

from improvements to I-30. Additional capacity was determined to be needed in the downtown areas of Little Rock and North Little Rock in order to promote connectivity across the Arkansas River. In addition, simply replacing the Arkansas River Bridge would not solve the roadway geometric issues that contribute to safety and congestion issues on I-30 and I-40 corridors. Consequently, bridge replacement was considered as part of the highway build alternatives, rather than the No Action Alternative. Representatives of the USCG worked closely with the study team to establish criteria for replacement of the Arkansas River Bridge, including horizontal and vertical clearances. Input from USCG, USACE and the shipping industry helped the study team identify the hazard caused by the existing bridge piers and guided preliminary bridge concepts, which removed the piers out of the shipping channel.

The study team used extensive outreach, including four public meetings, to solicit suggestions from the public for alternatives that could improve I-30. All alternatives proposed by the public were considered. Among the issues that the public raised during the PEL that were later incorporated into the project alternatives were weaving issues associated with the left exits and the Curtis Sykes interchange, and the need to look at alternatives for the Hwy. 10 interchange (EA Appendix D: PEL Public Involvement Summary, pp. 1007-1023, 1053-1059, and 1084-1089). The study team developed a screening methodology for evaluating these alternatives based on effectiveness in meeting the purpose and need for the project, environmental impacts and costs. The results of the screening process were presented to the public and suggestions for improvements to the alternatives were received. At the conclusion of the PEL, the study team presented a recommendation to the public: the 10-lane Downtown Collector/Distributor (C/D) alternative. The PEL recommendation included the addition of main lanes, main lane widening, C/D roads, complementary alternatives, and the replacement of the Arkansas River Bridge. On August 6, 2015 FHWA concurred that the decisions and recommendations made during the PEL Study could be utilized and advance into the NEPA process. Prior to the start of the NEPA process and at the request of Metroplan, FHWA decided to carry the 8-lane General Purpose Alternative, a second highway build alternative that had been screened out during the PEL study, forward into NEPA.

The NEPA Study began in 2015 with the purpose of evaluating the environmental effects of the alternatives and to determine if an Environmental Impact Statement was warranted. Alternatives analyzed included the No-Action Alternative; two corridor improvement alternatives that included the 10-lane Downtown C/D (renamed as 6-Lane with C/D), and the 8-lane General Purpose; and additional corridor improvement alternatives suggested by the public during the two public meetings and extensive outreach activities that were conducted as part of the NEPA public involvement process.

Of the numerous interchange alternatives for the Hwy. 10 interchange that were evaluated, the two that were rated the highest based on performance measures, cost, and environmental impacts, were the At-Grade Single Point Urban Interchange (SPUI) and Split Diamond

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 6 of 29

Interchange (SDI). Based on comments from the public and the City of Little Rock, the At-Grade SPUI was elevated and realigned in order to allow the River Rail Streetcar to continue to operate on East 3rd Street, after which the interchange option was known simply as the SPUI. In response to public comments, the SDI was revised to prevent an increase in traffic within the MacArthur Park National Register of Historic Places (NRHP) Historic District, a residential area extending from I-630 to Capitol Avenue. The revision prevented an increase in traffic in MacArthur Park, and improvements to local roadways within MacArthur Park are no longer needed. These two Hwy. 10 interchange options were shown to the public at Public Meeting 6 and were carried forward for consideration in the EA as independent Action Alternatives, under both corridor improvement Action Alternative 1 (8-Lane General Purpose) and corridor improvement Action Alternative 2 (6-Lane with C/D). The four Action Alternatives are therefore:

- Action Alternative 1A: 8-Lane General Purpose with SPUI at Hwy. 10
- Action Alternative 1B: 8-Lane General Purpose with SDI at Hwy. 10
- Action Alternative 2A: 6-Lane with C/D with SPUI at Hwy. 10
- Action Alternative 2B: 6-Lane with C/D with SDI at Hwy. 10.

The Interdisciplinary Staff, composed of representatives from various disciplines of ArDOT, considered information contained in the EA, and public comments received during the public involvement process before recommending Alternative 2B as the Preferred Alternative, as shown in **Figures 2-5**. Alternative 2B meets the project's purpose and need, minimizes overall impacts, and balances the benefits versus the overall impacts.

The Preferred Alternative is 7.3 miles in length with an estimated cost of between $615 and $700 million. The identified method of delivery of the project is design-build to a budget. The design-builder will work to maximize the amount of project scope that can be delivered for fixed budget of $535 million. In the event the Design-Build firm cannot provide the full project scope for the fixed budget, additional construction projects will be programmed and contracts will be let at a future date to complete the project scope. .

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 7 of 29

**Figure 2**



Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 8 of 29

Figure 3



Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 9 of 29

Figure 4



Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 10 of 29

**Figure 5**



Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 11 of 29

The Location and Design Public Hearing was held July 12, 2018. There were 351 comments received. A hard look at these comments was taken and an extensive 261-page response to the Public Hearing comments was prepared and attached to the EA (Appendix E). Numerous commenters were opposed to the project and those views were thoroughly considered to determine if any of them resulted in a need to perform additional analyses or use a different methodology to evaluate impacts. There were no comments that resulted in the need for additional or different analyses to determine if the project involves significant impacts. The analyses performed for the project used the correct methodology and adequately answered the comments raised by the public. The comment responses consisted of summarizing the information already present in the EA or EA appendices and referring the commenters to the locations where it could be found.

## Environmental Impacts

All environmental impacts have been evaluated and it has been determined that none are significant. Basis for this determination is given below:

### Land Use

The land surrounding the project corridor is heavily urbanized, with primarily commercial and residential land uses. The proposed project is included in the Fiscal Year 2019-2022 Transportation Improvement Plan developed by Metroplan, ARDOT, and Rock Region METRO, and is consistent with current and future land use plans. Through coordination with the Natural Resources Conservation Service, it has been determined that the project is in a heavily urbanized area with no farmlands.

FHWA finds that the impacts to land use are not significant.

### Social

*Community Facilities/Services.* The Preferred Alternative does not require any right of way from a community facility. The Arkansas River Trail passes through I-30 right of way on both sides of the Arkansas River. The Trail will remain open during construction, although temporary re-routing may be necessary at times, as discussed in Section 4(f) Impacts. The Preferred Alternative includes improvements to interchange ramps, frontage roads, and cross streets, including bicycle and pedestrian accommodations that would improve access to public facilities and improve emergency services response time.

*Neighborhood and Community Cohesion.* The Preferred Alternative would have a beneficial effect on the communities of Little Rock and North Little Rock. The Preferred Alternative would result in relatively few displacements: six residential and five business displacements are anticipated. The C/D system would improve community cohesion by improving connectivity across the Arkansas River, and the improved frontage roads would enhance access between East 3rd Street, East 4th Street, and Capitol Avenue. The removal of the existing Hwy. 10 interchange and spur connecting I-30 to Cumberland Street would

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 12 of 29

change travel patterns in downtown Little Rock and provide a visual enhancement by creating potential green space. In addition, improvements to make the area safer for pedestrians and bicycles are part of the Preferred Alternative. Public comments indicated concern that these improvements would have a detrimental impact on downtown Little Rock; however, the City of Little Rock and Little Rock Chamber of Commerce believe that the Preferred Alternative will have a beneficial effect. Based on this input, the effects of the Preferred Alternative on communities are considered to be beneficial.

FHWA finds that the social impacts are beneficial.

Environmental Justice

The Environmental Justice analysis has been performed in accordance with the Executive Order 12898 on Environmental Justice, and FHWA's EJ Order 6640.23A. The analysis is also in compliance with Title VI of the Civil Rights Act of 1964 which prohibits discrimination based on race, color, and national origin in any program or activity receiving Federal assistance. These federal actions provide that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. No person was discriminated against or denied the opportunity to comment on the proposed project alternatives. During the PEL and NEPA phases of the project, the team actively solicited the involvement of the minority communities. Provisions were made for Limited English Proficiency (LEP) persons at all public meetings. There were community meetings held at venues in minority neighborhoods, and outreach activities specifically targeted to minority and low-income communities including flyers, mailings, public service announcements, and newspaper ads.

Neighborhoods adjacent to the I-30 and I-40 corridors generally are minority communities with low-income populations. Twenty-two of the 62 census block groups in the study area have median incomes below the poverty guideline. The 2018 poverty guideline is $25,100 which is updated periodically in the Federal Register by the U.S. Department of Health and Human Services under the authority of 42 USC 9902 (2). In other words, approximately 33 percent of the households (7,919 out of the total 24,335) in the study area are considered to be low-income. People were living in 1,240 census blocks within the project study area, 877 of which have a minority population greater than 50% of the total population. For the total project study area, the minority population consists of approximately 59% of the total population; therefore, the population is predominantly minority for the entire study area. Minority populations are defined by Executive Order 128989 and are discussed in the Community Impacts Technical Report.

The right of way being acquired for the project requires relatively few relocations considering the highly developed 7.3-mile corridor; however, one business relocation and six residential relocations are within a high minority neighborhood. The relocations are necessary in order to construct a bridge across the Union Pacific Railroad (UPRR). This

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 13 of 29

bridge will be beneficial to the community by connecting the separated segments of Cypress Street. Cypress Street would then become a one-way southbound frontage road with provisions for bicyclists and pedestrians. The new frontage road would benefit the minority neighborhoods located north and south of the UPRR, which have been historically separated by the railroad, by increasing connectivity. These relocations are not considered disproportionately high and adverse to Environmental Justice populations, because these relocations (one business and six residences) are located within one EJ census block. The other four business relocations are located within non-EJ census blocks. No other displacements are anticipated within the remaining 876 census blocks with minority populations greater than 50 percent of the total population. Furthermore, no displacements are located within low-income areas.

Noise impacts would potentially occur along the entire corridor, including the areas of minority and/or low-income populations, and would affect all users of the facility. To address these impacts, potential noise abatement measures could include construction of traffic noise barriers, which would minimize and mitigate the potential noise impacts resulting from the proposed project alternative. An evaluation of noise abatement measures was conducted for the Preferred Alternative. Three potential traffic noise barriers were found to meet ARDOT criteria for feasibility and reasonableness and are therefore warranted. All three locations are within EJ population areas. These potential traffic noise barriers would benefit a total of 253 receptors. This project will be constructed as a design-build project. For design-build projects, design of design-build noise abatement measures is based on the preliminary noise abatement design developed during the noise analysis and re-evaluated during the project's final design.

The access changes with the Action Alternatives discussed above in the area of the Curtis Sykes Drive and the Hwy. 10 Interchange would occur in areas of high minority and/or low-income populations. Access would not be eliminated, merely shifted in location. Refer to the Community Impacts Technical Report (EA Appendix F) for additional discussion on access changes within the project limits.

Based on this information, FHWA finds that the Preferred Alternative would not have disproportionately high and adverse effects on minority and low-income populations and finds that the impacts would not be significant.

<u>Historic Properties</u>

A cultural resources survey has been conducted for the project. The investigation into historic resources determined that the project is in close proximity to seven historic districts, and 136 properties that are listed on or eligible for the NRHP, including the North Locust Street Overpass. The North Locust Street Overpass, which is eligible for the NRHP, and protected under Section 106 of *The National Historic Preservation Act of 1966,* is structurally deficient and must be replaced. The FHWA, in consultation with the State

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 14 of 29

Historic Preservation Officer (SHPO) and the Advisory Council on Historic Preservation (ACHP), has determined the proposed actions will have an adverse effect on the North Locust Street Overpass. Therefore, FHWA, the SHPO and the ACHP executed a Programmatic Agreement (PA) to resolve the adverse effect on the North Locust Street Overpass, as well as to prevent any unforeseen impacts upon any other archeological or historic sites identified in the EA as potentially eligible to the NRHP (Appendix 2). The SHPO concurred with FHWA's determination that the project "will not indirectly or cumulatively adversely affect the Historic Properties or Districts due to noise, changes in traffic patterns or volume and construction staging."

As a result of the archaeological investigation, seven new archeological sites were identified and recorded and a previously recorded but unevaluated archeological site was revisited. None of the newly recorded archeological sites were recommended as eligible for inclusion in the NRHP. No further archeological identification work was recommended for the currently planned project area. FHWA developed a PA in consultation with the SHPO and ACHP because some details of the project cannot be determined until final design. The PA includes an Unanticipated Discovery Plan (UDP) that specifies procedures to be followed if cultural resources are discovered during construction. If prehistoric sites are impacted, FHWA-led consultation with the appropriate Native American Tribe(s) will be conducted and the site(s) evaluated to determine if Phase II testing is necessary. Should any of the sites be determined as eligible or potentially eligible for the NRHP and avoidance is not possible, the PA includes procedures for the preparation of site-specific treatment plans and data recovery. All off-site areas, such as borrow pits, waste areas, and work roads, will be surveyed for cultural resources when locations become available. FHWA and ArDOT developed a Design Coordination Plan to establish procedures for coordination with SHPO and other interested parties should design changes occur that may affect historic properties. A Mitigation Measures Plan has also been developed to resolve any adverse effects resulting from unanticipated effects on historic properties. The PA is attached as Appendix 2.

FHWA finds that impacts to historic resources are not significant.

Section 4(f)

The proposed action will use the North Locust Street Overpass, which is eligible for the NRHP and is protected under *Section 4(f) of the Department of Transportation Act of 1966,* as amended. Alternatives including the No-Action, building a new structure on a new location and retaining the existing structure, and rehabilitating the existing structure were evaluated. It was determined that none of these alternatives are feasible and prudent. A Programmatic Section 4(f) Evaluation has been prepared to document that the North Locust Street Overpass can be demolished, subject to the agreement that mitigation to document the bridge will be provided to the Arkansas Historic Preservation Program.

The Preferred Alternative will require acquisition of right of way from three publicly-owned parks which are protected under Section 4(f): North Shore Riverwalk Park, the

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 15 of 29

Julius Breckling Riverfront Park, and the William J. Clinton Presidential Center and Park. In addition, a fourth park, MacArthur Park, is close enough to be evaluated for noise impacts. The Preferred Alternative will not have noise effects on any of the four parks. FHWA has evaluated the effects of the Preferred Alternative on the North Shore Riverwalk Park, the Julius Breckling Riverfront Park, and the William J. Clinton Presidential Center and Park and determined that they are minor and will not harm the contributing features, assets, or activities that qualify the parks for protection under Section 4(f). Through consultation with the Cities of Little Rock and North Little Rock, and consideration that the permanent and temporary impacts to the parks will be minimized and mitigated as described below, FHWA has determined that the impacts of the project constitute a *de minimis* effect on the parks.

ARDOT has reached agreements with the City of North Little Rock and the City of Little Rock, regarding minimization and mitigation of impacts to North Shore Riverwalk Park, Riverfront Park, and the Clinton Center.

The following measures would be included in the proposed project to reduce harm to Riverfront Park and the Clinton Center:

- The westernmost stairway connecting President Clinton Avenue to the Arkansas River Trail in the Clinton Center would be in the proposed right of way and would be removed. The stairway would be reconstructed outside the proposed right of way by ARDOT. The Arkansas River Trail would remain within ARDOT right of way.

- The City of Little Rock would be responsible for temporary relocation of the statues and benches along the Promenade. Upon completion of the bridge widening, the statues and benches could be placed within ARDOT right of way under the terms of an air space agreement at a location agreed to by ARDOT, the City of Little Rock and the Clinton Center.

- There would be temporary impacts to the Bill Clark wetlands to the east of the Interstate 30 Bridge. Upon completion of the bridge, the area would be restored to its natural contours, stabilized, and allowed to revegetate naturally.

- The Preferred Alternative would result in removal of the existing circular ramps at the Hwy. 10 interchange, as well as removal of the storage building under Interstate 30 north of President Clinton Avenue. This alternative would create additional open space within ARDOT right of way adjacent to the Clinton Center, which would enhance visibility of the Clinton Center.

- Temporary closures of the Promenade would be minimized so as to minimize disruption and avoid any loss of access to Riverfront Park.

- The construction contractor would coordinate activities affecting the Arkansas River Trail with the City of Little Rock Parks and Recreation Department

through ARDOT. If temporary re-routing of the trail is necessary, a safe detour route would be established to avoid loss of use of the Trail.

- A plan would be created by the construction contractor and submitted to ARDOT containing a schedule of temporary closure times for ARDOT right of way containing the Promenade and the Arkansas River Trail. A safe detour route for the Arkansas River Trail, as specified by the City of Little Rock Parks and Recreation Department, would be established and maintained by the construction contractor. ARDOT would coordinate with the City of Little Rock Parks and Recreation Department to ensure that temporary closure of the Promenade and re-routing of the Arkansas River Trail would not occur until alternate access is provided.

The following measures would be included in the proposed project to reduce harm to Riverwalk Park. These measures have been coordinated with the City of North Little Rock.

- The pavilion is currently within ARDOT right of way and the City would need to move it outside the construction zone prior to construction. Following construction, the City may choose to relocate it to another area within the park. If the City desires to relocate it back to ARDOT right of way, this could be possible under an air space agreement.

- The design-builder would work through ARDOT with the City to identify areas where parking can be provided within ARDOT right of way.

- Re-routing of the Arkansas River Trail would be coordinated through ARDOT, with the City of North Little Rock Parks and Recreation Department, to provide the park personnel ample time to schedule park activities, including cycling events. A safe detour route would be provided.

- Access to the area of the Park west of Olive Street would be maintained by making the existing entrance-only opening in the flood wall to the west of Olive Street a two-way roadway. The area of the Park east of the Locust Street entrance would not be affected, as the Locust Street entrance would remain open.

- Temporary closure of the boat ramp would be coordinated with the activities of the Sherriff, US Army Corps of Engineers, and with fishing tournaments. Alternate access to the River is available at the existing boat ramps at either Burns Park, approximately 4 miles upstream in North Little Rock, or Murray Park, approximately 5 miles upstream in Little Rock.

- A plan would be created by the Design Builder and submitted to ARDOT containing a schedule of temporary closure times for the boat ramp and the Arkansas River Trail in the construction zone. A safe detour route for the Arkansas River Trail, as specified by the City of North Little Rock Parks and Recreation Department, would be established and maintained by the Design

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 17 of 29

> Builder. ARDOT would coordinate with the City of North Little Rock to ensure
> that temporary closure of the boat ramp or re-routing of the Trail does not occur
> until alternate access is provided.
>
> FHWA finds that impacts to Section 4(f) properties are not significant.

## Right of Way/Relocation

The project improvements will occur almost entirely within existing ARDOT right of way.
Approximately 11.1 acres of right of way will be required from 61 parcels. The proposed
project will require six residential relocations and five business relocations. Relocations
will be conducted in accordance with *The Uniform Relocation Assistance and Real
Property Acquisition Policies Act of 1970,* as amended.

FHWA finds that the right of way and relocation impacts are not significant.

## Air Quality

The project is located in an area that has been designated as being in attainment for the six
criteria transportation pollutants (particulate pollution, ground-level ozone, nitrogen
oxides, lead, carbon monoxide, and sulfur dioxide) for the past 25 years. Therefore, the
conformity procedures of *The Clean Air Act of 1970,* as amended, do not apply. Following
the procedures in the *Interim Guidance Update on Mobile Source Air Toxic Analysis in
NEPA* (2012 and 2016 update), a Mobile Source Air Toxic (MSAT) quantitative analysis
was prepared for the Action and No-Action Alternatives for the existing year (2014),
opening year (2021), and design year (2041). ARDOT consulted with an FHWA expert in
air quality in developing the MSAT analysis methodology and reviewing the results of the
analysis. The amount of MSATs emitted in the region are proportional to Vehicle Miles
Traveled (VMT); however, because of improvements in emissions technologies, total
MSAT emissions will decline over time, even while VMT increases. The same is true of
greenhouse gases (carbon dioxide, nitrous oxide, and methane) emitted by vehicles. Under
both the Action and No-Action Alternatives, total MSAT emissions would be lower than
present levels in the design year.

FHWA finds that the air quality impacts are not significant.

## Noise

In accordance with the *Title 23 Code of Federal Regulations Part 772, Procedures for
Abatement of Highway Traffic Noise and Construction Noise,* a study was conducted to
assess the potential noise impacts associated with the proposed project. A noise analysis
indicates that 224 receptors, including residences, offices, places of worship, cemeteries,
schools/childcares, hotels, active sports areas, and various recreational areas along the
project route are predicted to approach or exceed the noise abatement criteria with the
Preferred Alternative. Of these, 172 receptors currently approach or exceed the noise
abatement criteria, and 168 receptors will approach or exceed the noise abatement criteria
with the No-Action Alternative. The average increase in noise levels with the Preferred

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 18 of 29

Alternative is 1.4 decibels. An increase below 3 decibels is considered to be below the threshold of human hearing. No receptors experienced a substantial increase in traffic noise levels with the Preferred Alternative.

Noise abatement measures were evaluated at 15 locations along the proposed route. The result of the evaluation was that these potential noise wall or berms met ArDOT criteria for feasibility and reasonableness and are therefore warranted in three of these locations. These three potential noise walls or berms would benefit a total of 253 receptors. For design-build projects, design of design-build noise abatement measures is based on the preliminary noise abatement design developed during the noise analysis and re-evaluated during the project's final design. Noise abatement measures are considered, developed, and constructed in accordance with this standard (23 CFR 772) and in conformance with the provisions of 40 CFR 1506.5(c) and 23 CFR 636.109.

FHWA finds that the noise impacts are not significant.

<u>Water Quality and Aquatic Resources</u>

The proposed project study area spans four ecoregions: Arkansas River Valley, Ouachita Mountains, Gulf Coastal Plain, and Mississippi Delta. The project area is within the watershed of the Arkansas River (HUC Code 1111020704), with two major contributing basins, Lakewood Lakes/Dark Hollow and Fourche Creek. There are fifteen streams within the project area, totaling 16,631 linear feet. These streams consist of ephemeral, intermittent, and perennial channels, some containing multiple types. Most of the natural stream systems have been altered through channelization, excavation, and straightening for highway/roadway construction and storm water conveyance. Most of the streams are narrow and cross the interstates and highways in the project area via culverts. Fourche Creek is listed as impaired for dissolved oxygen, turbidity and metals.

Approximately 852 linear feet of streams, out of approximately 16,631 linear feet of streams in the project area, would be impacted by the Preferred Alternative. The majority of stream impacts occur to two channelized streams that cross I-40 or the I-30/I-40 interchange in the Dark Hollow area of North Little Rock. Permits would be obtained from USACE for stream impacts. During design, further efforts to minimize stream impacts would be investigated, and any unavoidable impacts would be mitigated.

Floodways associated with Fourche Creek and the Arkansas River cross the project, and a floodplain associated with Dark Hollow is located in the I-30/I-40 interchange area in North Little Rock. It is not practicable to widen the roadway and Arkansas River Bridge without encroaching on these floodways and floodplains. In accordance with Executive Order 11988 and after consultation with the Cities of Little Rock and North Little Rock, all practicable measures to minimize harm have been incorporated into the project design to minimize impacts to floodplains. The project will not support incompatible use and development of the floodplain. Adjacent properties should not be impacted nor have a greater flood risk than existed before construction of the job. None of the encroachments

will constitute a significant floodplain encroachment or a significant risk to property and life.

The design measures to minimize floodplain impacts are specified in the contract Technical Provisions. Floodplain encroachment in Dark Hollow and Fourche Creek will be mitigated by creating floodplain compensation areas in the I-30/I-40 interchange and I-30/I-440/I-530 interchange. ArDOT will provide a "no-rise" certification to Pulaski County for any unavoidable increases in flood elevations in the Arkansas River. The final project design will be reviewed to confirm that the design is adequate and that potential risk to life and property are minimized.

ArDOT will comply with all requirements of *The Clean Water Act*, as amended, and *Section 10 of the Rivers and Harbors Act of 1899*, for the construction of this project. This includes obtaining the following: *Section 401 Water Quality Certification; Section 402 National Pollutant Discharge Elimination Permit* (NPDES); *Section 404 Permits for Dredged or Fill Material;* and approval under *Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Engineers Civil Works Projects Pursuant to 33 USC 408 (Section 408).*

FHWA finds that the impacts to water quality and aquatic resources are not significant.

<u>Wetlands and Waters of the U.S.</u>

Wetlands within the project area were delineated in conformance with the *U.S. Army Corps of Engineers (USACE) Wetland Delineation Manual (Technical Report Y-87-1)*, the *2010 Regional Supplement to the Wetland Delineation Manual: Atlantic and Gulf Coastal Plain Region (Version 2.0)*. The *Classification of Wetlands and Deepwater Habitats of the United States* (Cowardin System) was used to classify identified wetlands and watercourses (Cowardin et al, 1979). Within the project area, there are 23 jurisdictional wetlands totaling 60 acres associated with Fourche Creek, the Arkansas River, and Dark Hollow. Four wetland types were identified within the project study limits: Forested Wetlands, Scrub-Shrub Wetlands, Emergent Wetlands and Riverine Lower Perennial Unconsolidated Bottom Wetlands.

In accordance with *Executive Order 11990*, special considerations were taken in developing and evaluating the alternatives to avoid and minimize wetland impacts associated with this project. The Preferred Alternative will have permanent impacts to approximately 6.58 acres of wetlands, or approximately 11% of the wetlands within the project area. Approximately 4.25 acres of the impacts are associated with the proposed eastbound I-40 to northbound Hwy. 67 flyover ramp, located in Dark Hollow. The purpose of this improvement is to replace the existing left exit with a right exit. The existing left exit creates weaving issues which have led to high crash rates in the segment of I-40 between I-30 and Hwy. 67. Of the numerous alternatives that were evaluated for this ramp, the Preferred Alternative has the least wetland impacts. In addition, the Preferred

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 20 of 29

Alternative will have an additional 2.1 acres of temporary impacts due to temporary fill needed during construction. This fill will be removed following construction, and the area will be restored to natural contours. Further opportunities for avoidance and minimization of wetland impacts will be evaluated during design.

A permit has been applied for from USACE under Section 404 of the Clean Water Act. As part of this process, it is anticipated that stream and wetland mitigation will be offered at an approved mitigation bank site at a ratio approved by the USACE during the permitting process. The Arkansas Natural Resources Commission has reviewed the Environmental Assessment and expressed support for the project.

FHWA finds that impacts to wetlands and waters of the U.S. are not significant.

Threatened and Endangered Species

The project area is highly urbanized, with very little habitat for wildlife. Pursuant to Section 7(c) of *The Endangered Species Act of 1973*, the project area was evaluated for the potential occurrence of threatened and endangered species. None of these species are present in the project area. The construction contract will include a Special Provision that specifies procedures to prevent impacts during construction to birds protected under the *Migratory Bird Treaty Act*.

FHWA finds that there are no significant impacts identified to threatened or endangered species.

Hazardous Materials

An Initial Site Assessment (ISA) was performed to identify existing or potential recognized environmental conditions. The assessment consisted of a site reconnaissance and review of state and federal records. Field inspections found nine areas where excavation associated with construction of the project could potentially encounter hazardous materials, primarily petroleum.

During construction, if hazardous materials, unknown illegal dumps, or underground storage tanks are identified or accidentally uncovered by the design-builder, ARDOT will determine the type, size, and extent of the contamination according to ARDOT'S response protocol. ARDOT, in consultation with Arkansas Department of Environmental Quality (ADEQ), will decide the type of containment, remediation, and disposal methods to be employed for that particular type of contamination.

An asbestos survey will be conducted by a certified asbestos inspector on all buildings prior to the development of demolition plans. If the survey detects the presence of any asbestos-containing materials, plans will be developed to accomplish the safe removal of these materials prior to demolition. All asbestos abatement work will be conducted in conformance with the Arkansas Department of Environmental Quality, Environmental Protection Agency, and Occupational Safety and Health Administration asbestos abatement regulations.

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 21 of 29

FHWA finds that the hazardous materials impacts are not significant.

<u>Construction</u>

The design-build contractor will be required to adhere to the contract Technical Provisions. These provisions have been developed to minimize temporary impacts to the public and to the environment.

Lane closures will be necessary during construction to allow for the safe and efficient implementation of the project. Partial closures are expected throughout the project during off-peak hours. During periods of peak travel, the goal will be to maintain two to three lanes of travel in the peak direction, as much as possible. Full closures along portions of the corridor may be necessary but will be short-term in duration. The frequency of occurrence of full closures will be minimized to the extent possible. The public will be notified of these closures at least seven calendar days in advance through news releases and variable message signs. Possible nearby detour routes within the project area will be suggested so that the public can avoid congestion potentially resulting from the lane closures. Ramp closures and closure of more than one cross street or frontage road intersection at the same time will also be minimized.

Some of these potential impacts to the environment and preventative practices are summarized below.

*Land Use.* Most construction would occur within the existing right of way, with the Preferred Alternative requiring the acquisition of 11.1 acres of right of way. Additionally, temporary construction easements may be required. Following construction, these areas would be restored to their current condition, and no permanent impacts to the affected properties would occur. Temporary construction impacts would be required in the North Shore Riverwalk Park, Julius Breckling Riverfront Park and William J. Clinton Presidential Center and Park. ARDOT has worked with the Cities of North Little Rock and Little Rock to develop commitments to prevent these temporary impacts from having an adverse effect on the parks.

*Water Quality.* Temporary impacts to water quality could potentially occur due to sedimentation and erosion resulting from land disturbance. Permits would be obtained from the ADEQ under Sections 401 and 402 of the Clean Water Act for impacts to water quality during construction. Best Management Practices, which are measures which have been shown to prevent impacts to water quality, such as erosion control, would be utilized to prevent degradation of water quality due to construction activities. These measures are detailed in the contract Technical Provisions. A Water Pollution Control Special Provision will be incorporated into the contract to minimize potential water quality impacts. Appropriate action will be taken to mitigate any impacts to private drinking water sources should they occur due to this project.

*Air Quality.* Short term impacts to air quality could potentially occur during construction as a result of emissions from construction equipment or dust generated by construction

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 22 of 29

activities. The contract Technical Provisions will specify procedures for minimizing dust outside of the right of way.

*Noise.* Construction activities such as demolition, hauling, grading, paving and bridge construction would result in temporary increases in noise along the project. Local noise ordinances may place restrictions on the contractor, including limiting certain activities to specified hours, in order to reduce construction noise impacts. The contract Technical Provisions will place limitations on construction activities in order to reduce temporary noise impacts.

*Solid Waste Disposal.* Procedures for disposal of construction waste off-site will be governed by contract Technical Provisions. The Technical Provisions will include procedures for utilization of waste disposal sites operated by the contractor, as well as for utilization of a solid waste landfill. These procedures are designed to prevent impacts to the environment.

*Hazardous Materials.* Procedures concerning the handling of hazardous materials encountered during construction are discussed above and will be governed by the contract Technical Provisions. The Technical Provisions will include procedures for disposal of hazardous materials generated during construction, including lead-based paint. These procedures are designed to prevent impacts to the environment.

FHWA finds that the construction impacts would not be significant.

Indirect Impacts

The project area is highly developed, with approximately 21 percent undeveloped land remaining. Of this, approximately 12 percent consists of wetlands, floodplains, and parks, which are not likely to be developed due to environmental regulations. Consequently, the project is not likely to affect growth in these natural areas. Direct impacts to wetlands in the Dark Hollow area has the potential to affect natural areas outside of the direct impact area; however, impacts to these areas will be minimized by adherence to the conditions of the USACE Section 404 permit and the contract Technical Provisions.

The Preferred Alternative will improve access to downtown Little Rock and North Little Rock by decreasing travel times to and from downtown destinations and reducing congestion and crashes, all of which is expected to result in higher traffic volumes on I-30. These mobility improvements would have the potential to induce growth in the 9 percent of land available for development. Little Rock and North Little Rock City planners believe that mixed urban development will occur with or without the project, as that is consistent with the land use designation and development plans already underway; however, the timing of the development may be accelerated with the project. Although higher traffic volumes are anticipated with the Preferred Alternative, the project improvements will have a beneficial effect on traffic conditions on adjacent segments of I-630 and I-30. The improvements will not make further improvements to those segments any more needed than they would be without the project. The Preferred Alternative will also benefit the

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 23 of 29

regional roadway network. Reduced congestion on I-30 and I-40 will result in an overall reduction in delays within the regional roadway network and a reduction in the time that travelers spend in their vehicles.

FHWA finds that the indirect impacts from the project would not be significant.

Cumulative Impacts

Cumulative impacts to community resources, water resources, and cultural resources were scoped and evaluated for this project. As part of this analysis, the direct and indirect effects of the Preferred Alternative, as well as the effects of past and present projects, and reasonably foreseeable impacts of future projects, were evaluated for the resources of concern.

Reasonably foreseeable transportation actions that were included in the cumulative impact analysis included the widening of Hwy. 67 north of the Hwy. 67/I-440 interchange; the widening of I-630 from Baptist Hospital to University Avenue; the I-40/ Hwy. 391 interchange improvements; the reconstruction of I-30 at 65th Street, and I-440 from the Arkansas River Bridge to I-40. These were the only transportation projects on the 2016-2020 Transportation Improvement Plan within the Resource Study Areas at the time the analysis was performed. The direct, indirect, and cumulative impacts of those projects on community, water, and historic resources were analyzed using the AASHTO procedures for evaluating cumulative effects in NEPA documents. The analysis followed the AASHTO procedures and considered the impacts of these aforementioned projects in the cumulative analysis.

Since the time the analysis was performed, other considerations have been included in the cumulative impacts analysis and reflected in the EA in response to public comments. This includes the proposed developments for Amazon and the Pointe at North Hills apartments as well as planned transportation projects. The table below lists the planned transportation projects within the Resource Study Areas. Projects along I-40 and I-30 are being studied; however, scope and plans for these projects have not yet been determined at this time. Impacts that could be estimated and anticipated to be likely were considered for the cumulative impacts analyses for the resources analyzed.

| Location | Type of Work |
|---|---|
| I-40 in Maumelle | New Interchange |
| Hwy. 5/Hwy. 70/University Avenue | Intersection Improvements |
| Hwy. 10 and I-430 from Pleasant Ridge Road to Pleasant Valley Drive | Major Widening |
| Hwy. 176 at Shilcotts Bayou | Structure and Approaches Improvements |
| Hwy. 365 at Palarm Creek | Structure and Approaches Improvements |
| JP Wright Loop Road Rail | Railroad Grade Separation |

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 24 of 29

| Shackleford Road and Gamble Road (Kanis Road) | Major Widening |
|---|---|
| Hwy. 10 at Gill Street | Railroad Overpass Structures and Approaches Improvements |
| Hwy. 67 from Main Street to Vandenberg Boulevard | Major Widening |
| Hwy. 176 from 47th Street to Remount Road | Safety Improvements |
| Hwy. 10 at Taylor Loop Road to Pleasant Ridge Road | Major Widening and Operational Improvements |

Direct and indirect impacts of the proposed project on communities are expected to be beneficial. Relatively few relocations are required, and the project would have a beneficial effect on community cohesion. The impacts of the reasonably foreseeable projects were evaluated to the extent that information is available. These projects are unlikely to result in adverse community impacts and are likely to have a beneficial effect on community resources. Consequently, the cumulative impacts of this and other reasonably foreseeable projects on community resources are expected to be minimal.

Direct and indirect impacts of the proposed project on water resources is expected to be minimal, due to the regulations for prevention of water quality impacts during construction, and requirements for impacts to wetlands and floodplains to be avoided, minimized and mitigated. Two developments were identified that are reasonably foreseeable and have the potential to affect water resources. The requirement for impacts on wetlands and floodplains to be avoided, minimized, and mitigated ensures that effects on water resources due to this and other reasonably foreseeable projects will be minimal.

The project results in an adverse impact on only one cultural resource, the North Locust Street Overpass. Mitigation measures for the loss of this resource are being coordinated with the ACHP and SHPO under a PA. The PA also includes measures to avoid and mitigate impacts to unanticipated archaeological resources encountered during construction. A Design Coordination Plan has been developed by FHWA and ARDOT to establish procedures for coordination with SHPO and other interested parties should design changes occur that may affect historic properties. A Mitigation Measures Plan has also been developed to resolve any adverse effects resulting from unanticipated effects on historic properties. Local ordinances regarding historical and archaeological resources are expected to ensure that the effects of reasonably foreseeable projects on cultural resources will be minimal.

FHWA finds that the cumulative impacts would not be significant.

## Council on Environmental Quality (CEQ) Regulations

The Council on Environmental Quality's regulations requires consideration of a project's context and intensity in determining whether the project will have a significant impact (40 C.F.R. 1508.27).

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 25 of 29

Context is defined as: "Context means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant."

Regarding intensity, the regulations identify issues that should be considered in determining if the intensity of a project's impacts is substantial enough to warrant the preparation of an Environmental Impact Statement (40 C.F.R. 1508.27(b)(1-10)). The following issues are considered in the determination of whether there is a significant impact:

*1. Impacts that may be both beneficial and adverse. A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial.*

No significant impacts to the natural environment have been identified, as the project is in an area that is heavily urbanized. The project will have an effect on the human environment, specifically to communities.

The Preferred Alternative would improve travel conditions on I-30 and I-40, enhancing safety and mobility. Travel times to and from downtown Little Rock and North Little Rock would improve, and connectivity across the Arkansas River would be enhanced by the addition of C/D lanes. Access along the corridor would be improved by the continuous frontage road system and improved ramps. The removal of the existing Hwy. 10 interchange and connecting ramp to Cumberland Street would change travel patterns in downtown Little Rock.

While these improvements are anticipated to have a beneficial effect on businesses in the downtown area, the area has been experiencing slow and steady growth for many years and is mostly developed. Significant effects on growth are not anticipated; rather, the timing of planned development may be accelerated. Impacts on communities are expected to be beneficial, but not to a significant extent.

*2. The degree to which the proposed action affects public health or safety.*

The improvements to roadway geometry included with the Preferred Alternative are expected to improve the safety of the traveling public. Left exits, inadequate ramp geometry, inadequate interchange spacing, and inadequate shoulders would all be addressed. These deficiencies have resulted in a highly congested and unsafe corridor with crash rates several times higher than the statewide average. Elimination of these unsafe features is expected to provide a benefit to public health and safety.

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 26 of 29

The replacement of the I-30 Arkansas River Bridge would also address navigational safety issues on the Arkansas River, and will make the River safer for barge traffic, as well as reduce the incidence of barges striking and damaging the bridge.

3. *Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.*

The project is an area that contains cultural resources, including four parks, seven historic districts, and 136 structures either listed on, or eligible for listing on, the NRHP, including the North Locust Street Overpass. The North Locust Street Overpass is structurally deficient and will be replaced. A PA has been developed that will stipulate measures to avoid, minimize or mitigate any adverse effects on historic properties. Impacts to three parks will occur; however, most of these impacts are temporary. Commitments have been made to minimize the effect of these temporary impacts. The Cities of Little Rock and North Little Rock have agreed that the project will not harm the parks.

4. *The degree to which the effects on the quality of the human environment are expected to be highly controversial.*

Controversy, according to CEQ guidelines, refers to a case where there is a substantial dispute as to the size, nature, or effect of the major federal action, rather than the amount of public opposition. Numerous comments in response to the Public Hearing referred to a study performed by Norm Marshall, which criticized the traffic analysis performed for the project, and suggested that improvements to other arterial roadways would be more effective than improvements to I-30 in increasing overall regional mobility. The traffic analysis methodology performed for the project was agreed upon by FHWA, ARDOT, and Metroplan, reflects the state of practice in traffic forecasting, and adequately analyzes regional mobility. The suggestion to improve other arterial roadways does not fully consider that the primary purpose and need for the project is to improve aging and substandard infrastructure on I-30 and I-40, which has resulted in safety issues, in addition to traffic congestion. The study team has responded to the comments from Norm Marshall on traffic analysis methodology in detail and concluded that the methodology used is sound. This issue does not require an environmental impact statement to be prepared for this project.

5. *The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.*

During construction, if hazardous materials, unknown illegal dumps, or underground storage tanks are identified or accidentally uncovered by the design-builder, ARDOT will determine the type, size, and extent of the contamination according to ARDOT's response protocol. ARDOT, in consultation with ADEQ, will decide the type of containment, remediation, and disposal methods to be employed for that particular type of contamination. While uncertain, these situations are commonly encountered and do not

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ARDOT Job Number CA0602
Page 27 of 29

represent a unique risk. Further, methodologies exist to prevent impacts to human health if any of these situations occur.

6. *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.*

Several comments in response to the Public Hearing raised the concern that, as a result of the increased traffic volumes that are anticipated as a result of the project improvements, the need to improve adjacent segments of I-30 and I-630 would become more likely. The limits of this project meet the definition of logical termini and it has independent utility. The adjacent segments of I-30 and I-630 have existing capacity and geometric issues that have led to congestion. This is an existing situation. Although the project will add traffic to these adjacent segments, traffic modeling shows that the geometric improvements within the limits of the proposed project under the Preferred Alternative will improve traffic conditions on the segments of I-630 and I-30 compared to the existing and Future No-Action conditions.

The improvements to I-30 and I-40 being proposed under the Preferred Alternative will not make a study of I-630 or I-30 improvements any more or less likely. ARDOT does not currently have plans to improve I-630 from I-30 to the west. Due to current and anticipated mobility concerns on the corridor, the Highway Commission has provided approval for a future study of this portion of I-630; however, a date has not yet been set for this study to commence. If, at some future date, ARDOT conducts a study of this section of I-630, that study would be conducted in the context of previously identified commitments and constraints. Any recommendations resulting from such a study would also have to be evaluated through the environmental process to determine the possible environmental impacts. ARDOT is currently studying the need for and feasibility of improvements to I-30 from Benton to the I-530/I-440 interchange. The limits of the study for this corridor were selected based on the general commuting patterns and freight movement in the region and beyond.

7. *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.*

This project has logical termini and independent utility and is not related to any other current or planned roadway improvements. The project limits were defined based on documented needs in the I-30 and I-40 corridors, including bridge structural and navigational deficiencies, traffic congestion, safety, roadway geometric deficiencies; as well as points of major traffic generators:

- Congestion on I-30 and I-40 was documented to be most severe on the segment of I-30 from I-440/I-530 to I-40, and on I-40 from I-30 to Hwy. 67.

- Safety issues in the project corridor were related to geometric deficiencies: left exits, substandard ramp lengths, substandard curves, substandard shoulders, and closely spaced interchanges, which were found to be most prevalent on I-30 from I-440/I-530 to I-40 and on I-40 from I-30 to Hwy. 67

- The southerly project limit is a location where I-30, I-440, and I-530 converge, resulting in a significant change in traffic volumes

- The northerly project limit is a location where I-40 and Hwy. 67 converge, another location where traffic volumes change significantly

There are independent reasonably foreseeable projects planned within the study area. The cumulative impact of these projects on community, water and historic resources was evaluated and not determined to be significant.

8. *The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.*

The project will involve an adverse effect on the North Locust Street Overpass, which is eligible for the NRHP. The structure is structurally deficient and must be replaced. The FHWA and the ACHP developed a PA to address any adverse effects on historic properties within the APE. The PA stipulates measures to avoid, minimize or mitigate any adverse effects to historic properties that are currently identified or that become apparent in a later phase of the project. With regards to the North Locust Street Overpass, the PA includes appropriate measures to minimize harm as required by the Programmatic Section 4(f) Evaluation and Approval for FHWA Projects that Necessitate the Use of Historic Bridges. No other adverse effects on NRHP-eligible features within the project area are anticipated. The PA includes measures to minimize or mitigate any adverse effects to any archaeological sites or historic properties that become apparent during construction.

9. *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*

Pursuant to Section 7(c) of *The Endangered Species Act of 1973*, the project area was evaluated for the potential occurrence of threatened and endangered species. None of these species are present in the project area. The project will have no effect on endangered or threatened species or critical habitat.

10. *Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.*

The proposed action does not knowingly threaten a violation of any Federal, State, or local

Finding of No Significant Impact
FAP Number NHPP-030-22(68)
ArDOT Job Number CA0602
Page 29 of 29

law for protection of the environment. All applicable permits will be acquired prior to construction.

## Conclusion

Based upon the EA, additional information included in this document, and the Disposition of Public Comments for the Location and Design Public Hearing, FHWA concludes that the proposed project will not have a significant impact on the environment. No additional NEPA documentation is required for this project. FHWA in cooperation with ARDOT identifies Alternative 2B as the Selected Alternative for the project. If, during design or construction, changes in laws or regulations occur that affect the project, or there are major design changes that result in greater impacts than those evaluated in this document, a re-evaluation of this EA will be performed. The Arkansas Department of Transportation has completed the assessment of the proposed project and the Federal Highway Administration issues a Finding of No Significant Impact for the 30 Crossing Project in Pulaski County, Arkansas.


Angel L. Correa                                    2/26/2019
Division Administrator                             Date
FHWA, Arkansas Division Office

| Document | Location | PDF page | Comment | Response |
|---|---|---|---|---|
| EA | General | | Replace ArDOT with ArDOT | Replaced |
| EA | Cover | 1 | Add FAP, revised project title, added graphics | Revised |
| EA | Section 1.2, page 4 | 14 | Insert sentence on local traffic | Inserted |
| EA | Section 2.3, page 48 | 62 | Revise Figure 26 | Revised |
| EA | Section 2.3, page 51 | 66 | Revise Figure 28 | Revised |
| EA | Section 2.3, page 53 | 69 | Add text box to Figure 29 | Added |
| EA | Section 2.3, page 56 | 73 | Add text box to Figure 31 | Added |
| EA | Section 3.2, page 83 | 100 | Replace "five" with "all of" | Replaced |
| EA | Section 3.3, page 84 | 101 | Added reference to No-Action not meeting P&N | Added |
| EA | Section 3.3, page 92 | 109 | Revised language regarding Programmatic 4(f) and Cultural Resource Addendum | Revised |
| EA | Section 3.6, page 101 | 118 | Remove reference to new utility building | Deleted lines 8-10 |
| EA | Section 3.10, page 105 | 122 | Update stream impacts | Updated |
| EA | Section 3.12, page 108 | 125 | Revise text box | Revised |
| EA | Section 3.12, page 108 | 125 | Add text box | Added |
| EA | Section 3.12, page 108 | 125 | Update wetland impacts; add temporary impacts | Updated and added |
| EA | Section 3.13, page 109 | 126 | Add reference to Migratory Bird Treaty Act | Added |
| EA | Section 3.15, page 110 | 127 | Add reference to greenhouse gases | Added |
| EA | Section 3.16, page 114 | 131 | Delete lines 18-20 | Deleted |
| EA | Section 3.16, page 116 | 133 | Delete sentence regarding cumulative impacts | Deleted lines 5-7 |
| EA | Section 4, page 119 | 136 | Revise wetland and stream impact totals | Revised |
| Appendix B | | 282 | Revised Appendix B Traffic Results | Revised |
| Appendix E | | 1268 | Revise to include public hearing summary | Revised |
| Appendix H-1 | | 4029 | Replace North Shore Riverwalk 4(f) statement | Replaced |
| Appendix H-2 | | 4075 | Replace Little Rock Parks 4(f) statement | Replaced |

| Document | Location | PDF page | Comment | Response |
|---|---|---|---|---|
| EA Appendix H-3 | | 4139 | Replace Programmatic 4(f) for North Locust Street Bridge | Replaced |
| EA Appendix L | | 4704 | Insert appendices to Hazardous Material Report | Inserted |
| Appendix R | | 7071 | Revise Cumulative Effects Technical Report | Revised |