IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

THE LITTLE ROCK DOWNTOWN
NEIGHBORHOOD ASSOCIATIO, INC. *et al.* PLAINTIFFS

v. CASE NO. 4:19-cv-362 JM

FEDERAL HIGHWAY ADMINISTRATION, *et al.* DEFENDANTS

ORDER

This case involves the Arkansas Department of Transportation's I-30 Crossing Project ("the Project"), which calls for the redesign, reconstruction, and widening of approximately 7.3 miles of I-30 and I-40 that transect Little Rock and North Little Rock, including the I-30 Arkansas River Bridge.[1] The suit was filed by seven individuals who live near the Project's corridor and by neighborhood associations who represent residents and property owners in nearby neighborhoods. Pending is Plaintiffs' motion for preliminary and permanent injunction. Defendants have responded, and a hearing was held August 20 and 26, 2020. For the reasons set forth below, the motion for preliminary injunction and permanent injunction is denied.

I. Procedural History

On June 8, 2018, the Arkansas Department of Transportation (ArDOT) in conjunction with the Federal Highway Administration (FHWA) issued an Environmental Assessment (EA) of the Project. Based on the EA, the FHWA issued a Finding of No Significant Impact (FONSI) on February 26, 2019. This prompted Plaintiffs to file their complaint on May 5, 2019 seeking declaratory and injunctive relief against the United States Department of Transportation

[1] A map of the project location is attached as Exhibit A to this Order.

(USDOT), FHWA, and ArDOT. The complaint alleges that Defendants failed to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§4321-70a; the implementing regulations for NEPA issued by the White House Council on Environmental Quality (CEQ), 40 C.F.R. §§ 1500-1508; and other federal laws.

On July 3, 2019, Plaintiffs filed a motion for preliminary and permanent injunction to stop any construction on the Project; this motion was withdrawn by agreement of the parties. Subsequently, USDOT and FHWA (the "Federal defendants") conducted a Re-Evaluation of the Project to determine whether the FONSI remained valid in light of the agreed scope of the construction contract between ArDOT and Keiwit Massman Construction (KMC). The Re-Evaluation, filed on June 1, 2020 (ECF No. 38), determined that the FONSI was still valid and that the Project could proceed.

Following the completion of the Re-Evaluation, Plaintiffs filed the pending motion for preliminary and permanent injunction. (ECF No. 48). They contend that the EA and the Re-Evaluation did not adequately consider the environmental impacts of the Project. They also argue that a project of this magnitude requires a more in-depth analysis in the form of an Environmental Impact Statement (EIS). Plaintiffs seek an injunction to prohibit ArDOT from starting construction on any portion of the Project pending the final hearing scheduled to begin on October 20, 2020.

II. The Project

In 2012, a ten-year, half-cent sales tax was approved by voters to improve Arkansas's transportation system, including widening and improving approximately 200 miles of highways and interstates. ArDOT developed a list of highway projects on which the tax revenue would be spent calling it the Connecting Arkansas Program, or CAP. The budget for this Project is $631.7

million, of which 64% will come from CAP.[2] The Project may receive additional funding if the half-cent sales tax is voted to become permanent in November of this year.

In April of 2014, early in the planning of this Project, ArDOT and FHWA (collectively, the "Agencies") began a process called Planning and Environmental Linkages (PEL) Processes. The PEL process allowed the Agencies to coordinate with the communities in the Project area to discuss issues and alternatives at a local level. The PEL process included four public meetings held between August 2014 and April 2015 and the development of three separate work groups representing civic leaders (including the mayors of Little Rock and North Little Rock), local businesspersons, and residents in the Project area. As part of the process, a PEL Report was created in May 2015.[3] The PEL Report is not part of the NEPA documents but was used for the development of alternatives and avoidance measures at a local level, which the FHWA then used to transition to the NEPA review process.

After the PEL Report was completed in May 2015, the Agencies began preparing an EA as required by NEPA. An EA is a "concise public document for which a Federal agency is responsible that serves to [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. An EA is required to include "brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id.*

The Agencies issued the Draft EA for a 45-day notice and comment period beginning on

[2] EA-FONSI-001990_0078. (The remainder of the funds come from the National Highway Performance Program, the Federal Bridge Program, and the Interstate Rehabilitation Program.)
[3] EA-FONSI-000378

June 8, 2018.[4] The Draft EA identified the Project "purpose" as increasing the safety of vehicular traffic on I-30 and I-40, improving the conditions of the roadway, improving navigational safety on the Arkansas River, correcting deficiencies in the I-30 Arkansas River Bridge, and reducing traffic and congestion. It was the safety and traffic concerns that created the Projects "needs." Of the several alternatives considered, two alternatives for corridor improvement that were first recognized in the PEL Report advanced through the NEPA process. In their responsive brief, the Federal defendants sum up the configuration alternatives that were considered as part of the review process as follows:

> While ArDOT had originally proposed to advance one alternative, featuring a 10-lane bridge replacement, to the NEPA process, FHWA insisted that a second 8-lane alternative also be considered. See EA-FONSI-000437.
>
> The EA subsequently considered two variations of each of those alternatives. See EA-FONSI-001990_0038. One alternative features a split diamond interchange (SDI) for the on-and off-ramps from I-30 into downtown Little Rock, while the other alternative features a single point interchange (SPUI).
>
> The EA thus considered the following alternatives: An 8-lane general purpose with SPUI alternative (**Action Alternative 1A**); an 8-lane general purpose with SDI Case 3alternative (**Action Alternative 1B**); a 6-lane collector/distributor C/D) alternative featuring three travel lanes and two C/D lanes in each direction with SPUI(**Action Alternative 2A**); a 6-lane C/D alternative featuring three travel lanes and two C/D lanes in each direction with SDI (**Action Alternative 2B**). A No Action Alternative was also considered. See EA-FONSI-001990_0040.

(ECF No. 69, p. 2) (EA-FONSI-001990_0039) (Emphasis added.) The Draft EA addressed the effects of the Project on economic conditions, cultural resources, parks and recreation areas, noise levels, utilities, railroads, views, hazardous materials, water and other natural resources, flooding, wetlands, protected species, air quality, and indirect and cumulative effects. EA-

---

[4] EA-FONSI-001683

FONSI-001683_0082. The Draft EA did not identify any significant impacts to the natural and social environment as a result of the Action Alternatives or No-Action Alternative.

The stated goals of the EA were to: (1) evaluate the environmental effects of improving I-30 and I-40, (2) inform the public and receive feedback about the purpose and need of the Project, the alternatives being considered, and the anticipated environmental effects of the improvements; and (3) determine whether the effects were significant such as to require an Environmental Impact Statement (EIS), or if the Project effects could be sufficiently documented though an EA and FONSI.[5]

Of these alternatives, ArDOT ultimately proposed and FHWA accepted Alternative 2B as the Selected Alternative citing these reasons: (1) it improves local vehicle access to and from downtown Little Rock/North Little Rock by directly connecting the frontage road system to the C/D (collector/distributor) lanes crossing the river; (2) continuous frontage road optimizes opportunities for economic development and allowing additional green space for public use, (3) enhances east-west connectivity by removing elevated ramps between President Clinton Avenue and 3rd Street and by replacing the elevated Hwy 10 Spur with an improved at-grade 2nd street.[6] Alternative Actions 1A and 1B were not chosen as they were going to be less effective at reducing congestion and improving safety.[7]

A Location and Design Public Hearing was held on July 12, 2018. Before the hearing, ArDOT issued the Draft EA and a press release announcing the date for the hearing. According to the press release, while the Agencies would present the proposed Preferred Alternative, Action Alternative 2B, attendees could view the Draft EA and project design plans and discuss the

[5] EA-FONSI-001990_0035
[6] EA-FONSI-001683_0136
[7] EA-FONSI-001683_0136

Project with ArDOT, FHWA, and U.S. Army Corp of Engineers. Written statements could also be submitted by online, by mail or by email from June 8, 2018 through July 27, 2018. The Agencies received 351 comments during the comment period and prepared a 261page Public Hearing Comment Responses report including the comments and the agencies' responses.[8] This report was attached to the Final EA ("the EA") as Appendix E. The agencies considered the comments to determine if there appeared to be a need to perform additional analysis or use different methodology to evaluate impacts but did not find it to be necessary.[9]

The EA was issued on December 20, 2018 by the Agencies.[10] On February 26, 2019, FHWA conducted an independent review of the EA and issued its FONSI pursuant to 23 C.F.R. 771(a). FWHA determined that based on the EA, public comments, and other considerations, the Preferred Alternative, Action Alternative 2B, was now the Selected Alternative. FHWA also determined that the Selected Alternative would have "no significant impact on human or natural environment," considering the Project's impacts on land use, community facilities and services and neighborhood and community cohesion, environmental justice, historic properties, right of way relocation, air quality, noise, water quality and aquatic resources, wetlands and waters of the United States, threatened and endangered species, hazardous materials and construction. It determined that the Projects indirect and cumulative impacts are not significant. The EA concluded that the evidence before the Agencies was sufficient to determine that an EIS was not required.[11]

After bids were received ranging from $965 million to $1.1 billion, well over the budget

---

[8] EA-FONSI-001934
[9] EA-FONSI-002130_0011.
[10] A-FONSI-001990
[11] A-FONSI-001990

amount, ArDOT entered a design-build contract with Kiewit Massman Construction (KMC). Under design-build contracts, the designer-builder is allowed to incorporate innovation into the final design, as long as the project purpose and need, environmental commitments, and contractual obligations are met.[12] On December 6, 2019, ArDOT and KMC agreed upon a reduced scope for a first phase of the Project to keep the Project on budget. [13] The Phase One construction focuses on a 1.6-mile expanse covering the I-30/I-630 interchange and the I-30/East Broadway Street interchange, including the Arkansas River Bridge. Permanent design changes were made to the contract with KMC after the EA and FONSI were issued. Those changes include: "(1) the eastbound I-630 to northbound I-30 ramp will be restriped to two lanes as in the Selected Alternative but the alignment of the ramp will not be shifted west and the ramp bridge will not be replaced; (2) the northbound I-30 to northbound frontage road ramp will be widened to two lanes as in the Selected Alternative but the alignment of the ramp will not be shifted west; and (3) the right lane exit from I-40 eastbound to Hwy. 67 northbound will be eliminated and the current left exit will be maintained."[14] (ECF No. 69, p. 5).

These changes required that FHWA complete a Re-Evaluation of the Project to determine whether the FONSI remained valid. The Re-Evaluation considered the potential environmental impacts in light of the modifications to determine whether any additional NEPA documentation was required. The Re-Evaluation Report, in part, notes changes to the River Rail streetcar trolley system, describes impacts to the Clinton Center and Riverfront and Riverwalk Parks, analyzes noise impacts, and discusses a reduction in floodplain impacts, and updates traffic forecasting. It

[12] RE-EVAL 000511_05
[13] RE-EVAL-00051_0006
[14] RE-EVAL-000511_020; Re-EVAL-000511_0022.

concluded that the FONSI remained valid.

Defendants advise the Court that if Issue 1 passes in November 2020, ArDOT intends to increase funding by adding another $350 million to complete the funding for the remaining 5.7 miles of the Project could be completed as originally planned.

III. Standing

The parties in this case have stipulated that Plaintiffs have standing to bring this action. The Court agrees. In *Lujan v. Defenders of Wildlife*, the United States Supreme Court explained:

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]' " Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and footnotes omitted). Associations have standing to bring suit on behalf of their members if their members would otherwise have standing to sue in their own right, the interests at stake are germane to the organizations' purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 181 (2000) (citing *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Plaintiffs submitted affidavits of the individual Plaintiffs—Dale Pekar, John Hendrick, Joshua Silverstein, Rohn Muse, Barbara Barrows, Kathy Wells, and Denise Ennett—the last four of whom also represent an organizational Plaintiff. The Court has reviewed these affidavits (ECF No. 60-2 at pp. 87-120) and finds that they establish that both the individual and

the organizational Plaintiffs have standing to bring this action.

For example, Denise Ennett, a member of the Pettaway Neighborhood Association, lives adjacent to the Project in an area bounded by I-30 on the west and I-630 on the south.[15] She states that this is a mixed-race and mid-to-low income neighborhood. According to Ennett, among other harms, the proposed widening of I-630 will "further intrude into the neighborhood and increase traffic, noise and fumes;" and the proposed widening of I-30 will create bottlenecks resulting in long lines of slow-moving cars resulting in an increase of noise and toxic fumes on I-630. She further states that the widening of the interstates will amplify the economic and social effects that their construction caused in the first place.

III. Standard of Review

The case is before the Court for judicial review of a final agency action—the issuance of the FONSI by FHWA—pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq*. The Court is required to uphold the agency's decision unless the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A); *see also Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989). The scope of judicial review is limited to the administrative record before the decision-maker at the time of its decision, and the administrative decision is entitled to a presumption of validity. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). As addressed at the hearing on this matter, testimony in a judicial review of an agency's decision is limited to that which can "educate the court" and "illuminate the administrative record." *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 357 (8th Cir.1984).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

[15] Her affidavit is found at ECF No. 60-2, pp. 92-96.

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); see also *Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The Supreme Court has cautioned that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "The district court's inquiry is an equitable one, requiring the court to consider 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *Ozark Soc'y v. U.S. Forest Serv.*, No. 4:11CV00782 SWW, 2012 WL 994441, at *2 (E.D. Ark. Mar. 23, 2012) (quoting *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981).

IV. Factors for Preliminary Injunction

A. Likelihood of Success

"The NEPA mandates that a federal agency take a 'hard look' at the environmental consequences of a major federal action before taking that action." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 533 (8th Cir. 2003) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (internal quotations case omitted). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).

Community involvement is required by the CEQ regulations governing NEPA. Agencies are required to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures" and to provide public notice of hearings, public meetings, and the availability

of environmental documents. *See* 40 C.F.R. §1506.6(a) and (b). The administrative record demonstrates that the Agencies' efforts to involve the public in this process were diligent. The environmental documents were available at the Agencies' websites. The Agencies held four public meetings between August 2014 and April 2015 during the pre-NEPA process. They held an additional two public meetings following the issuance of the Draft EA, one on October 22, 2015 attended by 399 attendees and another on April 26, 2016 with 390 attendees. [16] The alternative lane configurations being considered were addressed at these meetings. There was a 45-day comment period following the release of the Draft EA. More than a dozen "pop-up" meeting stations were held in large businesses in Little Rock and North Little Rock where "[s]taff members answered questions from the public and showed materials provided at [the last public meeting], including the 3D video renderings." *Id.*

1. Plaintiffs' Procedural Rights

In spite of the above efforts to involve the community and address specific concerns from citizens, Plaintiffs claim that they have been denied their procedural rights to be involved in the process in that the Agencies: (1) denied Plaintiffs the right to comment on the Project being completed in phases rather than in its entirety; (2) failed to provide a notice and comment period *after* the issuance of the FONSI; (3) did not give the public opportunity to comment on new material they argue was presented in response to public comments to the Draft EA; (4) failed to respond to significant public comments; and (5) misled the public about the availability of the Draft EA for comment.

The Court finds that Plaintiff has not shown a likelihood of success on any of these claims. First, the idea of the project being completed in phases rather than all at once was

[16] EA-FONSI-001990_0079-0080.

included in the Draft EA that was available for public comment.[17] Specifically, the Draft EA stated "[t]his project will initially be delivered using a fixed budget/variable scope design-build delivery contract. Design-Builders will compete to provide the most project scope for the fixed budget. In the event that none of the Design-Build firms are able to provide the full project scope, additional projects will be programmed and contracts will be let at a future date to complete the project scope." *Id.* Second, as to the lack of a notice and comment period after the issuance of the FONSI, the CEQ regulations do not require one except in "certain limited circumstances,"[18] which the Court does not find present in this case, in part because the Project improvements will occur almost entirely within existing ArDOT right of way. Third, Plaintiffs have not established that the new material they say was presented in response to public comments, and was thereafter unable to be commented on itself, was actually new material. The fact that the Agencies responded to public comments using some information regarding travel time estimates from the IMPLAN analysis (that was not included in the Draft EA) to support the travel time estimates previously provided in the Draft EA does not indicate that Plaintiffs' procedural rights were violated. Fourth, the administrative record refutes Plaintiffs' claim that the Agencies failed to respond to significant public comments, including those raised by Casey Covington.[19] Finally, Plaintiffs are correct in their claim that the Agencies' notice of the availability of the Draft EA for comment initially included a directive to provide comments on the "preferred alternative" rather than on the Draft EA, the forms were updated prior to the public hearing on July 12, 2018, and there is no indication that the 21 commenters who

[17] EA-FONSI-001990_0078
[18] 40 C.F.R. § 1501.4(e)(2).
[19] EA-FONSI-001990_1770-2042, *e.g.*

responded prior to the form being updated were misled.[20]

2. NEPA's Procedural Requirements

Second, Plaintiffs argue that FHWA failed to comply with NEPA's procedural requirements. These arguments cover seventy-six pages in Plaintiff's brief (ECF No. 59, pp. 44-121) and challenge the definition of the "purposes and needs" section; the length of the EA and perceived incomprehensibility of the Draft EA; the lack of an EIS; the use of PEL created documents in the EA; the assessment of the Action Alternatives and No Action Alternative; the analysis of the direct and indirect impacts of the Selected Alternative; the perceived failure to address the indirect impact on minority and low-income residential areas; insufficient identification and analysis of the health effects of Mobile Source Air Toxics ("MSATs"); the assessment of the indirect impact on the wetlands, water quality, flooding; failure to address the direct and indirect impacts on the River Market, Clinton Presidential Park, Heifer International, North Little Rock Riverfront Park/Argenta areas, and the Rock Region Metro System; and the cumulative impacts of the Project.

The Court has carefully considered these arguments and Defendants' responses and finds that while Plaintiffs have thoroughly catalogued their disagreements with the EA and given comprehensive bases for those disagreements, they have not shown a likelihood that they would prevail on the merits on any of their challenges. The overarching issue in all of Plaintiffs' challenges is whether FHWA was arbitrary and capricious when it issued the FONSI. This Court must affirm the decision of the FHWA if it finds that the agency "took a 'hard look' at the project, identified the relevant areas of environmental concern, and made a convincing case for its FONSI. *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 838–39 (8th Cir. 1995) (citing

[20] EA-FONSI-001990_2286-291

*Audubon Society v. Dailey*, 977 F.2d 428, 434 (8th Cir.1992)). While Plaintiffs challenge the length of the EA, the Court finds it is clearly understood, thorough, and adequately addresses the identification and analysis of the environmental and social impacts raised by Plaintiffs.

In reviewing an agency's decision, courts are not free to substitute their judgment for that of the agency. *Mid States Coal. for Progress v. Surface Transp. Bd*., 345 F.3d 520, 534 (8th Cir. 2003). "Our role in the NEPA process "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* (quoting *Baltimore Gas*, 462 U.S. at 97-98).

At this time, Plaintiffs have not shown through any of their arguments that the Defendants' decision to issue the FONSI, and to stand by it after the Re-Evaluation—was arbitrary, capricious, an abuse of discretion, or otherwise in violation of the law. Therefore, they have not established a likelihood of success on the merits, and this factor weighs in favor of the Defendants.

B. Irreparable Harm

At the hearing, Plaintiffs called three witnesses to testify about the irreparable harm they will suffer if they are not granted preliminary relief pending a final hearing on the merits of their action. Plaintiff Joshua Silverstein lives on the 15th floor of a downtown condominium immediately west of I-30 and south of the exit ramp from Highway 10 onto I-30, and he works at the Bowen School of Law located at the intersection of I-30 and I-630. Silverstein testified he has been following the Project since 2015, attending ArDOT hearings and submitting comments. When asked about how the construction of the Project would impact him, he said he was concerned about (1) increased pollution that could aggravate his asthma; (2) the elimination of the Cantrell ramp to access I-30 because it would force more traffic directly on the streets by his

building; (3) noise, both during construction and then after with increased traffic being a little closer to his condominium; (4) traffic; (5) decrease in available parking; (6) strong light during construction; and finally (6) a possible drop in property values as the community becomes less livable.

Another witness who testified, Frederick Gentry, lives south of I-630 and three blocks from I-30. He is also the Vice President of the Pettaway Neighborhood Association. When asked about how the Project would harm him, he stated that "we would need to look at how traffic might be impacted and the quality of life in terms of being able to get around and walk the neighborhood." He had concerns about noise, dust, potential pollution, and possible loss of property values. Mr. Gentry also had concerns that the Project might impact economic growth in the South Main area.

Barbara Barrows, another plaintiff and member of the Hanger Hill Neighborhood Association testified. She lives on Welch Street in Little Rock, east of where I-630 feeds onto I-30. She and her husband are retired, and they enjoy watching the birds and taking care of their yard. Ms. Barrows has attended the public meetings on the Project and is of the opinion that, other than fixing the I-30 Arkansas River Bridge, the neighborhood did not need all the mess and the hassle. While she is concerned about more traffic, more pollution, more noise, and more wrecks, there was no evidence to establish the difference in these factors she would experience with the Project going forward than what she currently experiences in her close proximity to I-30.

Keli Wylie, Registered Professional Engineer and Alternate Project Delivery Administrator for ArDOT, testified that construction would likely begin at the end of September 2020, provided the Project was issued a 404 permit from the Corps of Engineers in the next two

or three weeks, with grading and clearing to begin mid-October. The final hearing in this matter is scheduled to begin October 20, 2010. The Court concludes that the Plaintiffs have failed to establish that they will likely suffer irreparable harm if work on the Project commences as planned. The Court is aware that a violation of NEPA itself is evidence of a real environmental harm. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011). In this case, however, there has not been a showing that Plaintiffs are likely to prove Defendants violated NEPA. *See Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 992 (8th Cir. 2011) ("[A] movant seeking injunctive relief must demonstrate that irreparable injury is *likely* in the absence of an injunction." (internal citations omitted) (emphasis in original)). Therefore, this factor weighs in favor of the Defendants.

C. <u>Balance of Equities</u>

At the hearing, Keli Wylie, testified that she has been involved with the Project starting in 2014 when the ArDOT began the PEL process. She has been with the Project throughout the NEPA process and serves as the administrator over the construction project itself. In connection with Phase One of the Project, Wylie testified that as of the middle of August, the ArDOT had paid about $100 million for the Project so far. About $40 million went for the NEPA process, with the balance of approximately $60 million being paid to KMC (which included mobilization payments of $25 million). Regarding the harms ArDOT would suffer if a preliminary injunction were entered, Wylie testified that KMC would be entitled under the contract to recover a per-day cost for overhead, including office staff and designers, in the amount of $32,000 per day. In anticipation of the start of construction, there were approximately 40 craft workers on site, with more coming each day, that would lose their jobs if the Project does not begin as scheduled.

Wylie also testified that work on the Project would be significantly impacted by even a

short delay, as a lot of the construction activities are temperature dependent. For example, paving requires ambient temperatures, so a three-monthly delay in construction could easily become a six-month delay if the window of ambient temperature is missed. Likewise, construction on the Project has to be scheduled around the window of high water on the Arkansas River each year. In the event that the Project were terminated, Wylie testified that it would cost approximately $21 million to demobilize the contract with KMC. Some materials have been purchased that require weeks to receive, equipment has been purchased, and leases have been secured for heavy equipment. In light of the Court's finding that Plaintiffs has not established that they were likely to suffer irreparable harm, the balance of the equities favors Defendants.

D. Public Interest

"The public has an interest in knowing that its government agencies are fulfilling their obligations and complying with laws that bind them." *Sierra Club v. United States Army Corps of Engineers*, 2010 WL 11484334, at *9 (W.D. Ark. Oct. 27, 2010), *aff'd sub nom. Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011). This is particularly true when the government agencies are tasked with protecting the environment, as they are under NEPA. Had Plaintiffs shown a likelihood that they would succeed on the merits, the public interest factor would be heavily weighted toward the Plaintiffs. However, Plaintiffs failed to make such a showing.

Defendants have demonstrated that the Project will likely benefit the public by reducing congestion, enhancing safety, and improving the quality of life for thousands of people who will use the expanded roadway every day. They argue that enjoining the project would not be in the public interest because it would cause a delay in its completion and a significant loss to the

taxpayers of Arkansas. Based on these considerations, the Court finds that this factor, also, favors the Defendants.

V. Conclusion

After considering all of the evidence and arguments presented by the parties, the Court finds that all of the factors weigh in favor of the Defendants and against the issuance of an injunction. Therefore, the request for injunctive relief (ECF No. 48) is DENIED.

IT IS SO ORDERED this 3rd day of September, 2020.

James M. Moody
United States District Judge

**Exhibit A**
**Project Location Map**
**(Taken from Doc. 49-1, p. 4)**

