IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

THE LITTLE ROCK DOWNTOWN
NEIGHBORHOOD ASSOCIATION, INC. *et al.*                    PLAINTIFFS

v.                              CASE NO. 4:19-cv-362 JM

FEDERAL HIGHWAY ADMINISTRATION, *et al.*                    DEFENDANTS

<u>ORDER</u>

Plaintiffs are seven neighborhood associations and seven individuals who challenge the expansion of the I-30 interstate corridor that runs through their neighborhoods and across the Arkansas River in Pulaski County, Arkansas.  They bring their challenge against the Federal Highway Administration (FHWA) and the Arkansas Department of Transportation (ArDOT) (collectively "the Agencies") under the National Environmental Policy Act (NEPA), U.S.C. § 4321, *et seq.* and seek declaratory and injunctive relief.[1]  Plaintiffs argue that the issuance of a Finding of No Significant Impact (FONSI) for the expansion project was in error, and that the Agencies were required to prepare an Environmental Impact Statement (EIS) instead of relying on the Environmental Assessment (EA).

Following a hearing on August 20 and 26, 2020, the Court denied Plaintiffs' motion for preliminary injunction.  (Doc. 79).  Currently pending are cross motions for summary judgment filed by the parties. (Docs. 95, 97, and 98).  Also pending is Plaintiffs' motion to compel re-evaluation or supplemental environmental assessment.  (Doc. 101).  At the hearing on the cross motions for summary judgment, the parties agreed that the arguments in the cross-motions for

---

[1] The Second Amended Complaint (SAC) also invokes the Department of Transportation Act; the Federal-Aid Highway Act; the Safe, Accountable, Flexible, Efficient Transportation Act of 2005; and the Federal Water Pollution Control Act.  These claims, to the extent they are presented in the SAC, have not been pursued by Plaintiffs.

summary judgment had been previously presented to the Court during the briefing and hearing

on the preliminary injunction.[2]

<u>The Project and the NEPA Process</u>

The I-30 expansion project ("the Project") involves the redesign, reconstruction, and

widening of approximately 7.3 miles of I-30 and I-40 that transect Little Rock and North Little

Rock, with Phase One of the construction focusing on a 1.6-mile expanse covering the I-30/I-630

interchange and the I-30/East Broadway Street interchange, including the Arkansas River Bridge.

In April of 2014, the Agencies began the Planning and Environmental Linkages (PEL)

processes to coordinate with the communities in the Project area to discuss issues and

alternatives at a local level. The PEL process included four public meetings held between August

2014 and April 2015 and the development of three separate work groups representing civic

leaders, local businesspersons, and residents in the Project area. The Technical Working Group

was made up of representatives of 37 agencies, including the FHWA, the Cities of Little Rock

and North Little Rock, Pulaski County, Metroplan, the Central Arkansas Transit Authority, as

well as the U.S. Army Corp of Engineers and the U.S. Coast Guard.   A PEL Report was created

in May 2015, following which the Agencies began preparing an EA as provided by NEPA.  40

C.F.R. § 1508.9.

The Agencies issued a Draft EA for a 45-day notice and comment period beginning on

June 8, 2018.  The Draft EA included several configuration alternatives for the Project, two of

which were first recognized in the PEL Report.  FHWA has summed up the configuration

---

[2] *See* Plaintiffs' Brief in Support of Preliminary and Permanent Injunction (Doc. 59), Defendants' Responses (Docs. 69, 70), and transcripts of the hearing on Plaintiff's motion for preliminary and permanent injunction held August 20 and 26, (Docs. 82, 87).

alternatives as follows:

> While ArDOT had originally proposed to advance one alternative, featuring a 10-lane bridge replacement, to the NEPA process, FHWA insisted that a second 8-lane alternative also be considered. See EA-FONSI-000437.

> The EA subsequently considered two variations of each of those alternatives. One alternative features a split diamond interchange (SDI) for the on-and off-ramps from I-30 into downtown Little Rock, while the other alternative features a single point interchange (SPUI).

> The EA thus considered the following alternatives: An 8-lane general purpose with SPUI alternative (**Action Alternative 1A**); an 8-lane general purpose with SDI Case 3 alternative (**Action Alternative 1B**); a 6-lane collector/distributor (C/D) alternative featuring three travel lanes and two C/D lanes in each direction with SPUI (**Action Alternative 2A**); a 6-lane C/D alternative featuring three travel lanes and two C/D lanes in each direction with SDI (**Action Alternative 2B**). A No Action Alternative was also considered.

(ECF No. 69, p. 2) (Citations to EA omitted. Emphasis added.).

ArDOT ultimately proposed Action Alternative 2B as the Selected Alternative citing these reasons: (1) it improves local vehicle access to and from downtown Little Rock/North Little Rock by directly connecting the frontage road system to the C/D (collector/distributor) lanes crossing the river; (2) continuous frontage road optimizes opportunities for economic development and allowing additional green space for public use, (3) enhances east-west connectivity by removing elevated ramps between President Clinton Avenue and 3rd Street and by replacing the elevated Hwy 10 Spur with an improved at-grade 2nd street. Alternative Actions 1A and 1B were not chosen as they were going to be less effective at reducing congestion and improving safety.

Following the release of the Draft EA, a Location and Design Public Hearing was held on July 12, 2018. According to the press release announcing the hearing, while the Agencies would present the proposed Action Alternative 2B as the Preferred Alternative, attendees could view the Draft EA and project design plans and discuss the Project with ArDOT, FHWA, and U.S. Army Corp of Engineers. Written statements were accepted online, by mail or by email through

3

July 27, 2018. The Agencies received 351 comments during the comment period and prepared a 261-page Public Hearing Comment Responses report including the comments and the Agencies' responses. After consideration of the comments, the Agencies determined that there was no need to perform additional analysis or use different methodology to evaluate impacts.

The final EA was issued by ArDOT on December 20, 2018. FHWA conducted an independent review and issued its FONSI on February 26, 2019, determining that the Selected Alternative, Action Alternative 2B, would have no significant impact on human or natural environment after considering the Project's impacts on land use, community facilities and services, neighborhood and community cohesion, environmental justice, historic properties, right of way relocation, air quality, noise, water quality and aquatic resources, wetlands and waters of the United States, threatened and endangered species, hazardous materials and construction. It determined that the Projects indirect and cumulative impacts are not significant.

During the course of this process, ArDOT received bids on the Project ranging from $965 million to $1.1 billion, well over the budget amount.  It ultimately entered a design-build contract with Kiewit Massman Construction (KMC). Under design-build contracts, the designer-builder is allowed to incorporate innovation into the final design, as long as the project purpose and need, environmental commitments, and contractual obligations are met. On December 6, 2019, ArDOT and KMC agreed upon a reduced scope for a first phase of the Project to keep the Project on budget.  The Phase One construction focuses on a 1.6-mile expanse covering the I-30/I-630 interchange and the I-30/East Broadway Street interchange, including the Arkansas River Bridge.

The decision to complete the Project in phases due to budgetary constraints led to permanent design changes being made after the EA and FONSI were issued. Those permanent changes include: "(1) the eastbound I-630 to northbound I-30 ramp will be restriped to two lanes

4

as in the Selected Alternative but the alignment of the ramp will not be shifted west and the ramp

bridge will not be replaced; (2) the northbound I-30 to northbound frontage road ramp will be

widened to two lanes as in the Selected Alternative but the alignment of the ramp will not be

shifted west; and (3) the right lane exit from I-40 eastbound to Hwy 67 northbound will be

eliminated and the current left exit will be maintained."(Doc. 69, p. 14, n. 2); (see also Doc. 38-1,

pp. 20-27 for complete listing of temporary and permanent modifications).

As a result of these changes, FHWA conducted a Re-Evaluation of the Project in May of

2020 to determine whether the FONSI remained valid or whether additional NEPA

documentation was required. The conclusion of the Re-Evaluation was that all previous findings

remained valid and that no new or additional significant impacts would result. (*Id.* at 68).

<u>Motion to Compel Re-Evaluation or Supplemental Environmental Assessment</u>

Plaintiffs' motion to compel another re-evaluation or supplemental EA of the Project,

filed just three days before the final hearing, was prompted by the October 29, 2020 decision of

the Arkansas Supreme Court in *Buonauito v. Gibson*, 609 S.W.3d 381 (Ark. 2020).  In that

illegal exaction case, the Arkansas Supreme Court held that Constitutional Amendment 91,

which levied a temporary sales and use tax for highway construction and improvement bonds for

the state's *four-lane* highway system, did not allow the Amendment's funds to be used for

improvements to *six-lane* interstate highways.  As a result of this ruling, ArDOT can longer use

Amendment 91 funds for the Project.

Plaintiffs argue that the loss of this source of funding constitutes a "significant new

circumstance or information relevant to environmental concerns and bearing on the proposed

action" within the scope of 40 C.F.R. §1502.9 and 23 C.F.R. §771.130.  In support of their

motion, Plaintiffs attach the April 2020 Financial Plan (FP) for the Project.  (Doc. 101-1).

According to the FP, of the estimated construction cost of $638.2 million for Phase One, approximately $461.4 million were to come from Amendment 91 (CAP) funds.  As a result, Plaintiffs ask the Court to require Defendants to re-evaluate the Project and to demonstrate that the Project can be completed without the use of the Amendment 91 funds.

After reviewing the regulations relied on by Plaintiffs and the arguments made by counsel at the hearing, the Court agrees with Defendants that the loss of Amendment 91 funding does not obligate Defendants to perform a re-evaluation.  The Court is not convinced that the regulations relied on by Plaintiffs, which are directed at environmental impact statements (EIS), apply to EAs.  Furthermore, Section 4.5 of the FP, Funding Availability, states that "[s]hould any unanticipated changes in the authorized funding or availability occur during the design and construction of the Funded Phase (Phase I) of the 30 Crossing Project, ArDOT will utilize state funding reserves to supplement the shortfall and/or make adjustments to the long-range plan making funds available to complete this project by delaying the start of new projects."  (101-1 at 25).  This language is repeated on Section 6, Financing Issues. (*Id.* at 29).  The Court finds that Defendants are not required to re-evaluate the Project based on the *Buonauito* decision, and the motion to compel re-evaluation is denied.

Standard of Review

The purpose of NEPA is two-fold: (1) to ensure that the agency makes "a fully informed and well considered decision" (*Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 973–74 (8th Cir. 2011)) and (2) to ensure "that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97, (1983).  NEPA does not govern the substance of an agency's decision, rather its mandate is "essentially procedural."  *Norbeck* 661, 974 (citing

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

The Court's review of NEPA challenges is pursuant to the Administrative Procedure Act

("APA"). *Sierra Club v. Kimbell*, 623 F.3d 549, 558-59 (8th Cir. 2010).  Under the APA, a

reviewing court will not set aside agency action unless it is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

      "[W]hen an agency determines not to prepare an EIS based on its review of the

environmental impact of a project, as when it has already prepared an EA and issues a finding of

no significant impact, a reviewing court reviews that determination under the arbitrary and

capricious standard." *Goos v. I.C.C.*, 911 F.2d 1283, 1292 (8th Cir. 1990) (citing *Marsh v.

Oregon Natural Resources Council*, 490 U.S. 360 (1989). [3]  *See also Anderson v. Evans*, 371

F.3d 475, 486 (9th Cir. 2004) ("If an agency decides not to prepare an EIS, the decision not to do

so may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law.'") (quoting 5 U.S.C.A. § 706(2)(A)).  "A court's role in reviewing an

agency's decision not to prepare an EIS is a limited one, designed primarily to ensure that no

arguably significant consequences have been ignored." *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C.

Cir. 2017) (internal quotations omitted).  The Court's task is to determine whether the agency

"took a 'hard look' at the project, identified the relevant areas of environmental concern, and

made a convincing case for its FONSI." *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 838–39

---

[3] Plaintiffs argue that this is an incorrect standard and submit that the reasonableness standard found in *Minnesota Pub. Int. Rsch. Grp. v. Butz*, 498 F.2d 1314 (8th Cir. 1974) is the appropriate standard for the Court to employ.  However, following the Supreme Court's decision in *Marsh*, the Eighth Circuit recognized that its cases that reviewed this question using the reasonableness standard were "incorrect," while noting in a footnote that the Supreme Court described the difference between the two standards as "not of great pragmatic consequence."  *Goos v. I.C.C.*, 911 F.2d 1283, 1293 (8th Cir. 1990) (quoting *Marsh,* at 1861 n. 23).

(8th Cir. 1995). It is not the role of the Court to determine "whether the agency correctly assessed the proposal's environmental impacts." *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 581 (6th Cir. 2014).

<u>Analysis</u>

While not waiving arguments made in their earlier briefing, Plaintiffs focus on seven issues in their motion for summary judgment, which Defendants mirror in their cross-motion for summary judgment.[4]

1. <u>Was an EIS required?</u> NEPA requires that an EIS be prepared for all "major Federal actions significantly affecting the quality of the human environment...." *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 837 (8th Cir. 1995); 42 U.S.C. § 4332(2)(C). An EA may be conducted to assist in determining whether any of the proposed actions will significantly affect the environment and thus require the preparation of an EIS. *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 837 (8th Cir. 1995) (citing 40 C.F.R. § 1508.9(a)(1)). To determine whether an action "significantly" affects the environment requires analyzing both the "context" and "intensity" of the action. *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (quoting 40 C.F.R. § 1508.27). "Intensity" refers to "severity of impact" and is assessed using ten factors enumerated in 40 C.F.R. § 1508.27(b).[5] These factors are to be addressed and evaluated by the agency but do

---

[4] The State Defendants adopted the cross-motion and brief filed by the Federal Defendants. (Doc. 98-1).

[5] The operative regulations have since been amended, *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 43,304 (July 16, 2020). *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 985 F.3d 1032, 1039 (D.C. Cir. 2021), *cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux*, No. 21-560, 2022 WL 516382 (U.S. Feb. 22, 2022).

not by themselves determine whether an action is significant for NEPA purposes.  *See Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 240 (5th Cir. 2006); *Spiller v. White*, 352 F.3d 235 (5th Cir. 2003); *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 584 (6th Cir. 2014).

Plaintiffs claim that seven of the ten factors listed in § 1508.27(b) support a finding that the Project is significant and required an EIS. Their arguments as to each are summarized as follows:

(1) *Impacts that may be both beneficial and adverse.*  Plaintiff argues that the EA "contains a significant amount of boosterism" of the benefits and a minimalization of the negative impacts without objective and rigorous analysis of alternatives and impacts. (Doc. 96, p. 5).

(2) *The degree to which the proposed action affects public health or safety*.  Plaintiffs state that the EA is "replete with alleged statistics regarding car crashes, personal injuries and property damage that were allegedly attributable to the current confirmation of the 30 Corridor." *Id.*  They argue that the stated goals of the EA of increasing speed and reducing travel time is "seemingly contradictory" to the goal of making the 30 Corridor safer, and that an EIS would "lend greater clarity." *Id.* p. 6.

(3) *Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas*.  Plaintiffs point out that the Project involves wetlands, is adjacent to historic districts, and "serious issues exist" about how it will impact historic McArthur Park.

(4) *The degree to which the effects on the quality of the human environment are likely to be highly controversial*.  A project is "highly controversial" if there is a "substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of

opposition to a use." *Native Ecosystems Council*, 428 F.3d 1233, (9th Cir. 2005) (internal citation omitted.)  "A substantial dispute exists when evidence ... casts serious doubt upon the reasonableness of an agency's conclusions." *Bark v. United States Forest Serv.*, 958 F.3d 865, 870 (9th Cir. 2020) (internal citations omitted).  Plaintiffs assert there is a "bona fide dispute between a substantial body of the public in central Arkansas and the Defendants" to many aspects of the project and that they have proposed alternatives to which they say Defendants gave only "slight consideration."   They say that the substantive public comments opposing the Project illustrate the controversy.

(5) *The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks*.  In analyzing this factor, the issue is whether "uncertainty may be resolved by further collection of data" or whether the collection of more data could prevent "speculation on potential ... effects." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (internal citations omitted). Plaintiffs argue that the phased construction of the project and the uncertainty of funding and timing for its completion render the possible effects on the human environment to be highly uncertain and risky.  They also point to the fact ArDOT acknowledged that this is the "largest and most ambitious project that it has ever undertaken." (Doc. 96, p. 10)

(6) *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration*.  Plaintiffs argue that in recent projects ArDOT has demonstrated a willingness to avoid the time and expense to conduct an EIS, pointing to two projects the agency identified as "categorical exclusions" to avoid preparing an EIS.

(7) *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts*. Plaintiffs argue that any work of major significance such as widening of roadways, modifications of interchanges, and access ramps that occurs on I-30 and on future projects planned for I-630, I-40, and Highway 67/167 will have a cumulative impact on the others.

The Court finds that none of these criteria alone or when considered together establish that Defendants' decision to issue an EA/FONSI rather than going forward with an EIS was arbitrary and capricious. The existence of "boosterism" and the desire for more clarity do not translate into agency error.  The Court does not see evidence that raises serious doubt about the reasonableness of Defendants' conclusions.  Nor is there evidence that the collection of more data is needed to clear up uncertainty as to the effects or risks of the Project.  The argument that ArDOT's characterization of two recent projects as "categorical exclusions" shows a trend that the agency is unwilling to spend the time and money to prepare an EIS is unpersuasive as there is no evidence that the NEPA process used for the two cited projects was used erroneously.

In sum, the EA appendix contains eighteen technical reports including reports analyzing indirect effects, traffic results and safety, traffic noise, community impacts, cultural resources, traffic noise, streams and wetlands, air quality, and cumulative effects. The EA acknowledges, for example, that all action alternatives would result in traffic noise impacts but concludes that those impacts would not be significant and would be mitigated with reasonable and feasible noise barriers.  The Re-Evaluation includes six additional appendices, including additional traffic, noise, and cumulative effects analyses. Defendants are given the discretion to rely on these reports in reaching their conclusions, even if the evidence could support a different

conclusion.  The Court is convinced that Defendants took a hard look at each factor and are entitled to summary judgment in their favor on this issue.

    2.  <u>Was a supplemental EA required as a result of the redesign of the Project into phases</u>? Plaintiffs argue that the division of the Project into phases without preparing a supplemental EA or an EIS was a NEPA violation.  Phase 1 is designed to include approximately 1.6 miles of the Project's total 7.3 miles.  Plaintiffs argue that project as revised is a substantial change to the scope and design of the Project primarily in that: (1) Phase 1 creates changes in termination points that will likely lead to dangerous bottlenecks where the 8-10 lanes merge into 6-lane portions of the highway, (2) it makes changes to the entrance/exit ramps at significant interchanges, and (3) the Project will take longer to complete meaning citizens and travelers will have to endure impacts from construction even longer.  Plaintiffs also argue that the Project as revised into Phase 1, which included temporary and permanent design changes, was not an alternative that was ever considered for environmental impacts in the EA review as required by NEPA.  The Re-Evaluation itself refers to these design changes as the Revised Selected Alternative.

    Pursuant to FHWA regulations governing re-evaluations, FHWA must determine whether an approved environmental document, in this case the EA and FONSI, remains valid prior to amending any previously approved aspect of an action. 23 C.F.R. § 771.129. The Re-Evaluation was the appropriate procedure, as "the FHWA must initially determine the significance of the impacts brought about by the proposed change in order to decide whether supplemental documentation is necessary." *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509–10 (9th Cir. 1997). It is only if the re-evaluation concludes that the impacts

from the design changes would be significant that a supplemental EA is required. 23 C.F.R. § 771.130.[6]

In conducting the Re-Evaluation, FHWA reviewed the EA and FONSI, examined the current project as revised, and examined the affected environment since the EA and FONSI were issued. In particular, Chapter 7 of the Re-Evaluation evaluates the environmental impacts as a result of the changes in the design. (Doc. 38-1, pp. 32-58).  It notes, among other findings, that the Revised Selected Alternative requires one less commercial displacement, requires less right-of-way (ROW) acreage overall, shifts access locations, requires temporary closures of the River Rail Streetcar trolley, and noted no changes to the effects on historic or archeological resources previously evaluated.  The Re-Evaluation also addressed impacts of the Revised Selected Alternative to the three parks along the Arkansas River, finding that three private land holdings will have to be acquired permanently or temporarily for ROW requirements, that the temporary construction easements along I-30 will be extended from where it was shown in the EA, and that all but the navigational span of the Arkansas River Bridge would be closed for the duration of construction.  Noise was re-evaluated in three areas due to changes in the design, and it was reported that "a final decision on the installation of abatement measures will be made based upon completion of the public involvement process, which will solicit the viewpoints of resident and property owners benefited by the construction of the feasible and reasonable noise barriers in

---

[6] The CEQ regulations have been amended effective September 14, 2020 to include a provision that agencies "[m]ay find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3 of this chapter), or, if necessary, in a finding of no significant impact supported by an environmental assessment." 40 C.F.R. § 1502.9(d)(4).

accordance with 23 C.F.R. 772.13(i)."  (Doc. 38-1, p. 57-58).  Impacts to streams, the floodplain, and wetlands in the Dark Hollow area were found to be reduced by the Revised Selected Alternative.

In its Re-Evaluation, FHWA concluded that the Revised Selected Alternative did not present significant or uncertain environmental impacts as compared with the original design's impacts analyzed in the EA. In many respects, the environmental impact was reduced from what was considered in the EA.  "[A] reduction in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact." *Arkansas Wildlife Fed'n v. U.S. Army Corps of Engineers*, 431 F.3d 1096, 1103 (8th Cir. 2005) (quoting *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1218-19 (10th Cir.1997). Plaintiffs rely on *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000) in support of their argument that Defendants improperly relied on the Re-Evaluation rather than conducting a Supplemental Environmental Assessment. However, as the Ninth Circuit stated in *Idaho Springs*, it is only "once an agency determines that new information is significant" that it must prepare a supplemental EA or EIS.  *Id.* at 566.

The Court is convinced that FHWA satisfied the requirement of § 771.129 that it conduct a re-evaluation as a result of changes in the immediate scope of the project once it had been broken into phases and that its conclusion was not arbitrary or capricious.  Therefore, Defendants were not required to prepare a Supplemental EA.

3. Was the scope of the EA sufficient?  Plaintiffs argue that the scope of the EA is too limited in that traffic congestion will be shifted to portions of the interstate system outside the Project area and that the EA does not analyze the impacts of that congestion.  This, they argue is an improper attempt to "segment" the interstate system to avoid having to conduct an analysis of

all affected areas.

Plaintiffs argue that Defendants failed to comply with the CEQ regulations that prohibit agencies from combining federal actions that are "connected," "cumulative," and "similar" in a single environmental assessment. 40 C.F.R. § 1508.25(a). While the Eighth Circuit has not addressed whether the CEQ regulations or the FHWA's regulation found at 23 C.F.R. § 711.111(f) applies, the Court agrees with the Fifth Circuit that the FHWA's regulation controls in highway cases. See *Fath v. Texas Dep't of Transportation*, 924 F.3d 132, 137 (5th Cir. 2018) ("[W]e read § 771.111(f) as having tailored the general policy of § 1508.25(a) to the specific question of whether multiple highway projects are 'in effect, a single course of action.' *See* 40 C.F.R. § 1502.4(a).") (citing cases from the District of Columbia, Seventh, Tenth, and Eleventh Circuits).

FHWA regulations require that each project evaluated in an EA/FONSI satisfies three factors: that it has logical termini, independent utility, and not restrict consideration of alternatives for other reasonably foreseeable transportation improvements. *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 962 (7th Cir. 2003); 23 C.F.R. § 711.111(f). As to the first factor, the EA states that the termini of the Project were determined based on traffic modeling that demonstrated that capacity improvements were needed for both I-30 from the I-530/I-440 interchange on the south to the I-40 interchange on the north and on I-40 from the I-30 interchange to the Hwy 67/167 interchange. Plaintiffs argue that these termini will create bottlenecks that will require expansion of I-30 to its intersection with I-430 and also expansion of I-630 west from its intersection with I-30. It is not disputed that additional improvements to the interstates in close proximity to the Project are either planned or are being studied to address congestion on I-30 and I-630. However, agencies are entitled to rely on their traffic analysis

experts who made determinations about the severity of congestion and the prevalence of safety issues related to geometric deficiencies within the selected termini. The segment contained in the EA has independent utility in that regardless of whether other projects are completed, this project standing alone will result in improvements including the correction of the Arkansas River Bridge deficiencies, increased safety, and improved traffic flow at significant interchanges.  "[I]t is inherent in the very concept of a highway network that each segment will facilitate movement in many others; if such mutual benefits compelled aggregation, no project could be said to enjoy independent utility. The proper question is whether one project will serve a significant purpose even if a second related project is not built."  *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987).  Finally, completion of the Project would not restrict consideration of alternatives for those reasonably foreseeable transportation improvements that may follow this Project.  As Plaintiffs note, future transportation improvements are already being considered.

> 4:  <u>Did the EA address the indirect impact of the Project on minority and low-income</u> <u>residential areas</u>?  Plaintiffs argue that the EA failed to take a hard look at the indirect impact of the Project on minority and low-income residential areas and instead recited unsubstantiated conclusions that it would have a "beneficial effect on communities due to increased community cohesion" and that "the proposed improvements would not further separate, divide, or isolate these neighborhoods or other adjacent neighborhoods, ethnic or other specific groups, because the 1-30 facility is an existing interstate and no new alignment or location is proposed for the alternatives."

The initial construction of I-30 and I-630 resulted in acknowledged highly adverse impacts on the individuals residing to the east of I-30 and the south of I-630, which includes a high minority and low-income population.  The EA does not ignore this fact.  In conducting the

16

analysis of the indirect impact of the Project's widening of I-30 on already-segregated minority and low-income populations, Defendants utilized technical expertise and had to sort many facts. During the PEL and NEPA processes, Defendants actively sought the involvement of minority communities by holding meetings in minority communities and circulating flyers, mailings, public service announcements and ads in the newspaper.  Section 3.2 of the EA discusses regional and community growth, public facilities, services and destinations, access and travel patterns, right-of-way acquisitions, displacements, community cohesion, and environmental justice. It discusses the adverse impacts of increased noise, changes in access, and commercial and residential displacements.    The EA's Community Impacts Technical Report goes into more detail and notes design modifications such as greater vehicular, bicycle, and pedestrian access that were incorporated as a result of public comments received during the PEL and NEPA review processes.

The EA and Re-Evaluation considered the impact on the predominately minority community of expanding I-30 and the I-630 interchange and weighed it against the existing dangerous conditions, including heavy congestion levels at peak times, the noted geometric deficiencies and functional deficiencies of the roadways, and the deficiencies of the Arkansas River Bridge that currently has portions designated as "fracture critical." The EA/FONSI determined that the one business relocation and six residential relocations located in a high minority neighborhood were necessary to construct a bridge across the Union Pacific Railroad, finding that the bridge would benefit the community by connecting the separated segments of Cypress Street and increasing connectivity.  The Court is convinced that Defendants took a hard look at the indirect impacts on the minority and low-income areas and reached a reasonable conclusion in the EA/FONSI, even if was not the only conclusion that could have been drawn.

5.  Did the EA adequately address direct and indirect impacts on the River Market, Clinton Presidential Park, Heifer International, North Little Rock Riverfront Park/Argenta Areas and the Rock Region Metro System? Plaintiffs argue that indirect impacts, particularly the economic impacts to these downtown venues, has not been sufficiently analyzed in the EA and that a "more intense examination" in the form of an EIS is warranted.  The EA acknowledges the loss of on-street parking, the shift in location of I-30 access ramps, creation of one-way streets and increased traffic, and the interruption and displacement of portions of the streetcar trolley rail among other issues the Project will create in this area.  The Community Impacts Technical Report evaluates the alternatives' impacts on regional and community grown and public facilities, services and destination including the locations highlighted by Plaintiffs as well as others.  The EA/FONSI reflects sound consideration of these issues and a balancing of public concerns for the Project's impacts with the area's need for the planned improvements.  Plaintiffs' argument that the Project "may well have an adverse impact on the growth and future of those areas" does not establish that Defendants failed to take a hard look at the potential direct and indirect impacts on this area.

6. Was the computer modeling of the traffic analysis for the various alternatives flawed? In the EA, the computer modeling of the two action alternatives and two sub-alternate action alternatives each assumed additional lanes would be added to the I-30 segment south of the Project's south terminus, outside of the study area, but the computer modeling did not assume additional lanes would be added at this section for the no-action alternative.  Plaintiffs interpret this to mean that the resulting computer modeling was manipulated into showing a faster rate of travel for the action alternatives and more congestion for the no-action alternative.  Defendants suggest that there were practical reasons for not including the lane additions in the no-action

alternative at that time since there was no current plan to add lanes and "the no-build configuration matches what was expected in a no-build future scenario." (Doc. 97-1, p. 39). Regardless, after Metroplan later added funding to add additional lanes to the portion of I-30 at issue, the computer modeling forecast was revised, and the lane additions were assumed in the no-action alternative as well.  This is reflected in the Re-Evaluation.   The Re-Evaluation concludes that congestion shown in the modeling is only "slightly less" than without the assumed lane additions.

The record reflects that Defendants sought and received feedback from traffic forecasting experts on their traffic and operational analysis throughout the NEPA process.  Metroplan, who is of record raising concerns about different aspects of the Project, believed that the initial traffic projections in the draft EA were "reasonable and fell within an acceptable range given engineering practices"[7] and was later satisfied with the traffic forecasting performed as part of the Re-Evaluation. [8]  Traffic forecasting specialists with the FHWA Arkansas Division were also consulted as part of the forecasting performed for the Re-Evaluation.  Defendants took a hard look at the traffic forecasting generated by the computer modeling, received and reacted to public comment, and with the advice of its experts, adjusted the modeling in the Re-Evaluation.

Plaintiffs challenge the use of a Re-Evaluation to make these computer modeling revisions, but the Court finds that Defendants have fulfilled their obligations under NEPA. "Where the EA fails to address fully a specific issue but the record makes clear that the agency and public were apprised of the deficiency and that the agency sufficiently considered the matter before making a final decision or permitting actions to be taken, it has fulfilled NEPA's

---

[7] EA-FONSI-001990_2571
[8] Re-EVAL-000147, 343

procedural mandate. *Twp. of Bordentown, New Jersey v. Fed. Energy Regul. Comm'n*, 903 F.3d 234, 260 (3d Cir. 2018).

7. <u>Was the public entitled to opportunity to comment on the design change resulting from the decision to construct the Project in phases?</u>  Plaintiffs' arguments on this issue are similar to those addressed in the second enumerated issue, above.  As previously discussed, the Re-Evaluation report was not a NEPA document. It was an initial significance determination that could have resulted in a supplemental EA had the impacts been found to be significant.  As such, Defendants were not required to give the public an opportunity to comment on the design changes reflected in Phase 1.  "To require more would task the agencies with a sisyphean feat of forever starting over in their environmental evaluations, regardless of the usefulness of such efforts."  *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997)

Plaintiffs also argue, without citation to authority, the use of the design-build method employed in the Project was an unlawful delegation of FHWA's authority to the contractor. However, FHWA did not take its hands off of the wheel but rather conducted the Re-Evaluation to assess the environmental impact of the design modification proposed by KMC in the design-build process.

Conclusion

After considering the administrative record and the arguments presented by the parties, Plaintiffs' Motion for Summary Judgment (Doc. 95) is DENIED, and Defendants' respective Cross-Motions for Summary Judgment (Docs. 97-98) are GRANTED.  Plaintiffs' Motion to

Compel Re-Evaluation or Supplemental Environmental Assessment (Doc. 101) is DENIED.

IT IS SO ORDERED this 31st day of March, 2022.

_____
James M. Moody
United States District Judge